# RADEMAKER DEC. EXHIBIT 14

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| SHURE INCORPORATED, | Case No. 17-CV-03078 |
| Plaintiff, | |
| vs. | Judge Edmond E. Chang |
| CLEARONE, INC., | Magistrate Judge Maria Valdez |
| Respondent. | |
| | |
| CLEARONE, INC., | |
| Counter-Plaintiff, | |
| vs. | |
| SHURE INCORPORATED, | |
| Counter-Defendant. | |

## CLEARONE, INC'S AMENDED FINAL PATENT ENFORCEABILITY AND VALIDITY CONTENTIONS FOR THE GRAHAM PATENT PURSUANT TO LOCAL PATENT RULE 3.2(b)

Pursuant to Local Patent Rule 3.2(b) and by mutual agreement of the Parties, Respondent and Counter-Plaintiff ClearOne, Inc. ("ClearOne"), by its undersigned counsel, provides the following response to Plaintiff and Counter-Defendant Shure Incorporated's ("Shure") Final Unenforceability and Invalidity Contentions related to U.S. Patent No. 9,813,806 ("the Graham Patent"), which Shure served on February 7, 2020.

ClearOne expressly reserves its rights under the Local Patent Rules, or for any other applicable reason, to further supplement or amend its responses, including if new evidence becomes available. The following disclosures are made subject to and without waiving the

foregoing.

## TABLE OF CONTENTS

I.    ClearOne's Responses to Shure's Final Invalidity Contentions ........................................ 4

    A.    ClearOne's Priority Date .......................................................................................... 4

    B.    Ground B-1: Purported Obviousness by CTG Conferencing System 6

    C.    Ground B-2: Chhetri in Combination with I-Ceiling Panel ................................. 17

    D.    Ground B-3: Sasaki in Combination with A-Net IPSCM .................................... 29

    E.    Ground B-4: Chhetri in Combination with the Atlas System ............................. 36

    F.    Secondary Considerations of Nonobviousness .................................................... 42

    G.    The Lack of Motivation to Combine Shure's Cited References .......................... 42

II.    ClearOne's Responses to Shure's Contentions Under 35 U.S.C. § 112 .......................... 44

III.    ClearOne's Responses to Shure's Contentions Under 35 U.S.C. § 101 .......................... 66

IV.    ClearOne's Responses to Shure's Unenforceability Contentions .................................... 68

I.      **ClearOne's Responses to Shure's Final Invalidity Contentions**

ClearOne objects to Shure's reservation of rights to supplement its invalidity contentions to the extent it is not permitted by the Local Patent Rules and applicable law. That said, if Shure is permitted to supplement its final invalidity contentions, ClearOne reserves its rights to file a supplemental response.

ClearOne addresses Shure's anticipation and obviousness arguments, as well as its LPR 2.3(b)(3) charts, in the following sections. For efficiency, ClearOne adopts Shure's abbreviations for all references.

      **A.**      **ClearOne's Priority Date**

Each Asserted Claim of the Graham Patent is entitled to the priority date of May 29, 2013. On that date, ClearOne filed United States Provisional Patent No. 61/828,524 ("the '524 Provisional"), which discloses the subject matter recited in the Asserted Claims, and which is incorporated by reference in its entirety into the disclosure of the Graham Patent.

Shure is wrong in contending that the Graham Patent should not be entitled to a priority date earlier than its filing date of September 3, 2014 and that ClearOne added "new matter" to its specification during prosecution "that it relied upon for allowance." In support of these arguments, Shure argues that "the specification of the '806 Patent, as originally filed, was titled 'Beamforming Microphone Array with Support for Interior Design Elements,' and makes no mention of a drop space or a grille or any beamforming microphone array integrated *into* any ceiling tile." With respect to the title of the Graham Patent, Shure has not identified why any change in the title of the application has introduced "new matter" into the specification, particularly where the original specification disclosure fully supports the title of the Graham patent: "Integrated beamforming microphone array and ceiling or wall tile." With respect to "a

drop space," "a grille," and "any beamforming microphone array integrated *into* any ceiling tile,"
not only did ClearOne disclose all three concepts in the original specification of the application
that issued as the Graham Patent ("the '849 Application"), but ClearOne also disclosed them in
the earlier-filed '524 Provisional, which was incorporated by reference in its entirety by the '849
Application. Shure is thus wrong in its assertion that the Graham Patent as originally filed
"makes no mention" of these concepts.

For example, with respect to "a drop space," Shure's argument ignores that ClearOne
repeatedly describes "drop ceilings" and "drop-ceiling mounting" in the original specification of
the '849 Application. Not only that, ClearOne also disclosed "drop ceilings" in the earlier-filed
'524 Provisional, which was incorporated by reference in its entirety by the '849 Application .
There is more than sufficient specification disclosure to provide both written description and
enablement of "drop space" in the Graham Patent. *See, e.g.*, '524 Provisional ¶ [72], Figs. 1–6;
'849 Application at Fig. 2F.

With respect to "a grille," ClearOne's BMA-1, which was the subject of the '524
Provisional disclosure, includes a grille, as Shure's own expert, Dr. Roy, testified at his
deposition. *See* Roy Tr. 192:24–193:25. There is more than sufficient disclosure in the '849
Application specification and the disclosure of the '524 Provisional to provide both written
description and enablement of "a grille" in the Graham Patent. *See, e.g.*, '524 Provisional at
Figs. 55–57; '849 Application ¶ [53]–[54].

With respect to "any beamforming microphone array integrated *into* any ceiling tile," as
Shure acknowledges, the original disclosure of the '849 Application includes numerous
disclosures of the phrases "integrated with" and "integrated to." In light of these original
specification disclosures, Shure fails to explain how ClearOne's use of "integrated into"

constitutes "new matter." In any event, the '524 Provisional and '849 Application disclose a beamforming microphone array that is integrated into a ceiling tile. *See, e.g.*, '524 Provisional ¶¶ [75]–[77]; '849 Application ¶ 10.

### B. <u>Ground B-1</u>: Purported Obviousness by CTG Conferencing System[1]

Shure is wrong in asserting that the CTG Conferencing System makes obvious the Asserted Claims for several reasons.

*First*, the "CTG System" does not "integrate[] into [a] ceiling tile as a single unit," as required by all independent claims of the Graham Patent. Shure defines the "CTG System" as "comprised of CTG's CM-01 ("Ceiling Mounted") microphones working in connection with its FS-400/800 Beamforming Mixers." The CM-01 datasheet shows the CM-01 microphones as tube microphones that may be inserted into holes drilled in a ceiling tile. *See* SHURE651596. It further shows that each tube microphone is associated with a "Connection Module," which "rest[s] . . . on top of [a ceiling] tile":



---

[1] Shure originally asserted the CTG Conferencing System as anticipating prior art in its March 15, 2019 Final Unenforceability and Invalidity Contentions. In Shure's most recent supplemental contentions, Shure asserted the CTG Conferencing System as obviousness prior art instead. *See* ECF No. 651-1 at 20. Under LPR 3.1, "[e]ach assertion of anticipation and each combination of references shall constitute separate grounds." Therefore, ClearOne interprets Shure's recent amendment as withdrawing the anticipation ground based on the CTG Conferencing System and asserting only an obviousness argument based on the CTG Conferencing System. If Shure wishes to assert both anticipation and obviousness arguments based on the CTG Conferencing System, it must first seek leave from the Court to assert a fifth prior art ground. ClearOne reserves the right to object if Shure attempts to assert more prior art grounds than allowed under the LPR at trial.

*Id.*; *see also* SHURE651604-05 (CTG Manual). The CTG Manual shows that the "Connection Modules," in turn, can be linked via cables to FS-400/800 devices:



SHURE651605.

The data sheet and the CTG Manual both show the CM-01 microphones employed individually across a ceiling, in a one-per-ceiling-tile configuration:



SHURE651595.



SHURE651602. Indeed, the CM-01 microphones are disclosed as preferably installed in

separate tiles and 6-12 feet apart from each other, because "the CTG ceiling microphone has a

pickup range with a radius of up to 10 feet or more." CTG0053; *see also, e.g., id.* at Figs. 1, 2, 4, and 5. Shure's own expert, Dr. LeBlanc, testified that if multiple CM-01 microphones were installed in a single ceiling tile, one probably would not want to use them with FS-400/800 mixers. *See* LeBlanc Tr. 210:14–23. ClearOne further disagrees with Shure's argument post-*Markman* that the CTG reference discloses a "beamforming microphone array integrated into said ceiling tile as a single unit" as that term has been construed by the Court. In addition to the reasons discussed above, ClearOne disagrees with Shure's assertion that a person of ordinary skill in the art would have been motivated to include multiple CM-01 microphones in a single ceiling tile "if a room, or a portion of a room, such as in the situation of a small 'huddle room,' or if the room acoustics call for it," and Shure has provided no examples or evidence of such situations to support this assertion.

Finally, neither the CM-01 datasheet nor the CTG Manual describe the FS-400/800 devices—when attached via cables to CM-01 "Connection Modules" and microphones—as being located on the same ceiling tile as those CM-01 "Connection Modules" and microphones. To the contrary, the FS-400/800 devices are described as *not being installed on the ceiling at all. See* SHURE651603 ("[I]n most rooms, cables will need to run down through a wall and terminate at the FS-400, FS-800.); *see also* SHURE651621 (giving dimensions of FS-400/800 devices as 19 inches wide by 8 inches long, which is relatively large when compared with a standard ceiling tile).

Based on the above, the "CTG System" does not "integrate[] into [a] ceiling tile as a single unit" in the following ways:

- There is no teaching or disclosure of multiple CM-01 microphones "integrating" into the same ceiling tile;

- There is no teaching or disclosure of the "Connection Module" associated with each microphone--or the wires related to that Connection Module—"integrating" into a ceiling tile; and

- There is no teaching or disclosure of an FS-400/800 device "integrating" into any ceiling tile, much less a disclosure of one "integrating" into the same ceiling tile as one or more CM-01 microphones.

Accordingly, the CTG System does not make the Asserted Claims obvious. Indeed, Shure's contentions for the CTG System do not even attempt to make a *prima facie* showing of obviousness.

*Second*, the "CTG System" does not disclose a "beamforming microphone array" as that term has been construed by the Court. As Joseph Marash, Phoenix Audio Technologies' corporate representative, revealed at his August 30, 2018 deposition, the CTG System does not perform beamforming. *See, e.g.*, Marash Tr. 66:1–6; 102:1–13; 110:25–111:13; Bathurst Tr. 134:23–136:3. Rather, Mr. Marash stated that CTG's marketing materials "overstated" the functions of the FS mixers and that "there is no directionality." *Id. See Rolls-Royce Ltd. v. GTE Valeron Corp.*, 625 F. Supp. 343, 352–53 (E.D. Mich. 1985), *aff'd*, 800 F.2d 1101 (Fed. Cir. 1986) (finding no anticipation because "a substantial question exists as to whether the [prior art] device . . . actually had the internal construction depicted in Exhibits 459 A & B."). Further, the Court has construed "beamforming microphone array" to include the limitations that microphones are "positioned at predetermined locations" and "produce audio signals to be used to form a directional pickup pattern. ClearOne disagrees with Shure's argument post-*Markman* that the CTG reference discloses such a "beamforming microphone array." The microphones of the CTG System are not positioned at predetermined locations, either in a ceiling tile or

otherwise, and they do not "produce audio signals to be used to form a directional pick up pattern." ClearOne further disagrees with Shure's assertion that a person of ordinary skill in the art would have been motivated to include multiple CM-01 microphones in a single ceiling tile "if a room, or a portion of a room, such as in the situation of a small 'huddle room,' or if the room acoustics call for it," and Shure has provided no examples or evidence of such situations to support this assertion. For these reasons as well, the Asserted Claims would not have been obvious in view of the CTG System. Indeed, Shure's contentions for the CTG System do not even attempt to make a *prima facie* showing of obviousness.

*Third*, the CTG System does not comprise "a ceiling tile with an outer surface on the front side of said ceiling tile, wherein said outer surface is acoustically transparent," as required by all independent claims of the Graham Patent. To the contrary, documents discussing the CTG System disclose a standard ceiling tile, made of materials that are *not* acoustically transparent, with a hole drilled in it. The idea that the dime-sized microphones inserted into the holes drilled into standard ceiling tiles themselves have front surfaces that are acoustically transparent does not satisfy the claim language requiring that the *ceiling tile* have an outer surface on its front side that is acoustically transparent. For the same reason, the CTG System does not comprise a beamforming microphone array that "picks up . . . audio input signals through [the] outer surface of [the] ceiling tile," as required by all independent claims of the Graham Patent. In addition, Shure argues that the surface of the CM-01 (which ClearOne maintains is *not* the surface of a ceiling tile) "allows for sound to pass through," but a person of ordinary skill in the art ("POSITA") would not consider merely "allow[ing] sound to pass through" to be the same as "acoustically transparent."

*Fourth*, the various elements of the CTG System are not "coupled to the back side" of a single ceiling tile, as required by all independent claims of the Graham Patent. As set forth above, there is no disclosure of multiple CM-01 microphones being used with a single ceiling tile, the "Connection Modules" are not attached to ceiling tiles in any way, and there is no disclosure of FS-400/800 devices being located anywhere on the ceiling when used with CM-01 microphones. In addition, the CM-01 microphones are depicted as being inserted—from the front—into holes that go all the way through a ceiling tile, with a portion of the microphone remaining on the front of the ceiling tile. *See, e.g.*, SHURE651596. For this reason as well, the CTG System does not satisfy the requirement that the "beamforming microphone array is coupled to the back side of said ceiling tile.

Further responses to Shure's Ground B-1 invalidity contentions are contained in the below chart.

| **Claim / Limitation** | **ClearOne's Response to Shure's Invalidity Contention** |
|---|---|
| **Claim 1 / Preamble:**<br><br>A ceiling tile beamforming microphone array that integrates a ceiling tile with a beamforming microphone array into a single unit where the ceiling tile is used in a drop ceiling mounting configuration, comprising: | ClearOne disagrees that the CTG System discloses the subject matter recited in the preamble.<br><br>As discussed above, the CTG System does not perform beamforming, because the FS-400/800 mixers do not create any directionality. *See, e.g.*, Marash Tr. 66:1–6; 102:1–13; 110:25–111:13. Thus, the CTG System does not disclose a beamforming microphone array. The microphones of the CTG System are not "positioned at predetermined locations," nor do they "produce audio signals to be used to form a directional pickup pattern" as required under the Court's construction of "beamforming microphone array." In addition, the CTG system is not integrated into a ceiling tile as a single unit. Rather, the CM-01 microphones of the CTG System are installed in different |

| **Claim / Limitation** | **ClearOne's Response to Shure's Invalidity Contention** |
|---|---|
|  | ceiling tiles and are separated by large distances. Moreover, the FS-400/800 devices are not integrated into a ceiling tile as a single unit. Finally, the "Connection Modules" and wires associated with the CM-01 microphones and required for connection to the FS-400/800 devices are not "integrated" into any ceiling tile. |
| **Claim 1 / Limitation ("Lim") 1:** <br><br> a beamforming microphone array that includes a plurality of microphones that picks up audio input signals; and | ClearOne disagrees that the CTG System discloses this limitation. <br><br> The CTG System does not disclose a beamforming microphone array. The microphones of the CTG System are not positioned at predetermined locations. In addition, the FS-400/800 mixers do not create any directionality. *See, e.g.*, Marash Tr. 66:1–6; 102:1–13; 110:25–111.13. |
| **Claim 1 / Lim 2:** <br><br> a ceiling tile with an outer surface on the front side of said ceiling tile wherein said outer surface is acoustically transparent, said beamforming microphone array integrated into said ceiling tile as a single unit, | ClearOne disagrees that the CTG System discloses this limitation. <br><br> The CTG System does not disclose a beamforming microphone array integrated into a ceiling tile as a single unit. First, the CTG System does not disclose a beamforming microphone array. As Mr. Marash revealed at his deposition, the FS-400/800 mixers do not create any directionality. *See, e.g.*, Marash Tr. 66:1–6; 102:1–13; 110:25–111.13. In addition, there is no evidence of multiple CM-01 microphones being installed in a single ceiling tile, and Shure has pointed to no teaching or disclosure of installing multiple CM-01 microphones in a single ceiling tile. In addition, the FS-400/800 products are not integrated into a ceiling tile as a single unit. The "Connection Modules" and wires associated with the CM-01 microphones and required for connection to the FS-400/800 devices are also not "integrated" into any ceiling tile. The CTG System also does not disclose a ceiling tile with an outer surface on the front side that is acoustically transparent. |

| Claim / Limitation | ClearOne's Response to Shure's Invalidity Contention |
|---|---|
| **Claim 1 / Lim 3:**<br><br>said beamforming microphone array picks up said audio input signals through said outer surface of said ceiling tile; | ClearOne disagrees that the CTG System discloses this limitation.<br><br>The CTG System does not disclose a beamforming microphone array.  As Mr. Marash revealed at his deposition, the FS-400/800 mixers do not create any directionality.  *See, e.g.*, Marash Tr. 66:1–6; 102:1–13; 110:25–111:13.  In addition, the CTG System does not disclose a beamforming microphone array that picks up audio input signals through the outer surface of a ceiling tile. |
| **Claim 1 / Lim 4:**<br><br>wherein the ceiling tile beamforming microphone array is used in a drop ceiling mounting configuration | ClearOne disagrees that the CTG System discloses this limitation.<br><br>The CTG System does not disclose a beamforming microphone array.  As Mr. Marash revealed at his deposition, the FS-400/800 mixers do not create any directionality.  *See, e.g.*, Marash Tr. 66:1–6; 102:1–13; 110:25–111:13.  Nor, as explained above, does the CTG System comprise a "ceiling tile beamforming microphone array," because it is not integrated into a ceiling tile as a single unit. |
| **Claim 1 / Lim 5:**<br><br>wherein said beamforming microphone array is coupled to the back side of said ceiling tile and all or part of said beamforming microphone array is in the drop space of the drop ceiling. | ClearOne disagrees that the CTG System discloses this limitation.<br><br>The CTG System does not disclose a beamforming microphone array.  As Mr. Marash revealed at his deposition, the FS-400/800 mixers do not create any directionality.  *See, e.g.*, Marash Tr. 66:1–6; 102:1–13; 110:25–111:13.  In addition, for the reasons discussed above, none of the elements of the CTG System are disclosed as being "coupled to the back side" of a ceiling tile. |

| **Claim / Limitation** | **ClearOne's Response to Shure's Invalidity Contention** |
|---|---|
| **Claim 4**<br><br>The claim according to claim 1, wherein said ceiling tile comprises acoustic or vibration damping material. | Because claim 4 depends from claim 1, ClearOne incorporates its responses relating to claim 1 above.<br><br>Shure has not demonstrated that the CTG System discloses a ceiling tile comprising acoustic or vibration damping material, as that limitation would be understood by a POSITA. To support its argument regarding this limitation, Shure points to a single statement in the Declaration of Dave Newman, which states that "[w]ithin the tube [of the CM-01 microphone], the microphone element is also surrounded by silicone potting to minimize vibration around the ceiling microphone." Newman Decl. ¶ 9. A person of ordinary skill in the art would not consider any "silicone potting" placed inside the tube of an individual CM-01 microphone element of the CTG System to satisfy the requirement of a ceiling tile that comprises acoustic or vibration damping material. Rather, a POSITA would understand this limitation to cover acoustic or vibration damping material that is external of the microphones and which dampens sounds or vibrations that might otherwise affect the microphones. |
| **Claim 5**<br><br>The claim according to claim 1, wherein said outer surface comprises a grille. | Because claim 5 depends from claim 1, ClearOne incorporates its responses relating to claim 1 above.<br><br>Shure has not demonstrated that the CTG System incorporates a ceiling tile having an outer surface on its front side that comprises a grille. The idea that the dime-sized microphones inserted into the holes drilled into standard ceiling tiles themselves have front surfaces that may be grilles does not satisfy the claim language requiring that the *ceiling tile* have an outer surface on its front side that comprises a grille. Moreover, although Shure argues that "the CM-01 microphones include a porous microphone grille as the front face," Shure has not identified which structure of the |

| Claim / Limitation | ClearOne's Response to Shure's Invalidity Contention |
|---|---|
|  | CM-01 microphones constitutes this porous grill, nor has it pointed to any statement in any CTG documents to this effect. |
| **Claim 6**<br><br>The claim according to claim 1, wherein said outer surface is coplanar with said ceiling tile. | Because claim 6 depends from claim 1, ClearOne incorporates its responses relating to claim 1 above.<br><br>As set forth in more detail below, ClearOne disagrees that this claim is "unamenable to any construction."<br><br>ClearOne disagrees that the CTG System discloses this limitation. The CTG System does not disclose an outer surface that is coplanar with the ceiling tile.<br><br>Shure purports to identify the surface of a CM-01 microphone as an "acoustically transparent surface." But Shure has not provided any evidence that this surface of any individual microphones of the CTG System are coplanar with any of the ceiling tiles in which they are installed. On the contrary, Shure's cited evidence indicates that the bottom surface of the individual microphones of the CTG System extend below the plane of the ceiling tiles in which these microphones are installed, as shown below.<br><br><br><br>(FS-400/800 Manual, p. 7) |

| Claim / Limitation | ClearOne's Response to Shure's Invalidity Contention |
|---|---|
| **Claims 8, 11, 12, 13, 15, 18, 19, and 20** | To the extent Shure is asserting the CTG System in the same manner for claims 8, 11, 12, 13, 15, 18, 19, and 20 as it did for claims 1, 2, 5, and 6, ClearOne refers Shure to its responses above to the limitations in claims 1, 4, 5, and 6.<br><br>ClearOne reserves its right to supplement this response to the extent Shure adds prior art for Claims 8, 11, 12, 13, 15, 18, 19, and 20, or asserts previously disclosed prior art in a manner different than it disclosed for claims 1, 4, 5, and 6. |

## C.    Ground B-2: Chhetri in Combination with I-Ceiling Panel

Shure is wrong in asserting that the combination of the Chhetri reference and the I-Ceiling Panel reference renders the Asserted Claims obvious. First, Shure is incorrect that a POSITA would have been motivated to combine those references. Second, even when combined, those references do not disclose every element of the Asserted Claims.

Chhetri describes a three-dimensional beamforming microphone array for use in an augmented reality system. While Chhetri does not disclose the precise size of its microphone array, Chettri makes clear that the microphones associated with its array are located a substantial distance from one another, in the air space of a room, and not in a ceiling tile. For example, Chhetri depicts its microphone array in a room with male human figures in Figures 1 and 5:



# FIG. 1



**FIG. 5**

As shown in Figure 1 and Figure 5, the total width of the microphone array is approximately equal to the height of the male figures.  Thus, the microphone arrays in Chhetri are shown to be on the order of 6 feet wide.  Figures 1, 4 and 5 also disclose that the three-dimensional aspect of the array is significant.  Figure 5, in particular, depicts a microphone that hangs down from the plane of the other microphones a distance on the order of two to three feet.  The Chhetri specification emphasizes that the microphones in the array should be a sizeable distance from one another.  *See, e.g.*, Chhetri ¶ [0049] ("As mentioned above, the microphones 218 and speakers may be distributed throughout the scene."); ¶ [0050] ("The support structure **302** aids in maintaining a known pre-determined distance between the microphones **218** which may then be used in the determination of the special coordinates of the acoustic signal."); ¶ [0051] ("[I]n one implementation the microphones 218 may be placed at various locations within the room and their precise position relative to one another determined by the ranging system **224** using an optical range finder configured to detect an optical tag disposed upon each."); ¶ [0053] ("By arranging the microphones 218 in a three-dimensional configuration, the beamforming module **124** may be configured to generate beampatterns directed to a particular azimuth and elevation relative to the microphone array."); ¶ [0041] ("In some implementations audio inputs may be located within the scene using time-or-arrival differences among the microphones . . . .").  The disclosure in Chhetri that microphones used for beamforming should be a sizeable distance from one another was consistent with the prevailing wisdom as of the priority date of the Graham Patent—persons of ordinary skill in the art thought that microphones that were far apart would be more useful for beamforming, as long as those microphones were sufficiently close to ensure uniform coverage.  *See, e.g.*, http://www.shure.com/americas/support/find-an-answer/microphone-array-primer ("A physically larger array allows for greater spacing between

microphone elements, which in turn leads to better low-frequency directionality."),
http://blog.biamp.com/beamforming-microphones-placement-and-lobe-aiming/ ("Ensure that spacing and isolation are adequate to reduce noise and maximize automatic mixing performance.").  Accordingly, ClearOne disagrees with Shure's unsupported assertion that a person of ordinary skill in the art would understand the microphone array of Chhetri to "fit within the dimensions of a ceiling tile, either a 2 foot X 2 foot ceiling tile, or a 2 foot X 4 foot ceiling tile."

Among other things, Chhetri fails to teach a beamforming microphone array that is integrated with a ceiling tile as a single unit, a ceiling tile that is used in a drop ceiling mounting configuration, a beamforming microphone array that picks up audio signals through the outer surface of a ceiling tile, a ceiling tile with a front surface that is acoustically transparent, or a beamforming microphone array that is coupled to the back side of the ceiling tile, with all or part of the beamforming microphone array being in the drop space of a drop ceiling.[2]

The I-Ceilings Sound Panel is described in its marketing brochure as a "loudspeaker system designed to match Armstrong's market-leading range of ceilings."  SHURE651649.  It was designed to "provide an unparalleled sound system for foreground and background music, voice reinforcement, public address and active acoustics such as sound masking." SHURE651648.  The front of the sound panel was designed to avoid "spoiling the aesthetic consistency of the ceiling plane."  *Id.*  A picture of the back of one such sound panel is below.

---

[2] Shure argues that the patent examiner found that the Chhetri BMA is "coupled to the backside of the ceiling."  Shure's Final Contentions at 37.  What the examiner found is that, by being coupled to the *front* of the ceiling as shown in Figure 1, the Chhetri BMA was "thus transitively coupled to the back side of the ceiling as well."  July 13, 2017 Office Action in Prosecution History of '849 Application.  ClearOne disputes the examiner's conclusion here.  Regardless, ClearOne's claim amendment that all or part of the beamforming microphone array is located "in the drop space of the drop ceiling" resolved this issue.



*Id.*

The I-Ceilings Sound Panel is a loudspeaker, not a microphone, much less a beamforming microphone array. *See, e.g.*, SHURE651646. As such, it does not disclose, among other things, a beamforming microphone array integrated with a ceiling tile, a plurality of microphones that picks up audio input signals, or picking up audio input signals through an outer surface of a ceiling tile.

Shure argues that the I-Ceilings Sound Panel "'can be used with Talkback Systems,' whereby the radiator is used as a microphone." Shure's Final Contentions, Addendum B at 38. Shure's apparent evidence for this point is a single reference to "Talkback Systems" in a single I-Ceilings Brochure. Shure's Final Contentions at Chart B-2, p.7; *see also* SHURE738726. That reference does *not* explain what "Talkback Systems" refers to, much less that it refers to using the "sound radiator" as a microphone. SHURE738726. Nor does it say that the "Talkback System" is part of the I-Ceilings Sound Panel. Rather, it simply says that the I-Ceilings Sound Panel "[c]an be used with Talkback Systems," thus indicating that the Talkback System— whatever it is—is something separate and apart from the I-Ceilings Panel. *Id.* To support its argument that a "Talkback System" encompasses using a radiator as a microphone, Shure points to a published patent application that it claims relates to the I-Ceilings Sound Panel. Shure's

Final Contentions at Chart B-2, pp. 7-8.  Of course, Shure cannot point to a patent application to meet its burden of showing components of a prior art system.  Contrary to Shure's argument, the only disclosures of microphones in the I-Ceilings Sound Panel documents that Shure produced are disclosures of handheld and table-top microphones that are separate from the loudspeaker system.  *See* SHURE651650, SHURE651656.  There is no disclosure of microphones residing in ceiling tiles.

Shure's claim that there is a motivation to combine Chhetri with the I-Ceiling Panel loudspeaker relies heavily on Shure's argument that Chhetri discloses a "beamforming microphone array that is already contained within a chassis."  Shure's Final Contentions at 40; *see also id.* at 36 ("[T]he microphones and the corresponding computing device with a beamforming module may be held in a compact chassis as illustrated by Figure 2 of Chhetri reproduced on the right below."). This is not an accurate description of Chhetri.  Figure 2 of Chhetri does *not* disclose a beamforming microphone array held inside a compact chassis. Instead, Figure 2 of Chhetri discloses a chassis **204** that holds an augmented reality functional node **102**.  Chhetri Figure 2, ¶ [0039-0041].  That augmented reality functional node **102** has "a beamforming module along with other selected components," but *not* a microphone array. Chhetri ¶ [0004], ¶ [0040], Figure 2.  While "[o]ne or more microphones **218** may be disposed within the chassis **204**," those microphones are not the microphone array **104**, which is consistently depicted and described as something different and separate from the augmented reality functional node **102** contained within the chassis 204.  *See, e.g.*, Chettri ¶ [0042] ("One or more microphones **218** may be disposed within the chassis **204**, or elsewhere within the scene such [as] in the microphone array **104**."), ¶ [0055] ("FIG **5** illustrates a room **500** containing multiple users in an augmented reality environment as provided by the ARFN [augmented reality

functional node] **102** and the microphone array **104**."), Figure 3 (showing the augmented reality

functional node **102**, contained within its compact chassis, and coupled to the much larger

microphone array **104**), Figure 4 (same), Figure 5 (same), Figure 1 (same); ¶ [0029] ("A

microphone array **104** . . . may couple to a computing device **110** . . . .).  Thus, because Chhetri

does not disclose a microphone array contained within a compact chassis, one of ordinary skill in

the art would not have been motivated to combine Chhetri with the I-Ceiling Panel.

A POSITA trying to combine Chhetri with the I-Ceiling Panel would have had to make

significant modifications to Chhetri to combine it with the I-Ceiling panel.  First, the POSITA

would have had to remove the vertical portion of the 3-dimensional microphone array disclosed

in Fig. 5 of Chhetri, and then tried to fit the remaining large, cross-shaped array into a 2' by 2'

housing.  Even if a POSITA could have practically accomplished this, there is no evidence that a

POSITA would have had a reasonable expectation of success in doing it.  Although Chhetri

mentions planar and linear arrays in passing, Chhetri does not enable the use of such

embodiments.  Instead, Chhetri discloses a three-dimensional microphone array that is better for

capturing spatial data for an augmented reality system.  A planar array would be significantly

worse than a 3-dimensional array at detecting sounds from people moving around in three

dimensions, which was the application of Chhetri.  Nor does Chhetri make any disclosure of a

beamforming microphone array that can be effective when contained in a small form factor.  On

the contrary, a POSITA would have understood Chhetri to favor a large and cumbersome

beamforming microphone array, which would have been more effective at localizing sounds and

creating an effective directional pickup pattern in a three-dimensional environment such as an

augmented reality space.  In addition, there would have been no motivation to fit the 3-

dimensional microphone array of Chhetri—which is used in an augmented reality environment—

into a ceiling-tile form factor, as the augmented reality system could already conceal the microphone array from a user's view. Additionally, there would have been no motivation to combine the two references for use in a conferencing application because augmented reality systems—to which Chhetri applies—require far lower audio quality and fidelity than a conferencing system. Finally, there would have been no motivation to combine Chhetri—a microphone array—with the I-Ceiling Panel—a loudspeaker, because of the known difficulties—discussed in the I-Ceiling Panel documents—involved when microphones are located "in . . . close proximity to . . . loudspeakers." SHURE651650.

| **Claim / Limitation** | **ClearOne's Response to Shure's Invalidity Contention** |
|---|---|
| **Claim 1 / Preamble:**<br><br>A ceiling tile beamforming microphone array that integrates a ceiling tile with a beamforming microphone array into a single unit where the ceiling tile is used in a drop ceiling mounting configuration, comprising: | ClearOne disagrees that the cited references, alone or in combination, make an enabling disclosure of the subject matter recited in the preamble.<br><br>Chhetri does not disclose a beamforming microphone array that integrates a ceiling tile with a beamforming microphone array into a single unit. Chhetri also does not disclose a ceiling tile used in a drop ceiling mounting configuration.<br><br>The I-Ceilings panel includes a speaker and does not disclose a beamforming microphone array—or any microphone at all. |
| **Claim 1 / Limitation ("Lim") 1:**<br><br>a beamforming microphone array that includes a plurality of microphones that picks up audio input signals; and | ClearOne does not dispute that Chhetri discloses this limitation. |

| Claim / Limitation | ClearOne's Response to Shure's Invalidity Contention |
|---|---|
| **Claim 1 / Lim 2:**<br><br>a ceiling tile with an outer surface on the front side of said ceiling tile wherein said outer surface is acoustically transparent, said beamforming microphone array integrated into said ceiling tile as a single unit, | ClearOne disagrees that the cited references, alone or in combination, disclose this limitation.<br><br>Chhetri does not disclose a ceiling tile with an acoustically transparent outer surface. Chhetri further does not disclose a beamforming microphone array that is integrated into a ceiling tile as a single unit. Indeed, Chhetri does not disclose a ceiling tile, and the beamforming microphone array embodiments of Chhetri could not readily be integrated into a ceiling tile as a single unit.<br><br>The I-Ceilings Panel does not disclose an acoustically transparent outer surface. The I-Ceiling Panel also does not disclose a beamforming microphone array—or any microphone at all—that is integrated into a ceiling tile as a single unit. |
| **Claim 1 / Lim 3:**<br><br>said beamforming microphone array picks up said audio input signals through said outer surface of said ceiling tile; | ClearOne disagrees that the cited references, alone or in combination, disclose this limitation.<br><br>Chhetri does not disclose a beamforming microphone array that picks up audio input signals through the outer surface of a ceiling tile. Indeed, Chhetri does not disclose a ceiling tile. Instead, Chhetri discloses a microphone array that is attached to the ceiling.<br><br>The I-Ceilings Panel does not disclose a beamforming microphone array (or any microphone at all). The I-Ceilings Panel also does not disclose picking up audio input signals through an outer surface of a ceiling tile. |

| **Claim / Limitation** | **ClearOne's Response to Shure's Invalidity Contention** |
|---|---|
| **Claim 1 / Lim 4:**<br><br>wherein the ceiling tile beamforming microphone array is used in a drop ceiling mounting configuration | ClearOne disagrees that the cited references, alone or in combination, disclose this limitation.<br><br>Chhetri does not disclose a ceiling tile beamforming microphone array. Chhetri further does not disclose using a beamforming microphone array in a drop ceiling mounting configuration.<br><br>The I-Ceilings Panel does not disclose a beamforming microphone array (or any microphone). |
| **Claim 1 / Lim 5:**<br><br>wherein said beamforming microphone array is coupled to the back side of said ceiling tile and all or part of said beamforming microphone array is in the drop space of the drop ceiling. | ClearOne disagrees that the cited references, alone or in combination, disclose this limitation.<br><br>Chhetri does not disclose a beamforming microphone array that is coupled to the back side of a ceiling tile. Instead, Chhetri discloses a microphone array that is attached to the surface of the ceiling in plain view. Indeed, Chhetri does not disclose a ceiling tile, and the beamforming microphone array embodiments of Chhetri could not readily be mounted to the back side of a ceiling tile. Chhetri further does not disclose that all or part of a beamforming microphone array is in the drop space of a drop ceiling.<br><br>The I-Ceilings Panel does not disclose a beamforming microphone array (or any microphone) that is coupled to the back side of a ceiling tile. As the I-Ceilings Panel does not disclose any microphone, it also does not disclose a beamforming microphone array that is all or partly in the drop space of a drop ceiling. |

| Claim / Limitation | ClearOne's Response to Shure's Invalidity Contention |
|---|---|
| **Claim 4**<br><br>The claim according to claim 1, wherein said ceiling tile comprises acoustic or vibration damping material. | ClearOne disagrees that the cited references, alone or in combination, disclose this limitation. Because claim 4 depends from claim 1, ClearOne incorporates its responses relating to claim 1 above.<br><br>Chhetri does not disclose a ceiling tile, nor does it disclose a ceiling tile that comprises acoustic or vibration damping material.<br><br>Shure has not demonstrated that the I-Ceilings Panel discloses acoustic or vibration damping material. Shure has provided no evidence other than its own expert's statement that the I-Ceilings Panel has a foam isolator that is "vibration damping." Shure attempts to cite to U.S. Pat. No. 6,386,315 as evidence that the I-Ceilings Panel comprises acoustic or vibration damping material, but Shure cannot point to a patent to meet its burden of showing components of a prior art system. Moreover, the "isolation element **214**" described in this patent is expressly not required. *See, e.g.*, U.S. Pat. No. 6,386,315 at 6:17-20 ("If the containment element **212** is very soft . . . the separate isolation element **214** may not be needed.") |
| **Claim 5**<br><br>The claim according to claim 1, wherein said outer surface comprises a grille. | Because claim 5 depends from claim 1, ClearOne incorporates its responses relating to claim 1 above.<br><br>Chhetri does not disclose a ceiling tile with an outer surface that comprises a grille. Instead, Chhetri discloses a microphone array that is attached to the surface of the ceiling in plain view.<br><br>Shure has not demonstrated that the "Orcal" finish of the I-Ceilings Panel is a grille. It is not clear whether there are holes in the "Orcal" finish that go all the way through. Additionally, it appears that the I-Ceilings Panel generates sound by causing the entire |

| Claim / Limitation | ClearOne's Response to Shure's Invalidity Contention |
|---|---|
| | panel to vibrate. *See, e.g.,* SHURE651649. Accordingly, the "Orcal" finish of the I-Ceilings Panel is not a grille. |
| **Claim 6**<br><br>The claim according to claim 1, wherein said outer surface is coplanar with said ceiling tile. | Because claim 6 depends from claim 1, ClearOne incorporates its responses relating to claim 1 above.<br><br>ClearOne disagrees that this claim is "unamenable to any construction."<br><br>ClearOne does not dispute that the I-Ceilings Panel has an outer surface that is coplanar with the ceiling tile. |
| **Claims 8, 11, 12, 13, 15, 18, 19, and 20** | To the extent Shure is asserting the CTG System in the same manner for claims 8, 11, 12, 13, 15, 18, 19, and 20 as it did for claims 1, 2, 5, and 6, ClearOne refers Shure to its responses above to the limitations in claims 1, 4, 5, and 6.<br><br>ClearOne reserves its right to supplement this response to the extent Shure adds prior art for Claims 8, 11, 12, 13, 15, 18, 19, and 20 in a manner different than it disclosed for claims 1, 4, 5, and 6. |

### D. Ground B-3: Sasaki in Combination with A-Net IPSCM

Sasaki is a research paper that describes a "newly developed online voice command recognition system in noisy environments using a microphone array." SHURE651711. The Sasaki system is designed for voice recognition in a smart home system for providing commands to a robot, which is very different from an audio conferencing application. Sasaki describes experiments in which the authors used a "command dictionary [with] 30 words and 4 sentence constructs, such as 'go to somewhere', 'come here' or greetings." SHURE651713. But even using this limited command dictionary, the Sasaki system only recognized between 61.1% and 94.1% of the words spoken. SHURE651716. Sasaki concluded:

> In this paper, word dictionary is limited simple command for mobile robot to prevent error recognition. Recognizer could works with a handled size of word dictionary for separated sound sources when input sound sources are only human voice included in dictionary. On the other hand, error recognition rate becomes high, when unknown sound sources exists. Future research is needed to detect human voice and reduce error recognition for non-modeled sound sources.

SHURE651717.

The Sasaki system is not designed to work in audio conferencing, and Sasaki provides no indication as to how the system would operate if used in an audio conferencing setting. Nor, given Sasaki's application and poor results in speech recognition, would a POSITA have had any motivation to apply Sasaki in the audio conferencing space, which requires extremely high quality speech recognition, resolution, and reproduction. Sasaki discloses microphone arrays that are installed on the ceiling in plain sight. The arrays disclosed in Sasaki are not integrated with a ceiling tile as a single unit. Sasaki also does not disclose a beamforming microphone array in which all or part of the beamforming microphone array is in the drop space of a drop ceiling. The microphone array of Sasaki is not coupled to the back side of a ceiling tile, and the microphone array of Sasaki does not have an acoustically transparent outer surface through which the array picks up audio input signals.

The A-Net IPSCM is a speaker manufactured by Advanced Network Devices ("A-Net"), which describes the IPSCM as suitable for "bell scheduling, alerts, reminders, and clock chimes," and "voice paging." SHURE651483 (A-Net brochure). The A-Net IPSCM Speaker is not designed to be used in installed audio conferencing. In addition to its loudspeaker, the A-Net IPSCM Speaker contains a single non-beamforming omni-directional electret microphone. As it has only one microphone, the A-Net IPSCM does not perform beamforming. And the A-Net IPSCM Speaker does not disclose a digital signal processor capable of performing a

- 30 -

beamforming operation.  The A-Net IPSCM Speaker also does not describe an outer surface of a ceiling tile that is acoustically transparent,  nor does it disclose picking up audio input signals through such an outer surface.

A person of ordinary skill in the art would not have been motivated to combine the microphone array of Sasaki with the A-Net IPSCM housing for use in audio conferencing. Neither the microphone array of Sasaki nor the A-Net IPSCM are designed for audio conferencing, and neither appears to have the audio quality necessary for such an application. The Sasaki microphone array is designed for speech recognition in a smart-home system to provide commands to a mobile home robot, which presents different objectives and needs than audio conferencing.  Moreover, even when used for its intended purpose and restricted to a small dictionary of 30 words and 4 sentence constructs, the microphone array of Sasaki demonstrated poor voice recognition, recognizing only between 61.1% and 94.1% of spoken words. The A-Net IPSCM Speaker is designed for use in Public Address (PA) and intended for applications such as broadcasting general announcements and emergency pages.  Shure has produced no evidence that a POSITA would have a reasonable expectation of success in integrating the microphone array of Sasaki into the housing of the A-Net IPSCM without undue experimentation.  Indeed, a POSITA in the field of the A-Net IPSCM Speaker would not have had the requisite knowledge to integrate a beamforming microphone array into a drop ceiling mountable form factor. *See, e.g.*, Donahoe Tr. 155:12–156:11.

| **Claim / Limitation** | **ClearOne's Response to Shure's Invalidity Contention** |
|---|---|
| **Claim 1 / Preamble:**<br><br>A ceiling tile beamforming microphone array that integrates a ceiling tile with a beamforming microphone array into a single unit where the ceiling tile is used in a drop ceiling mounting configuration, comprising: | ClearOne disagrees that the cited references, alone or in combination, disclose the subject matter recited in the preamble.<br><br>Sasaki does not disclose a beamforming microphone array that integrates a ceiling tile with a beamforming microphone array into a single unit. Instead, Sasaki discloses a microphone array designed for speech recognition in a smart home system to command a mobile robot that is attached to the ceiling in plain view. Sasaki also does not disclose any ceiling tile used in a drop ceiling mounting configuration.<br><br>The A-Net IPSCM Speaker does not disclose a beamforming microphone array that integrates a ceiling tile with a beamforming array into a single unit. The A-Net IPSCM Speaker includes, in addition to a loudspeaker, just a single omnidirectional electret microphone. Having just one microphone, the A-NET IPSCM Speaker does not perform beamforming. The A-Net IPSCM also does not disclose any digital signal processor that is capable of performing a beamforming algorithm. The A-Net IPSCM Speaker also does not disclose a ceiling tile beamforming microphone array that integrates into a ceiling tile that is used in a drop ceiling mounting configuration. |
| **Claim 1 / Limitation ("Lim") 1:**<br><br>a beamforming microphone array that includes a plurality of microphones that picks up audio input signals; and | ClearOne does not dispute that Sasaki discloses this limitation. |

| **Claim / Limitation** | **ClearOne's Response to Shure's Invalidity Contention** |
|---|---|
| **Claim 1 / Lim 2:**<br><br>a ceiling tile with an outer surface on the front side of said ceiling tile wherein said outer surface is acoustically transparent, said beamforming microphone array integrated into said ceiling tile as a single unit, | ClearOne disagrees that the cited references, alone or in combination, disclose this limitation.<br><br>Sasaki does not disclose a ceiling tile with an outer surface that is acoustically transparent. Sasaki further does not disclose a beamforming microphone array that is integrated into a ceiling tile as a single unit. Instead, Sasaki discloses a microphone array that is attached to the ceiling in plain view.<br><br>The A-Net IPSCM Speaker does not disclose a ceiling tile with an acoustically transparent outer surface. Although the A-Net IPSCM Speaker has a perforated metal outer surface, Shure has not demonstrated that this outer surface is acoustically transparent. The A-Net IPSCM Speaker also does not disclose a beamforming microphone array integrated into a ceiling tile as a single unit. The A-Net IPSCM Speaker contains, in addition to its loudspeaker, just a single omnidirectional electret microphone. The A-Net IPSCM also does not disclose any digital signal processor that is capable of performing a beamforming algorithm. |
| **Claim 1 / Lim 3:**<br><br>said beamforming microphone array picks up said audio input signals through said outer surface of said ceiling tile; | ClearOne disagrees that the cited references, alone or in combination, disclose this limitation.<br><br>Sasaki does not disclose a beamforming microphone array that picks up audio input signals through the outer surface of a ceiling tile. Sasaki discloses a microphone array that is attached to the ceiling in plain view.<br><br>The A-Net IPSCM Speaker does not disclose a beamforming microphone array that picks up audio input signals through the outer surface of a ceiling tile. The A-Net IPSCM Speaker includes just a single electret microphone and does not disclose any digital signal processor capable of performing a beamforming |

| Claim / Limitation | ClearOne's Response to Shure's Invalidity Contention |
|---|---|
|  | algorithm. |
| **Claim 1 / Lim 4:**<br><br>wherein the ceiling tile beamforming microphone array is used in a drop ceiling mounting configuration | ClearOne disagrees that the cited references, alone or in combination, disclose this limitation.<br><br>Sasaki does not disclose a beamforming microphone array that is used in a drop ceiling mounting configuration. Rather, Sasaki discloses a microphone array that is attached directly to the surface of the ceiling.<br><br>The A-Net IPSCM Speaker does not disclose a beamforming microphone array that is used in a drop ceiling mounting configuration. The A-Net IPSCM Speaker includes just a single electret microphone and does not disclose any digital signal processor capable of performing a beamforming algorithm. |
| **Claim 1 / Lim 5:**<br><br>wherein said beamforming microphone array is coupled to the back side of said ceiling tile and all or part of said beamforming microphone array is in the drop space of the drop ceiling. | ClearOne disagrees that the cited references, alone or in combination, disclose this limitation.<br><br>Sasaki does not disclose a beamforming microphone array that is coupled to the back side of a ceiling tile. Sasaki also does not disclose a beamforming microphone array wherein all or part of the beamforming microphone array is in the drop space of a drop ceiling. Instead, Sasaki discloses a microphone array that is attached directly to the surface of the ceiling in plain view.<br><br>The A-Net IPSCM Speaker does not disclose a beamforming microphone array that is coupled to the back side of a ceiling tile or a beamforming microphone array wherein all or part of the beamforming microphone array is in the drop space of a drop ceiling. Instead, the A-Net IPSCM Speaker includes just a single electret microphone and does not disclose any digital signal processor capable of performing a beamforming algorithm. |

| Claim / Limitation | ClearOne's Response to Shure's Invalidity Contention |
|---|---|
| **Claim 4**<br><br>The claim according to claim 1, wherein said ceiling tile comprises acoustic or vibration damping material. | Because claim 4 depends from claim 1, ClearOne incorporates its responses relating to claim 1 above.<br><br>Sasaki does not disclose a ceiling tile comprising acoustic or vibration damping material. Instead, Sasaki discloses a microphone array that is attached to the surface of a ceiling and is silent with regard to any potential acoustic or vibration damping materials.<br><br>Shure has not demonstrated that the A-Net IPSCM Speaker discloses acoustic or vibration damping material. Although Shure argues that the A-Net IPSCM Speaker allegedly includes a "sound-baffle sheet," Shure has not demonstrated that this sheet comprises acoustic or vibration damping material. The Mason Patent, which Shure argues is related to the A-Net IPSCM Speaker, is ambiguous, stating that "sound moves into a room and ***is not dampened or canceled***" (emphasis added). |
| **Claim 5**<br><br>The claim according to claim 1, wherein said outer surface comprises a grille. | Because claim 5 depends from claim 1, ClearOne incorporates its responses relating to claim 1 above.<br><br>ClearOne does not dispute that the A-Net IPSCM Speaker includes a grille. |
| **Claim 6**<br><br>The claim according to claim 1, wherein said outer surface is coplanar with said ceiling tile. | Because claim 6 depends from claim 1, ClearOne incorporates its responses relating to claim 1 above.<br><br>ClearOne disagrees that this claim is "unamenable to any construction."<br><br>ClearOne does not dispute that the IPSCM Speaker has an outer surface that is coplanar with the ceiling tile. |

| Claim / Limitation | ClearOne's Response to Shure's Invalidity Contention |
|---|---|
| **Claims 8, 11, 12, 13, 15, 18, 19, and 20** | To the extent Shure is asserting the CTG System in the same manner for claims 8, 11, 12, 13, 15, 18, 19, and 20 as it did for claims 1, 2, 5, and 6, ClearOne refers Shure to its responses above to the limitations in claims 1, 4, 5, and 6.<br><br>ClearOne reserves its right to supplement this response to the extent Shure adds prior art for Claims 8, 11, 12, 13, 15, 18, 19, and 20 in a manner different than it disclosed for claims 1, 4, 5, and 6. |

### E. Ground B-4: Chhetri in Combination with the Atlas System

Chhetri was first introduced in association with Ground 2. ClearOne therefore incorporates by reference here all arguments and points related to Chhetri in Ground 2.

The I128SYSM IP Compliant Loudspeaker with Microphone ("Atlas System") is manufactured by Atlas Sound, L.P. and contains a loudspeaker and a single omnidirectional electret condenser microphone. Marlin Decl. ¶ 7. Atlas describes the Atlas System as being suitable for "advanced alerting, bell schedules, pre-recorded & scheduled announcements." SHURE651659 (Atlas Brochure). Because the Atlas system includes only a single omnidirectional electret condenser microphone, it does not perform beamforming and does not comprise a beamforming microphone array. The Atlas system also does not disclose a digital signal processor capable of performing a beamforming algorithm. In addition, the Atlas System does not disclose an acoustically transparent outer surface or picking up audio input signals through such an outer surface.

Contrary to Shure's arguments, a POSITA would not have been motivated to combine Chhetri with Atlas Systems. A POSITA trying to combine Chhetri with Atlas Systems would

have had to make significant modifications to Chhetri to do so. First, the POSITA would have

had to remove the vertical portion of the 3-dimensional microphone array disclosed in Fig. 5 of

Chhetri, and then tried to fit the remaining large, cross-shaped array into a 2' by 2' housing.

Even if a POSITA could have practically accomplished this, there is no evidence that a POSITA

would have had a reasonable expectation of success in doing it. Although Chhetri mentions

planar and linear arrays in passing, Chhetri does not enable the use of such embodiments.

Instead, Chhetri discloses a three-dimensional microphone array that is better for capturing

spatial data for an augmented reality system. A planar array would be significantly worse than a

3-dimensional array at detecting sounds from people moving around in three dimensions, which

was the application of Chhetri. Nor does Chhetri make any disclosure of a beamforming

microphone array that can be effective when contained in a small form factor. On the contrary, a

POSITA would have understood Chhetri to favor a large and cumbersome beamforming

microphone array, which would have been more effective at localizing sounds and creating an

effective directional pickup pattern in a three-dimensional environment such as an augmented

reality space. In addition, there would have been no motivation to fit the 3-dimensional

microphone array of Chhetri—which is used in an augmented reality environment—into a

ceiling-tile form factor, as the augmented reality system could already conceal the microphone

array from a user's view. Additionally, there would have been no motivation to combine the two

references for use in a conferencing application because augmented reality systems—to which

Chhetri applies—require far lower audio quality and fidelity than a conferencing system.

Indeed, a POSITA in the field of the Atlas System would not have had the requisite knowledge

to integrate a beamforming microphone array into a drop ceiling mountable form factor. *See,*

*e.g.*, Marlin Tr. 54:7-12. Shure has produced no evidence that a POSITA would have a

reasonable expectation of success in integrating the microphone array of Chhetri into the housing

of the I128SYSM IP Compliant Loudspeaker with Microphone without undue experimentation.

| **Claim / Limitation** | **ClearOne's Response to Shure's Invalidity Contention** |
|---|---|
| **Claim 1 / Preamble:**<br><br>A ceiling tile beamforming microphone array that integrates a ceiling tile with a beamforming microphone array into a single unit where the ceiling tile is used in a drop ceiling mounting configuration, comprising: | ClearOne disagrees that the cited references, alone or in combination, disclose an enabling disclosure of the subject matter recited in the preamble.<br><br>Chhetri does not disclose a beamforming microphone array that integrates a ceiling tile with a beamforming microphone array into a single unit. Chhetri also does not disclose a ceiling tile used in a drop ceiling mounting configuration.<br><br>The Atlas System does not disclose a beamforming microphone array that integrates a ceiling tile with a beamforming microphone array into a single unit, or a ceiling tile beamforming microphone array that is used in a drop ceiling mounting configuration. The Atlas System includes, in addition to a loudspeaker, just a single omnidirectional electret microphone. Having just this one microphone, the Atlas System does not perform beamforming. The Atlas System also does not disclose any digital signal processor that is capable of performing a beamforming algorithm. |
| **Claim 1 / Limitation ("Lim") 1:**<br><br>a beamforming microphone array that includes a plurality of microphones that picks up audio input signals; and | ClearOne does not dispute that Chhetri discloses this limitation. |

| Claim / Limitation | ClearOne's Response to Shure's Invalidity Contention |
|---|---|
| **Claim 1 / Lim 2:**<br><br>a ceiling tile with an outer surface on the front side of said ceiling tile wherein said outer surface is acoustically transparent, said beamforming microphone array integrated into said ceiling tile as a single unit, | ClearOne disagrees that the cited references, alone or in combination, disclose this limitation.<br><br>Chhetri does not disclose a ceiling tile with an acoustically transparent outer surface. Chhetri further does not disclose a beamforming microphone array that is integrated into a ceiling tile as a single unit. Indeed, Chhetri does not disclose a ceiling tile, and the beamforming microphone array embodiments of Chhetri could not readily be integrated into a ceiling tile as a single unit.<br><br>Shure has not demonstrated that the Atlas System discloses a ceiling tile with an acoustically transparent outer surface. The Atlas System also does not disclose a beamforming microphone array integrated into a ceiling tile as a single unit. The Atlas System contains, in addition to its loudspeaker, just a single omnidirectional electret microphone. Thus the Atlas System does not disclose a beamforming microphone array. The Atlas System also does not disclose any digital signal processor that is capable of performing a beamforming algorithm. |
| **Claim 1 / Lim 3:**<br><br>said beamforming microphone array picks up said audio input signals through said outer surface of said ceiling tile; | ClearOne disagrees that the cited references, alone or in combination, disclose this limitation.<br><br>Chhetri does not disclose a beamforming microphone array that picks up audio input signals through the outer surface of a ceiling tile. Indeed, Chhetri does not disclose a ceiling tile. Instead, Chhetri discloses a microphone array that is attached to the ceiling.<br><br>The Atlas System does not disclose a beamforming microphone array that picks up audio input signals through the outer surface of a ceiling tile. The Atlas System contains, in addition to its loudspeaker, just a single omnidirectional electret microphone and does |

| **Claim / Limitation** | **ClearOne's Response to Shure's Invalidity Contention** |
|---|---|
| | not perform beamforming. The Atlas System also does not disclose any digital signal processor that is capable of performing a beamforming algorithm. |
| **Claim 1 / Lim 4:**<br><br>wherein the ceiling tile beamforming microphone array is used in a drop ceiling mounting configuration | ClearOne disagrees that the cited references, alone or in combination, disclose this limitation.<br><br>Chhetri does not disclose a ceiling tile beamforming microphone array. Chhetri further does not disclose using a beamforming microphone array in a drop ceiling mounting configuration. Instead, Chhetri discloses a microphone array that is attached to the surface of the ceiling in plain view.<br><br>The Atlas System does not disclose a beamforming microphone array used in a drop ceiling mounting configuration. The Atlas System includes just a single electret microphone and does not disclose any digital signal processor capable of performing a beamforming algorithm. |
| **Claim 1 / Lim 5:**<br><br>wherein said beamforming microphone array is coupled to the back side of said ceiling tile and all or part of said beamforming microphone array is in the drop space of the drop ceiling. | ClearOne disagrees that the cited references, alone or in combination, disclose this limitation.<br><br>Chhetri does not disclose a beamforming microphone array that is coupled to the back side of a ceiling tile. Instead, Chhetri discloses a microphone array that is attached to the surface of the ceiling in plain view. Indeed, Chhetri does not disclose a ceiling tile, and the beamforming microphone array embodiments of Chhetri could not readily be mounted to the back side of a ceiling tile. Chhetri further does not disclose that all or part of a beamforming microphone array is in the drop space of a drop ceiling.<br><br>The Atlas System does not disclose a beamforming microphone array that is coupled to the back side of a ceiling tile. The Atlas System also does not disclose a beamforming |

| Claim / Limitation | ClearOne's Response to Shure's Invalidity Contention |
|---|---|
| | microphone array wherein all or part of the beamforming microphone array is in the drop space of a drop ceiling. Instead, the Atlas System discloses just a single electret microphone. Accordingly, the Atlas System does not perform beamforming and does not disclose any digital signal processor capable of performing a beamforming algorithm. |
| **Claim 4**<br><br>The claim according to claim 1, wherein said ceiling tile comprises acoustic or vibration damping material. | Because claim 4 depends from claim 1, ClearOne incorporates its responses relating to claim 1 above.<br><br>Chhetri does not disclose a ceiling tile, nor does it disclose a ceiling tile that comprises acoustic or vibration damping material.<br><br>Shure has not demonstrated that the Atlas System discloses acoustic or vibration damping material. For example, Shure points to a single statement in an Atlas 2009 Data Sheet, which states "Surround Material & Dampening Polymer Dampened Integral Paper Surround." Beyond this ambiguous reference to "dampening," Shure has provided no evidence that the Atlas Sound discloses acoustic or vibration damping material. |
| **Claim 5**<br><br>The claim according to claim 1, wherein said outer surface comprises a grille. | Because claim 5 depends from claim 1, ClearOne incorporates its responses relating to claim 1 above.<br><br>ClearOne does not dispute that the Atlas System includes a grille. |
| **Claim 6**<br><br>The claim according to claim 1, wherein said outer surface is coplanar with said ceiling tile. | Because claim 6 depends from claim 1, ClearOne incorporates its responses relating to claim 1 above.<br><br>ClearOne disagrees that this claim is "unamenable to any construction."<br><br>ClearOne does not dispute that the Atlas System discloses an outer surface that is coplanar with the ceiling tile. |

| Claim / Limitation | ClearOne's Response to Shure's Invalidity Contention |
|---|---|
| **Claims 8, 11, 12, 13, 15, 18, 19, and 20** | To the extent Shure is asserting the CTG System in the same manner for claims 8, 11, 12, 13, 15, 18, 19, and 20 as it did for claims 1, 2, 5, and 6, ClearOne refers Shure to its responses above to the limitations in claims 1, 4, 5, and 6.<br><br>ClearOne reserves its right to supplement this response to the extent Shure adds prior art for Claims 8, 11, 12, 13, 15, 18, 19, and 20 in a manner different than it disclosed for claims 1, 4, 5, and 6. |

## F.     Secondary Considerations of Nonobviousness

In "reviewing an obviousness challenge", this Court "must consider…which, if any, secondary considerations—or objective evidence of nonobviousness—are relevant and the effect of those secondary considerations." *Techtronic Indus. v. Chevron Holdings*, 395 F. Supp. 2d 720, 732-33 (N.D. Ill. 2005).  Secondary considerations include, but are not limited to, "commercial success, long felt but unsolved need for the invention, the failure of others, and copying of the claimed invention." *Id.* (internal quotations omitted)

Here, as disclosed previously by ClearOne in its interrogatory responses relating to the Graham Patent and prior briefing, evidence produced in this case of commercial success, long felt but unsolved need, failure of others, and copying of the claimed invention all demonstrate the nonobviousness of the Graham Patent.

## G.     The Lack of Motivation to Combine Shure's Cited References

ClearOne disputes much of the "evidence" and conclusions contained in the sections of Shure's Final Contentions titled "The '806 Patent and State of the Prior Art" and "Additional Motivations to Combine."  ClearOne is not aware of, and Shure has not identified, any prior art

reference or system that integrates a beamforming microphone array into a ceiling tile.  In addition, ClearOne is not aware of, and Shure has not identified, any prior art reference or system that discloses a beamforming microphone array that is—under either party's proposed construction of "drop space"—at least partially in the drop space of a drop ceiling.  Shure ignores that, at the time of the Graham Patent, beamforming microphone arrays were generally large and cumbersome, such that they could not easily be "exchanged" (as Shure says) for simple acoustical equipment such as microphones and speakers in any prior art devices that were configured to fit into a drop ceiling grid. Chhetri and Sasaki describe examples of such large, cumbersome arrays.

Prior art systems that were configured to be mounted in a drop ceiling (such as the Atlas System, the A-Net IPSCM, and the I-Ceiling Panel) included only very simple audio equipment such as a single microphone or speaker designed for use in low-fidelity applications such as Public Address (PA) systems, and general paging, a far cry from a sophisticated beamforming microphone array for use in teleconferencing.  The Atlas System, A-Net IPSCM, and I-Ceiling Panel are in a completely different field from beamforming microphone arrays for installed audio conferencing, and a POSITA in the field of the Atlas System, A-Net IPSCM, and I-Ceiling Panel would not have had the motivation (or even the requisite knowledge) to integrate a beamforming microphone array into a drop ceiling mountable form factor.  *See, e.g.*, Marlin Tr. 54:7-12; Donahoe Tr. 155:12–156:11.  Shure's assertion that "[a] POSITA knew that beamformer technology, by 2012, had alleviated concerns regarding placement of microphones close to a sound source" is contradicted by the contemporaneous evidence about conventional wisdom in the art, including teachings from Shure's own website in 2013 that counseled against putting microphones on the ceiling.  *See, e.g.*, CLRONE-00418394 ("Microphones On The Ceiling?

- 43 -

Shure Strongly Advises 'NO!' . . . . [T]o an experienced audio engineer, the ceiling is the last place to mount a microphone.  Why? Because it is far away from the desired audio source (the talker) and close to undesired sound sources (loudspeakers, air conditioning vents, or fluorescent lights that buzz.").  It is further contradicted by Shure's own representations to the United States Patent Office that similar technology was novel as of 2015.  *See, e.g.*, U.S. Patent No. 9,565,493 at claims 1–40.

Integrating a beamforming microphone array into a ceiling tile required significant research and development in beamforming audio conferencing technology and creative solutions pioneered by ClearOne's engineers to make a BMA that was small enough to fit into a ceiling tile while still having good audio quality.  It was not merely a repackaging of existing technology.  Shure has failed to proffer a specific motivation to combine its cited prior art reference, and Shure's argument that "no showing of a specific motivation to combine the cited prior art is required" is incorrect and misinterprets *KSR Int'l Co v. Teleflex, Inc.*, 127 S. Ct. 1727 (2007).  *See Ball Aerosol and Specialty Container, Inc. v. Limited Brands, Inc.*, 555 F.3d 984 (Fed Cir. 2009) ("Under the flexible inquiry set forth by the Supreme Court [in *KSR*] the district court therefore erred . . . by failing to find a motivation to combine related pieces from the prior art.").  ClearOne disagrees with Shure's characterizations of the prosecution history of the Graham Patent, including Shure's interpretation of the Examiner's rejections and reasons for allowance.  The prosecution history of the Graham Patent speaks for itself.

## II. ClearOne's Responses to Shure's Contentions Under 35 U.S.C. § 112

ClearOne objects to Shure's reservation of rights to supplement its invalidity contentions to the extent it is not permitted by the Local Rules and applicable law.  That said, if Shure is

permitted to supplement its final invalidity contentions, ClearOne reserves its rights to file a supplemental response.

Shure purports to make various invalidity arguments based on 35 U.S.C. § 112. All of Shure's arguments based on Section 112 are meritless.

*First*, Shure argues that all of the Asserted Claims purportedly lack written description and are not enabled because the term "drop space" does not appear in the specification of the '849 Application as filed on September 3, 2014. But ClearOne's original '849 Application specification repeatedly describes "drop ceilings" and "drop-ceiling mounting" and provides written-description and enabling support for this term. For example, the original '849 Application specifications states:

- "For example, a ceiling-mounted beamforming microphone array ***may be installed as a separate component with a suspended or 'drop' ceiling*** using suspended ceiling tiles in the conference room." '849 Application specification ¶ [06].

- "The band-limited array 116 may be configured and arranged into various usage configurations, such as ceiling mounting, ***drop-ceiling mounting***, wall mounting, etc." *Id.* ¶ [45].

- "Any of the lighting fixtures 210, 230, 240, 250 may include a panel 214 being appropriately suspended from the ceiling 206 (or a ***drop ceiling***) using hanger wires or cables such as 218-1 and 218-2 over the first set of users 104 at an appropriate height from the ground." *Id.* ¶ [46].

- "In a third example (FIGS. 2F to 2I), the band-limiting array 116 with BFMs 212 and the NBMs may be integrated to a ceiling tile for a ***drop ceiling mounting***

- 45 -

*configuration* 260.  The drop ceiling 262 is a secondary ceiling suspended below the main structural ceiling, such as the ceiling 2-6 illustrated in FIGS 2A-2E. The *drop ceiling* 262 may be created using multiple drop ceiling tiles, such as a ceiling tile 264, each arranged in a pattern based on **(1)** a grid design created by multiple support beams 266-1, 266-2, 266-3, 266-4 (collectively, support beams 266) connected together in a predefined manner and **(2)** the frame configuration of the support beams 266.  Examples of the frame configurations for the support beams 266 may include, but are not limited to, standard T-shape, stepped T-shape, and reveal T-shape for receiving the ceiling tiles."  *Id.* ¶ [53].

- In the illustrated example (FIG. 2F), the grid design *may include square gaps* (not shown) between the structured arrangement of multiple support beams 266 *for receiving and supporting square-shaped ceiling tiles*, such as the tile 264. However, the support beams 266 may be arranged to create gaps for receiving the ceiling tiles of various sizes and shapes including, but not limited to, rectangle, triangle, rhombus, circular, and random.  The ceiling tiles such as the ceiling tile 264 may be made of a variety of materials or combinations of materials including, but not limited to, metals, alloys, ceramic fiberboards, fiberglass, plastics, polyurethane, vinyl, or any suitable acoustically neutral material known in the art, related art, or developed later.  Various techniques, tools, and parts for installing the *drop ceiling* are well known in the art and may be understood by a person having ordinary skill in the art; and hence, are these techniques, tools, and parts are not discussed in detail herein."  *Id.* ¶ [54].

- 46 -



*FIG. 2F*

*Id.* at Fig. 2F.

Not only that, ClearOne also disclosed "drop ceilings" in the earlier-filed U.S.

Provisional Patent Application No. 61/828,524 ("the '524 Provisional"), which was incorporated

by reference in its entirety by the '849 Application. For example:

- "In the past, the mechanical and electrical design of a beamforming microphone
  array designed for use in a professionally installed application has been a
  separate device from other elements or required to be installed in the conference
  room. For example, the designer of a conference room might specify a
  suspended or ***"drop" ceiling*** using suspended ceiling tiles . . . ." '524 Provisional
  ¶ [03].

- "One embodiment of this invention discloses a method of 'disguising' the
  microphone array as a standard ***drop ceiling*** tile or ceiling mounted light fixture."
  *Id.* ¶ [72].

- 47 -

*See also id.* at Figs. 1–6.

Shure further argues with respect to the term "drop space" that "ClearOne's amended contentions related to the MXA910-A highlight the lack of the disclosure and contradict ClearOne's contention that the claims satisfy the written description requirement." Shure is wrong again. ClearOne's amended contentions related to the MXA910-A have no impact on whether there is written description for the term "drop space," which ClearOne has argued consistently throughout this litigation and which the Court has construed. Rather, Shure's argument appears to be an argument about the proper understanding of the term "beamforming microphone array." Shure relies on a misinterpretation of the Court's construction of that term, while ignoring the Court's order, in which the Court opined that "[t]he MXA910 is a BFMA in the form of a ceiling tile—ClearOne does not have to point to one particular component of the MXA910 as the ceiling tile, distinct and separate from the beamforming microphone array. That is the point of the invention: they are integrated together." ECF No. 551 at 30. Shure also ignores the fact that for at least some ceiling tile grids, the MXA910-A continues to infringe in precisely the same manner as the MXA910.

In addition, Shure is wrong that "the specification fails to describe or illustrate an embodiment where the microphones of the BFMA are below the drop space and some other aspect of the BFMA is located in the drop space of the drop ceiling." The '524 Provisional Application describes positioning microphones on or in a ceiling tile. *See* '524 Provisional Specification [20] ("Even without the microphone holes disguised in the texture of the tile there is value in having a drop-in panel. In fact the microphone hole pattern may be in plain view."), [72] ("Standard suspended ceiling tiles have many small (2 to 4 millimeter) depressions in them which provide a visible texture that helps to mask imperfections in the flatness or color of the

ceiling tile. It is possible to design a microphone array such that the microphone elements are placed at locations that correspond to the depressions in the ceiling tile."), [77] ("Another embodiment of this invention uses a beamforming array with 1,024 (32 x 32) tiny microphones hidden in the small depressions in a normal looking ceiling tile."), Figs. 1-5, 9, 12, 44-48, and 50-55 (all showing microphones on or in the front face of the ceiling tile). As Shure has pointed out, and as noted by the Court, not all drop ceiling tiles sit in drop ceiling support grids quite the same way:



'806 PI Order (Roy Rpt. Ex. 32) at 26. A POSITA for the '806 Patent would have known this, especially in light of the patent's disclosure that ceiling tiles may be of "various sizes and shapes." '806 Patent at 8:45-46; *see also* Roy 11-08-19 Tr. at 167:15-19 ("Q. Would a person of ordinary skill in the art of the '806 patent have been familiar with these ceiling tile configurations in that timeframe? A. I would expect so. All of them were being used in the marketplace."). And a Tegular Edge ceiling tile, for example, perfectly corresponds with the idea disclosed in the patent that "the surface of the front side 268 may extend below the plane of the drop ceiling." In the case of a Tegular Edge ceiling tile, even with the microphones of the device inserted from the back, *see, e.g.*, '806 Patent 8:65-67, it is very possible that the microphones of the device would be positioned below the drop space, while other portions of the device would be positioned in the drop space. *See* Prelim. Inj. Hrg. Tr. at 90:1-10 (inventor Graham testifying

that it could be possible for the "front surface, the acoustically transparent outer surface," to be lowered somewhat to allow the microphones to be dropped down a little bit into the room.") This idea was thus disclosed in the original specification. And, in fact, the Court discussed such an embodiment at length in its Preliminary Injunction Order. *See* ECF No. 551 at 23-26.

Moreover, Shure's argument that the '806 Patent specification must provide a precise disclosure of a device where the microphones are below the drop space and other aspects are above it is contrary to settled Federal Circuit law. The law "does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention." *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (*en banc*). In any case, with or without the Tegular Edge or Shiplap ceiling grid, the '806 Patent's specification discloses at least one embodiment in which the microphones of the BFMA can be below the drop space. *See*, *e.g.*, '806 Patent 9:42–45 ("Alternatively, the surface of the front side 268 may extend below the plane of the drop ceiling so as to move the microphones of the Array 116 away from the ceiling tile."); *see also* 2018-10-10 Graham Tr. 96:4–101:6.

Accordingly, there is more than sufficient specification disclosure to provide both written description and enablement of "drop space" in the Graham Patent. Moreover, this argument has been rejected by the Court in its *Markman* ruling. *See* ECF No. 551.

*Second*, Shure argues that all Asserted Claims are purportedly invalid as lacking written description and not enabling "[b]ased on ClearOne's contentions that the claimed 'beamforming microphone array integrated into said ceiling tile as a single unit' does not require a separate beamforming microphone array and separate ceiling tile, but rather is satisfied by a 'beamforming microphone *in the shape of* a ceiling tile.'" Similar to Shure's previous argument, this argument ignores the Court's ruling that "[t]he MXA910 is a BFMA in the form of a ceiling

tile—ClearOne does not have to point to one particular component of the MXA910 as the ceiling tile, distinct and separate from the beamforming microphone array. That is the point of the invention: they are integrated together." ECF No. 551 at 30. Shure also ignores the fact that for at least some ceiling tile grids, the MXA910-A continues to infringe in precisely the same manner as the MXA910.

Moreover, Shure rehashes its prior argument that beamforming microphone array and the ceiling tile must be two separate structures. This argument was already rejected by the Court. *See* ECF No. 551. There is more than sufficient disclosure in the disclosure of the Graham Patent to provide both written description and enablement for integrating a beamforming microphone array into a ceiling tile as a single unit—i.e. a beamforming microphone array that is in the form of a ceiling tile. For example, the specification states that "[t]he ceiling tile 264 may be combined with the Array 116 in a variety of ways.  In one non-limiting embodiment, the ceiling tile 264 may include a geometrical socket (not shown) having an appropriate dimension to substantially receive the Array 116, which integrates the tile and the Array as a standalone unit. The Array 116 may be introduced into the geometrical socket from any side of the ceiling tile 264 based on the geometrical socket design."  Graham Patent at 8:58-65.  In another non-limiting embodiment, "[t]he reverse side 270 of the ceiling tile 264 may include hooks 272-1, 272-2, 272-3, 272-4 (collectively, hooks 272) for securing the Array 116 to the ceiling tile 264.  *Id.* at 9:5-9. The specification further discloses that "[i]n some embodiments, the Array 116 may be integrated with the ceiling tile 264 as a single unit.  Such construction of the unit may be configured to prevent any damage to the ceiling tile 264 due to the load or weight of the Array 116"  *Id.* at 9:26-29.  From these disclosures, it would have been clear to a person of ordinary skill in the art that the beamforming microphone array could be integrated into a ceiling tile by

bringing together two separate structures or by building a ceiling tile that includes the beamforming microphone array—i.e. a beamforming microphone array that is in the form of a ceiling tile. *See also, e.g.*, *id.* at 6:61-8:12 (discussing the integration of a beamforming microphone array in lighting fixture embodiments).

In addition, Shure's reliance on ClearOne's product development is misplaced. Written description and enablement of a patent do not rest on whether a patentee practices the patent on the priority date commercially. And Shure has not provided any authority to the contrary. Instead, the proper analysis should be whether the '524 Provisional Application provides sufficient written description and enablement. As Dr. Schonfeld explained, the Provisional Application provides sufficient written description and enablement for a POSITA. *See*, *e.g.* 2019-11-26 Schonfeld Rebuttal Rpt. ¶¶ 303-306; 2020-02-28 Schonfeld Supp. Rebuttal Rpt. ¶ 80.

Moreover, it is not unusual for technology companies to patent their inventions before they have sufficient resources to develop their inventions into commercial products. *See*, *e.g.*, Schonfeld Report ¶ 102; 2018-10-22 Decl. of David Cerra in support of Shure's '806 PI Opp. ¶ 7 ("As is always the case with engineering in my experience, Shure was resource constrained and could not pursue *every* project of interest simultaneously."); 2018-10-30 Cerra Tr. 54:5-24 ("Q. In the next paragraph of your declaration, paragraph 7, last sentence, 'As is always the case with engineering in my experience, Shure was resource constrained and could not pursue every project of interest simultaneously.' What do you mean by that statement? A. At any given time there are a list of potential products Shure could develop. They all take a number of engineers to do that. And given the limitations of our engineering staff, we can only work on a subset of those products. Q. Okay. Would you say that it is common for any technology company? A. I would,

yes. … I would think that would be pretty standard."). For example, Shure itself filed a patent application that allegedly covers its MXA910 product in early 2015 but did not release the MXA910 until a year later. *See* U.S. Patent No. 9,565,493. Specifically, regarding the Bullfrog project identified by Dr. Roy, ClearOne's Senior Vice President and '806 inventor, Derek Graham, already explained that the project was abandoned because ClearOne "had applied [its] resources to other projects." 2018-10-10 Graham Tr. 32:3-12 ("And we really, as a small company, just couldn't afford the additional resources we needed to do that project in parallel with the other projects that we had. We already had a beamforming microphone product that was selling well, and so the decision was made to not overextend ourselves as a company to try to do another beamformer at that point."). The period of time between when ClearOne thought of the product and when ClearOne implemented the product is not an indicator that the disclosure in the Graham Patent was not enabling.

*Third*, Shure argues that all of the Asserted Claims are purportedly indefinite because "there is no indication of where the drop space begins." On the contrary, "drop space" has a plain and ordinary meaning in the context of the patent and specification. Specifically, the "drop space" is the space between the surface of the structural ceiling of the room and the lower surface of a suspended ceiling tile. *See, e.g.*, Graham Patent Certificate of Correction ("[A]ll or part of the Array 116 resides in the drop space between the plane of true ceiling of the room and the plane of the drop ceiling."). Moreover, this argument has been rejected by the Court in its *Markman* ruling. *See* ECF No. 551.

Shure further argues with respect to the term "drop space" that "ClearOne's amended contentions related to the MXA910-A highlight the lack of the disclosure and contradict ClearOne's contention that the claims satisfy the written description requirement." Shure is

wrong again. ClearOne's amended contentions related to the MXA910-A have no impact on whether there is written description for the term "drop space," which ClearOne has argued consistently throughout this litigation and which the Court has construed. Rather, Shure's argument appears to be an argument about the proper understanding of the term "beamforming microphone array." Shure relies on a misinterpretation of the Court's construction of that term, while ignoring the Court's order, in which the Court opined that "[t]he MXA910 is a BFMA in the form of a ceiling tile—ClearOne does not have to point to one particular component of the MXA910 as the ceiling tile, distinct and separate from the beamforming microphone array. That is the point of the invention: they are integrated together." ECF No. 551 at 30. Shure also ignores the fact that for at least some ceiling tile grids, the MXA910-A continues to infringe in precisely the same manner as the MXA910.

In addition, Shure is wrong that "the specification fails to describe or illustrate an embodiment where the microphones of the BFMA are below the drop space and some other aspect of the BFMA is located in the drop space of the drop ceiling." The '524 Provisional Application describes positioning microphones on or in a ceiling tile. *See* '524 Provisional Specification [20] ("Even without the microphone holes disguised in the texture of the tile there is value in having a drop-in panel. In fact the microphone hole pattern may be in plain view."), [72] ("Standard suspended ceiling tiles have many small (2 to 4 millimeter) depressions in them which provide a visible texture that helps to mask imperfections in the flatness or color of the ceiling tile. It is possible to design a microphone array such that the microphone elements are placed at locations that correspond to the depressions in the ceiling tile."), [77] ("Another embodiment of this invention uses a beamforming array with 1,024 (32 x 32) tiny microphones hidden in the small depressions in a normal looking ceiling tile."), Figs. 1-5, 9, 12, 44-48, and

50-55 (all showing microphones on or in the front face of the ceiling tile). As Shure has pointed

out, and as noted by the Court, not all drop ceiling tiles sit in drop ceiling support grids quite the

same way:



'806 PI Order (Roy Rpt. Ex. 32) at 26.  A POSITA for the '806 Patent would have known this,

especially in light of the patent's disclosure that ceiling tiles may be of "various sizes and

shapes." '806 Patent at 8:45-46; *see also* Roy 11-08-19 Tr. at 167:15-19 ("Q. Would a person of

ordinary skill in the art of the '806 patent have been familiar with these ceiling tile

configurations in that timeframe? A. I would expect so. All of them were being used in the

marketplace."). And a Tegular Edge ceiling tile, for example, perfectly corresponds with the idea

disclosed in the patent that "the surface of the front side 268 may extend below the plane of the

drop ceiling." In the case of a Tegular Edge ceiling tile, even with the microphones of the device

inserted from the back, *see*, *e.g.*, '806 Patent 8:65-67, it is very possible that  the microphones of

the device would be positioned below the drop space, while other portions of the device would

be positioned in the drop space. *See* Prelim. Inj. Hrg. Tr. at 90:1-10 (inventor Graham testifying

that it could be possible for the "front surface, the acoustically transparent outer surface," to be

lowered somewhat to allow the microphones to be dropped down a little bit into the room.")

This idea was thus disclosed in the original specification. And, in fact, the Court discussed such

an embodiment at length in its Preliminary Injunction Order.  *See* ECF No. 551 at 23-26.

*Fourth*, Shure argues that claims 5, 12, and 19 purportedly lack written description and are not enabled because the original specification of the '849 Application does not use the word "grille."  ClearOne's BMA-1, which was the subject of the '524 Provisional disclosure, includes a grille, as Shure's own expert, Dr. Roy, testified at his deposition.  *See* Roy Tr. 192:4–193:25. There is more than sufficient disclosure in the specification and the disclosure of the '524 Provisional to provide both written description and enablement for "grille" in the Graham Patent. For example:



FIG. 55



FIG. 56

FIG. 57

'524 Provisional at Figs. 55–57.  *See also, e.g.*, '849 Application ¶ [53]–[54].  Moreover, this

argument has been rejected by the Court in its *Markman* ruling. *See* ECF No. 551.

*Fifth*, with respect to the term "beamforming microphone array," Shure argues that all Asserted Claims are purportedly invalid as indefinite "to the extent the Court now agrees with ClearOne's latest interpretation of the 'beamforming microphone array'—namely that the BFMA is more than just the microphones and also includes part of the 'ceiling tile' or some part of the combined 'ceiling tile beamforming microphone array' structure." This argument is generally similar to Shure's first three arguments, which refer to ClearOne's amended contentions based on the MXA910-A, and fails for the same reasons. Shure further argues that "[t]he '806 specification only describes that the Array 116 is a plurality of microphones that transmits audio input signals to a communication device." That is incorrect.

The independent claims of the '806 Patent all claim a "beamforming microphone array *that includes* a plurality of microphones." '806 Patent at Claims 1, 8, 15. Thus, the beamforming microphone array itself can be something more than just that plurality of microphones. For example, the beamforming microphone array can be a structure that contains those microphones and holds them in place, as well as electrical components related thereto. The language of independent claims of the '806 Patent is consistent with this understanding: they refer to the "beamforming microphone array" as something that "integrates [with] a ceiling tile . . . into a single unit" and "is coupled to the back side of said ceiling tile."

Both the '524 Application's and the '806 Patent's specifications describe and refer to the beamforming microphone array as the overall device. *See, e.g.*, '524 Application Specification [03] ("In the past, the mechanical and electrical design of a beamforming microphone array designed for use in a professionally installed application has been a separate device from other elements or required to be installed in the conference room."), [07] ("A variation of this product could be offered in the form of a ceiling tile …."), [10] ("The present invention is related to the

ClearOne beamforming microphone array ...."), [14]-[20] (describing figure as "embodiment of the Beamforming Microphone Array"), [72] ("One embodiment of this invention discloses a method of 'disguising' the microphone array as a standard drop ceiling tile...."); '806 Patent at Fig. 2H (showing a beamforming microphone array as a structure that contains microphones affixed to the back of a ceiling tile), 1:34-47 ("[A] ceiling-mounted [prior art] beamforming microphone array may be installed as a separate component ...."), 1:56-59 ("[I]t is not practical for a video or teleconference conference room since the color scheme, size, and geometric shape of the [prior art] array might not blend well with the décor of the conference room"), 2:36-41 (describing Figs. 3 and 4A as showing the front and back sides of "the exemplary beamforming microphone array according to an embodiment of the present disclosure"), 4:25-29 ("The numerous references in the disclosure to a beamforming microphone array are intended to cover any and/or all devices capable of performing respective operations in the applicable context, regardless of whether or not the same are specifically provided."), 5:44-46 ("In another embodiment, the functionality of the communication device 110 may be incorporated into Array 116."), 6:25-26 ("The audio reception device 160 may be in communication with, or include, the Array 116"), 9:66-10:3 ("In some embodiments, the BFMs 212, the NBFMs, or both may be embedded within contours or corrugations, depressions of the ceiling tile 264 or that of the panel 214 to disguise the Array 116 as a standard ceiling tile or a standard panel respectively."), 11:8-15 ("Further, since the Array 116 may be configured for being combined or integrated with various room elements such as lighting fixtures 210, 230, 240, 250, ceiling tiles 264, and wall panels 294, a separate cost of installing the Array 116 in addition to the room elements may be significantly reduced, or completely eliminated. Additionally, the Array 116 may blend in with the room décor, thereby being substantially invisible to the naked eye."), 11:16-18 ("FIG. 3 is a

- 59 -

schematic view that illustrates a first side 300 of the exemplary beamforming microphone array according to the first embodiment of the present disclosure."), 11:46-50 ("The Array 116 may optionally include a user interface having various elements (e.g., joystick, button pad, group of keyboard arrow keys, a digitizer screen, a touchscreen, and/or similar or equivalent controls) configured to control the operation of the Array 116 based on a user input."), 12:3-10 ("FIG. 4A is a schematic view that illustrates a second side 400 of the beamforming microphone array of the present disclosure. At the second side 400, the Array 116 may include a link-in expansion bus (E-bus) connection 402, a link-out E-bus connection 404, a USB input port 406, a power-over-Ethernet (POE) connector 408, retention clips 410-1, 410-2, 410-3, 410-4 (collectively, retention clips 410), and a device selector 412.").

*Sixth*, with respect to the term "said beamforming microphone array integrated into said ceiling tile as a single unit," Shure argues that all Asserted Claims are purportedly invalid as indefinite because "the claimed 'beamforming microphone array integrated into said ceiling tile as a single unit' allegedly does not require a separate beamforming microphone array and a ceiling tile." This argument is generally similar to Shure's first three and fifth arguments, which refer to ClearOne's amended contentions based on the MXA910-A, and fails for the same reasons.

*Seventh*, with respect to the term "said beamforming microphone array picks up said audio input signals through said outer surface of said ceiling tile," Shure argues that all Asserted Claims are purportedly invalid as indefinite "based on ClearOne's contention that it 'need not distinguish between separate 'ceiling tile' and 'beamforming microphone array' portions of the MXA910 or the MXA910-A to establish infringement." This argument is generally similar to Shure's first three, fifth, and sixth arguments, which refer to ClearOne's amended contentions

based on the MXA910-A, and fails for the same reasons. Moreover, this argument is directly contrary to the Court's instruction and logically flawed. ECF No. 551 at 30 ("ClearOne does not have to point to one particular component of the MXA910 as the ceiling tile, distinct and separate from the beamforming microphone array."). That a single device, MXA910 or MXA910-A, meets all of these claim terms does not mean that all of these terms carry the same meaning. The claims terms are not limited by the features of two infringing devices—a subset of all possible infringing or practicing devices. To argue otherwise is backwards. The requirement that the BFMA pick up audio input signals through the outer surface of the ceiling tile is not meaningless; indeed it provides meaning to this claim by excluding devices in which the microphones cannot or are not configured to pick up audio signals through the outer surface of the ceiling tile.

*Eighth*, with respect to the term "said beamforming microphone coupled to the backside of said ceiling tile," Shure argues that all Asserted Claims are purportedly invalid as indefinite "based on ClearOne's contention that it 'need not distinguish between separate 'ceiling tile' and 'beamforming microphone array' portions of the MXA910 or the MXA910-A to establish infringement." This argument is generally similar to Shure's first three, fifth, sixth, and seventh arguments, which refer to ClearOne's amended contentions based on the MXA910-A, and fails for the same reasons. Moreover, this argument is directly contrary to the Court's instruction and logically flawed. ECF No. 551 at 30 ("ClearOne does not have to point to one particular component of the MXA910 as the ceiling tile, distinct and separate from the beamforming microphone array."). That a single device, MXA910 or MXA910-A, meets all of these claim terms does not mean that all of these terms carry the same meaning. The claims terms are not

limited by the features of two infringing devices—a subset of all possible infringing or practicing devices.

Further, Shure argues that "The '806 Patent describes an embodiment where the Array 116 is coupled to the back side of the ceiling tile 264, and a different embodiment where the Array 116 is coupled to the front side of the ceiling tile [and that t]hus, this limitation is important in determining which of the described embodiments is claimed." This argument is incorrect because the two embodiments are not mutually exclusive. It is possible to have an embodiment where the beamforming microphone array is "in contact with" the front side and yet coupled with the backside. It is also possible to have an embodiment where the beamforming microphone array is coupled with both the front and back sides.

*Ninth*, Shure argues that claims 6, 13, and 20 are purportedly invalid as indefinite because they require that the "outer surface is coplanar with said ceiling tile." These claims are not indefinite. At least in light of the specification and claims 7, 14, and 21 of the Graham Patent, a POSITA would understand that claims 6, 13, and 20 describe the invention wherein the outer surface of the apparatus is on the same plane as the drop ceiling, in contrast to where the outer surface extends below the plane of the drop ceiling as described in claim 7. *See also, e.g.*, Graham Tr. 98:2–9; Graham Patent at 9:38-45. The specification of the Graham Patent makes this clear when it explains that the beamforming microphone "[a]rray **116** may be integrated with the ceiling tile **264** as a single unit," and then describes that "[t]he surface of the front side **268** of the ceiling tile **264** may be coplanar with the front surface of the Array **116** . . . [or] the surface of the front side **268** may extend below the plane of the drop ceiling so as to move the microphones of the Array **116** away from the ceiling tile." Graham Patent at 9:26-45. In other words, the Graham Patent explains that the front surface of a ceiling tile beamforming microphone array can

either be located away from the body of that device (which body sits in a drop ceiling mounting configuration and is coplanar with the drop ceiling), as claimed in Claim 7, or the front surface of the ceiling tile beamforming microphone array can be coplanar with that body, as claimed in Claim 6, and thus also coplanar with the rest of the ceiling. Claim 6 is not indefinite. Moreover, this argument has been rejected by the Court in its *Markman* ruling. *See* ECF No. 551.

Shure further argues with respect to Claims 6, 13, and 20 that "ClearOne's amended contentions related to the MXA910-A adds to the ambiguity of these claims." Shure argues that ClearOne's prior infringement contentions with regard to these claims "appeared to have interpreted Claim 6 as being satisfied by the MXA910 because, as alleged, a grill of the MXA910 was coplanar with the 'rest of the tiles.'" This is a misinterpretation of ClearOne's prior infringement argument, which stated ***first*** that "the outer surface of the Shure Microflex Array – the grille – is coplanar with the ceiling tile that is integrated with the beamforming microphone array" and ***second*** that the grille is "coplanar or substantially coplanar with the beamforming microphone array itself." That the grille is also coplanar or substantially coplanar with the rest of the tiles is a useful fact, but not what is necessary to show infringement of the claim language requiring that "said outer surface is coplanar with said ceiling tile." Shure is correct that ClearOne has distinguished Claim 6—which requires that the outer surface be "coplanar with said ceiling tile"—from Claim 7—which requires that the outer surface "extends below the plane of said ceiling tile." Consistent with the disclosure at Column 9, lines 38-45, these two claims cover disclosures where the grille of the device is located either: (1) coplanar with the body and microphones of the device; or (2) moved away from the body and microphones of the device. The Court has discussed exactly this distinction. With respect to Claim 6, the Court reasoned:

> It is possible for an apparatus to have an outer surface that is part of the apparatus but also be considered distinct from the rest of it. In that scenario, the outer surface could be either "coplanar" with the apparatus itself (precisely what Claim 6 sets forth) or it could be an additional structure that—although still part of the apparatus—is lower than the rest of the tile. . . . It is simply incorrect that the surface of a thing can never be lower than the thing itself, especially if the "thing" is comprised of various parts.

ECF No. 551 at 49.

Because Shure's MXA910-A did not change the relative locations of the grille and microphones vis a vis the MXA910, Shure's MXA910-A infringes Claim 6, and not Claim 7, in precisely the same way Shure's MXA910 did, regardless of whether Shure's MXA910-A is coplanar with the other ceiling tiles in a room. That said, Shure's MXA910-A also can be installed coplanar with the other ceiling tiles in a room in the exact same way as the MXA910, and, even when installed otherwise, is likely to be coplanar with certain types of other installed ceiling tiles. *See* Roy Tr. at 40:23-41:7; *see also* SHURE782887.

*Tenth*, Shure argues that claims 1, 4, 5, and 6 are purportedly invalid as indefinite because they purportedly cover both an apparatus and a method of use. Shure's argument is incorrect and contradicted by much of the very same legal authority that Shure cites. As the Federal Circuit has made clear, apparatus claims may include verbs that "represent permissible functional language used to describe capabilities of" an apparatus or structure. *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1315–16 (Fed. Cir. 2017). *See also, e.g., HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1273 (Fed. Cir. 2012); *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008); *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 826 (Fed Cir. 2016). Claims are invalid as indefinite for claiming both an apparatus and a method of use within a single claim only when it is "unclear whether infringement … occurs when one creates a[n infringing] system, or

- 64 -

whether infringement occurs when the user actually uses [the system in an infringing manner]." *MasterMine*, 874 F.3d at 1316 (quoting *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005)). Here, claims 1, 4, 5, and 6 are clear on their face and recite an apparatus that is capable of being "used in a drop ceiling mounting configuration." These claims are infringed upon creation of the infringement system; there is no need to wait, for infringement purposes, until the system is actually used in the drop ceiling mounting configuration. Moreover, this argument has been rejected by the Court in its *Markman* ruling. *See* ECF No. 613.

*Eleventh*, Shure argues that claims 15, 18, 19, and 20 are purportedly invalid as indefinite because they purportedly cover both a method of manufacturing and a limitation relating to a method of use. This argument is generally similar to Shure's indefiniteness argument with respect to claims 1, 4, 5, and 6, and fails for the same reason. Claims 15, 18, 19, and 20 are clear on their face and recite methods of manufacturing a ceiling tile beamforming microphone array with certain capabilities, including the capability of being "used in a drop ceiling mounting configuration." Moreover, this argument has been rejected by the Court in its *Markman* ruling. *See* ECF No. 613.

*Lastly*, Shure argues that claims 15, 18, 19, and 20 purportedly lack written description and are not enabled because the Graham Patent fails to describe the limitation reciting "integrating said beamforming microphone array into a ceiling tile as a single unit." There is more than sufficient disclosure in the disclosure of the Graham Patent to provide both written description and enablement for integrating a beamforming microphone array into a ceiling tile as a single unit. For example, the specification states that "[t]he ceiling tile 264 may be combined with the Array 116 in a variety of ways. In one non-limiting embodiment, the ceiling tile 264 may include a geometrical socket (not shown) having an appropriate dimension to substantially

receive the Array 116, which integrates the tile and the Array as a standalone unit.  The Array 116 may be introduced into the geometrical socket from any side of the ceiling tile 264 based on the geometrical socket design." Graham Patent at 8:58-65.  In another non-limiting embodiment, "[t]he reverse side 270 of the ceiling tile 264 may include hooks 272-1, 272-2, 272-3, 272-4 (collectively, hooks 272) for securing the Array 116 to the ceiling tile 264. *Id.* at 9:5-9.  The specification further discloses that "[i]n some embodiments, the Array 116 may be integrated with the ceiling tile 264 as a single unit.  Such construction of the unit may be configured to prevent any damage to the ceiling tile 264 due to the load or weight of the Array 116" *Id.* at 9:26-29.  From these disclosures, it would have been clear to a person of ordinary skill in the art that the beamforming microphone array could be integrated into a ceiling tile by bringing together two separate structures or by building a ceiling tile that includes the beamforming microphone array. *See also, e.g.*, *id.* at 6:61-8:12 (discussing the integration of a beamforming microphone array in lighting fixture embodiments).

### III.     ClearOne's Responses to Shure's Contentions Under 35 U.S.C. § 101

Shure purports to argue that that claims 1, 4-6, and 18-20 are invalid under 35 U.S.C. § 101 for purportedly encompassing two statutory categories of invention.  With respect to claims 1 and 4-6, Shure apparently argues that these claims are apparatus claims that also recite a method of use of the apparatus ("used in a drop ceiling mounted configuration").  With respect to claims 18-20, Shure apparently argues that these claims are method of manufacture claims that also recite a method of use limitation.

As explained in the previous section, ClearOne's claims do not impermissibly mix statutory claim classes.  Claims 1 and 4-6 do not cover an apparatus and a method of use.  As the Federal Circuit has made clear, apparatus claims may include verbs that "represent permissible

functional language used to describe capabilities of" an apparatus or structure. *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1315–16 (Fed. Cir. 2017). *See also, e.g.*, *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1273 (Fed. Cir. 2012); *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008); *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 826 (Fed Cir. 2016). That is what Claims 1 and 4-6 do. Similarly, Claims 18-20 are clear on their face and recite methods of manufacturing a ceiling tile beamforming microphone array with certain capabilities, including the capability of being "used in a drop ceiling mounting configuration." For at least these reasons, claims 1, 4-6, and 18-20 are valid under Section 101.

Moreover, Shure cites no district or Circuit court cases to support its argument that claims which purportedly cover both an apparatus and a method—or purportedly cover both a method of manufacture and a method of use—can be invalidated under Section 101. Instead, Shure cites two "routine opinions" of the Patent Trial and Appeal Board ("PTAB") rejecting claims during prosecution. Neither of these routine opinions is in any way precedential. According to the PTAB's Designations for Opinions, "[a]n opinion of the Board designated as 'routine' also is not binding authority on the members of the Board. . . . Such opinions may have little persuasive value in relation to other Board opinions in other cases."

In the first of these opinions, *In re Lyell*, the Board did not reject any of the claims-in-prosecution under Section 101 but merely discussed Section 101 in dicta. In the second opinion, *Ex Parte Moore*, a PTAB panel rejected, with minimal analysis, a single claim-in-prosecution under both Sections 112 and 101. Unlike the claims in *In re Lyell* and *Ex Parte Moore*, ClearOne's Asserted Claims are not in prosecution. The Patent Office has issued ClearOne's claims and they are entitled to a presumption of validity. Shure has not identified a single case in

which issued patent claims were invalidated under Section 101 for purportedly encompassing an apparatus and a method (or a method of manufacture and a method of use), and ClearOne does not believe that Section 101 would be a proper statute for doing so.

## IV.    ClearOne's Responses to Shure's Unenforceability Contentions

ClearOne objects to Shure's reservation of rights to supplement its unenforceability contentions to the extent it is not permitted by the Local Rules and applicable law.  That said, if Shure is permitted to supplement its final unenforceability contentions, ClearOne reserves its rights to file a supplemental response.

Shure's unenforceability arguments fall into two general categories.  Not only do they all fail because Shure provides no evidence, as required, of an "intent to deceive or mislead the patent examiner into granting the patent," *Outside the Box Innovations v. Travel Caddy*, 695 F.3d 1285, 1290 (Fed. Cir. 2012), but Shure also misrepresents the facts and does not establish the requisite materiality.

*First*, Shure argues that "drop space," "grille," and "integrated into" were not disclosed in the original specification of the application that issued as the Graham Patent ("the '849 Application") and that ClearOne purportedly introduced "new matter" regarding these concepts and "misrepresented to the Patent Office that 'Applicant is not adding new matter.'"  Shure's assertions are incorrect.  Not only did ClearOne disclose all three concepts in the original specification of the '849 Application, but ClearOne also disclosed them in the earlier-filed U.S. Provisional Patent Application No. 61/828,524 ("the '524 Provisional"), which was incorporated by reference in its entirety by the '849 Application.

For example, with respect to "drop space," the '524 Provisional and '849 Application specification include numerous disclosures of "drop ceilings," thereby also disclosing a drop

space, as would have been understood by a person of ordinary skill in the art. ClearOne further disclosed placing the beamformer in the "drop space." *See , e.g.*, '524 Provisional ¶ [72], Figs. 1–6; '849 Application at Fig. 2F. With respect to "grille," ClearOne's BMA-1, which was the subject of the '524 Provisional disclosure, includes a grille. Indeed, Shure's own expert, Dr. Roy, testified to this fact at his deposition. *See* Roy Tr. 192:24–193:25. *See also, e.g.*, '524 Provisional at Figs. 55–57; '849 Application ¶ [53]–[54]. With respect to "integrated into," Shure argues that this phrase 'if construed in a certain manner [is] also unsupported by the specification." However, as Shure acknowledges in its Final Contentions, the original disclosure of the '849 Application includes numerous disclosures of the phrases "integrated with" and "integrated to." In light of these original specification disclosures, Shure fails to explain how ClearOne's use of "integrated into" could constitute inequitable conduct. In any event, the '524 Provisional and '849 Application disclose a beamforming microphone array that is integrated into a ceiling tile. *See, e.g.*, '524 Provisional ¶¶ [75]–[77]; '849 Application ¶ 10. Shure's unenforceability arguments based on any purported failure by ClearOne to disclose these concepts are entirely without merit. Moreover, Shure has not proffered any evidence that ClearOne intentionally withheld information from the Patent Office, or provided material misinformation to the Patent Office, with the intent to deceive or mislead the patent examiner into granting the Graham Patent, as is required to establish unenforceability due to inequitable conduct. *See Outside the Box Innovations*, 695 F.3d at 1290.

*Second*, Shure argues that ClearOne failed to disclose prior art to United States Patent Office, including ClearOne's own brochure for its ceiling-mounted beamforming microphone array ("BMA-1"), as well as prior art relating to the CTG System.

The BMA-1 brochure is not prior art. Shure cites no evidence that this brochure was in the public domain before the critical date or that disclosure was made by someone other than the persons mentioned in 35 U.S.C. § 102(b)(1). On the contrary, contemporaneous documents and the testimony of ClearOne's CEO show that the BMA-1 brochure is not prior art. Perhaps for this reason, Shure does not rely on the BMA-1 brochure for its anticipation and/or obviousness contentions related to the Graham Patent. Moreover, ClearOne did provide information about the BMA-1 to the USPTO. The '849 Application claimed priority to and "incorporated by reference for all purposes" U.S. Patent Provisional No. 61/771,751 ("the '751 Provisional"), which included over 30 pages of literature about the BMA-1, including an "Installation Guide" and a "Quick-Start Guide." Finally, Shure has not provided any evidence that any alleged failure to disclose the BMA-1 was intentional. Accordingly, any alleged failure to disclose the BMA-1 cannot render the Graham Patent unenforceable for inequitable conduct. *See, e.g.*, *Therasense, Inc. v. Becton, Dickinson, & Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011).

With respect to the CTG System, Shure claims that ClearOne was aware of the CTG System but "failed to cite the CTG System during prosecution of the '806 Patent." But Shure provides no evidence that information about the CTG System was intentionally withheld from the Patent Office. *See Cancer Research Tech. Ltd. v. Barr Labs*, 625 F.3d 724, 733–34 (Fed. Cir. 2010). In any event, any nondisclosure of the CTG System cannot give rise to inequitable conduct because the CTG System presents information that is cumulative of prior art disclosed by ClearOne and/or that is not material to patentability. *See, e.g.*, Marash Tr. 66:1–6; 102:1–13; 110:25–111:13; Bathurst Tr. 134:23–136:3. Any non-disclosure by ClearOne of the CTG System is not "but-for" material such that the PTO would not have allowed a claim of the Graham Patent had it been aware of the CTG System. *See Therasense*, 649 F.3d at 1291 (en

banc). For instance, the CTG System does not perform beamforming and does not disclose a beamforming microphone array. *See, e.g.*, Marash Tr. 66:1–6; 102:1–13; 110:25–111:13; Bathurst Tr. 134:23–136:3. The CTG System also does not disclose a beamforming microphone array that is integrated into a ceiling tile "as a single unit," as is required by the claims of the Graham Patent. In fact, Shure has failed to provide any evidence that multiple CM-01 microphones of the CTG System have ever been installed in a single ceiling tile. Shure also has not pointed to any disclosure or teaching of installing multiple CM-01 microphones in a single ceiling tile. The CTG System does not include a pre-arranged array of microphones. Instead, the CTG System discloses individual microphones that are installed in separate ceiling tiles and distanced 6–12 feet apart. In addition, the FS-400 or FS-800 mixers that form part of the CTG System under Shure's current definition of the "CTG System" are not integrated into a ceiling tile as a single unit. At least because of these differences between the CTG System and the claims of the Graham Patent, any argument by Shure that the CTG System would have caused the Patent Office not to issue the Graham Patent is incorrect.

Dated: February 28, 2020

By: */s/ Xinlin Li Morrow*

John C. Hueston, *pro hac vice*
Douglas J. Dixon, *pro hac vice*
Christina V. Rayburn, *pro hac vice*
jhueston@hueston.com
ddixon@hueston.com
crayburn@hueston.com
Hueston Hennigan LLP
523 West 6th Street, Suite #400
Los Angeles, CA 90014
Telephone: (213) 788-4340

And

Xinlin Li Morrow, *pro hac vice*

xinlin@morrowfirm.com
The Morrow Firm, P.C.
1880 Century Park E Ste 815
Los Angeles, CA 90067

And

Garret A. Leach, P.C.
(IL Bar No. 6237520)
garret.leach@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for ClearOne, Inc*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 28, 2020, a copy of the foregoing document was served via email upon all counsel of record for Shure Incorporated in this case.

<u>/s/ Xinlin L. Morrow</u>
Xinlin L. Morrow

***Counsel for Counter-Plaintiff ClearOne, Inc.***