**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Shure Incorporated, | Civil Number 1:17-cv-03078 |
| Plaintiff, | |
| v. | Jury Trial Demanded |
| ClearOne, Inc., | |
| Defendant. | Hon. Edmond E. Chang |
| | Mag. Judge Hon. Maria Valdez |
| ClearOne, Inc., | |
| Counter-Plaintiff, | |
| vs. | |
| Shure Incorporated | |
| Counter-Defendant. | |

**MEMORANDUM IN SUPPORT OF CLEARONE'S MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT, OF
INFRINGEMENT OF U.S. PATENT NOS. 9,635,186 AND 9,813,806**

## TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION .................................................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ...................................... 2

       A.     ClearOne's Inventions and Patents at Issue ...................................... 2

       B.     Shure's Infringing Products .................................................................. 3

       C.     The Court's Prior Relevant Rulings .................................................... 4

III.   LEGAL STANDARD .......................................................................................... 5

IV.    ARGUMENT ......................................................................................................... 5

       A.     Direct Infringement of Claims 1, 3, 7, 9, 13, and 15 of the '186 Patent. ............. 5

              1.     The '186 Accused Products practice each limitation of the asserted
                     claims ....................................................................................................... 6

              2.     Joint enterprise ..................................................................................... 16

       B.     Direct Infringement of Claims 1, 4, 5, 6, 11, 12, 13, 18, 19, and 20 of
              the '806 Patent .................................................................................................. 18

              1.     The '806 Accused Products practice each limitation of the asserted
                     claims ..................................................................................................... 19

       C.     Induced Infringement of the '186 and '806 Patents ........................................... 27

       D.     Contributory Infringement of the '186 Patent .................................................... 30

       E.     Willful Infringement and Enhanced Damages Relating to the '806 Patent ....... 31

              1.     Willfulness .............................................................................................. 31

              2.     Enhanced Damages ............................................................................... 32

V.     CONCLUSION ..................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*01 Communique Lab., Inc. v. LogMeIn, Inc.*,
    687 F.3d 1292 (Fed. Cir. 2012) ..................................................................................8

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
    797 F.3d 1020 (Fed. Cir. 2015) ................................................................................16

*Astrazeneca LP v. Apotex, Inc.*,
    633 F.3d 1042 (Fed. Cir. 2011) ................................................................................28

*Avnet, Inc. v. Motio, Inc.*,
    2016 WL 3365430 (N.D. Ill. June 15, 2016) ...........................................................15

*Callpod, Inc. v. GN Netcom, Inc.*,
    703 F. Supp. 2d 815 (N.D. Ill. 2010) ...............................................................7, 9, 14

*Cascades Computer Innovation, LLC v. Samsung Elecs. Co.*,
    77 F. Supp. 3d 756 (N.D. Ill. 2015) .........................................................................28

*Cobalt Boats, LLC v. Brunswick Corp.*,
    296 F. Supp. 3d 791 (E.D. Va. 2017) .......................................................................35

*Commil USA, LLC v. Cisco Sys., Inc.*,
    135 S. Ct. 1920 (2015) ..............................................................................................27

*Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc.*,
    347 F.3d 1314 (Fed. Cir. 2003) ..................................................................................5

*Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*,
    946 F.3d 1367 (Fed. Cir. 2020) ..........................................................................31, 32

*Enzo Biochem, Inc. v. Amersham PLC*,
    902 F. Supp. 2d 308 (S.D.N.Y. 2012) ........................................................................9

*Gart v. Logitech, Inc.*,
    254 F.3d 1334 (Fed. Cir. 2001) ..................................................................................5

*Georgetown Rail Equip. Co. v. Holland L.P.*,
    867 F.3d 1229 (Fed. Cir. 2017) ..........................................................................32, 33

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
    136 S. Ct. 1923 (2016) ....................................................................................31, 32, 33

- ii -

*Hilgraeve Corp. v. Symantec Corp.*,
    265 F.3d 1336 (Fed. Cir. 2001) .......................................................................... 10, 15

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) ................................................................................... 28

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
    681 F.3d 1323 (Fed. Cir. 2012) ................................................................................. 30

*Intellect Wireless Inc. v. Sharp Corp., No. 10 C*,
    2012 WL 787051 (N.D. Ill. Mar. 9, 2012) ................................................................ 28

*Intellectual Ventures I, LLC v. NetApp, Inc.*,
    2020 WL 1644227 (D. Mass. Apr. 2, 2020)............................................................... 22

*Kid Stuff Mktg., Inc. v. Creative Consumer Concepts, Inc.*,
    2015 WL 3485759 (D. Kan. June 2, 2015) ................................................................ 28

*Loggerhead Tools, LLC v. Sears Holding Corp.*,
    2016 WL 6778881 (N.D. Ill. Nov. 15, 2016) ............................................................. 31

*Moleculon Research Corp. v. CBS, Inc.*,
    793 F.2d 1261 (Fed. Cir. 1986) ................................................................................. 27

*Novartis Corp. v. Ben Venue Labs.*,
    271 F.3d 1043 (Fed. Cir. 2001) ................................................................................... 8

*Oxford Gene Tech. Ltd. v. Mergen Ltd.*,
    345 F. Supp. 2d 444 (D. Del. 2004) ........................................................................... 30

*Pactiv Corp. v. Multisorb Techs., Inc.*,
    2013 WL 2384249 (N.D. Ill. May 29, 2013)............................................................... 16

*Parker–Hannifin Corp. v. Wix Filtration Corp.*,
    2011 WL 976559 (N.D. Ohio Mar. 17, 2011) ............................................................ 35

*Read Corp. v. Portec, Inc.*,
    970 F.2d 816 (Fed. Cir. 1992) ................................................................................... 33

*Toshiba Corp. v. Imation Corp.*,
    681 F.3d 1358 (Fed. Cir. 2012) ........................................................................... 15, 27

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ................................................................................... 14

- iii -

**Statutes**

35 U.S.C. § 271(c) .............................................................................................................. 30
35 U.S.C. § 284 ................................................................................................................... 32

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................................ 5

## I.   INTRODUCTION

ClearOne, Inc ("ClearOne") seeks summary judgment, or in the alternative, partial

summary judgment, against Shure Incorporated ("Shure") as follows.

U.S. Patent No. 9,635,186:

- That Shure directly infringed all asserted claims of U.S. Patent No. 9,635,186 (the "'186 Patent") at least between April 25, 2017 and June 12, 2019, by making, using, offering to sell, and selling its MXA910[1] product with firmware versions prior to 4.0.12 in combination with its P300 product.

- That Shure directly infringed claims 7, 8, 13, and 15 of the '186 Patent through joint enterprises with Biamp Systems ("Biamp") and QSC, LLC ("QSC") at least between April 25, 2017 and June 12, 2019, by making, using, offering sell, and selling its MXA910 product with firmware versions prior to 4.0.12 in combination with Biamp's Tesira/TesiraFORTÉ products and QSC's Q-SYS product.

- That Shure induced its customers to infringe all asserted claims of the '186 Patent at least between April 25, 2017 and June 12, 2019 by using its MXA910 product with firmware versions prior to 4.0.12 in combination with Shure's P300 product, Biamp's Tesira/TesiraFORTÉ products, and QSC's Q-SYS product.

- That Shure contributorily infringed all asserted claims of the '186 Patent at least between April 25, 2017 and June 12, 2019 by making, using, selling, and offering to sell its MXA910 product with firmware versions prior to 4.0.12, to be used in combination with Biamp's Tesira/TesiraFORTÉ products and QSC's Q-SYS product with no significant non-infringing use.

U.S. Patent No. 9,813,806:

- That Shure infringed all asserted claims of U.S. Patent No. 9,813,806 (the "'806 Patent") at least between November 7, 2017 and August 23, 2019, by making, using, offering to sell, and selling its MXA910 product.

- That Shure further infringed all asserted claims of the '806 Patent at least between November 2019 and June 1, 2020, by making, using, offering to sell, and selling its MXA910-A product.

- That Shure continues to infringe all asserted claims of the '806 Patent by making, using, offering to sell, and selling its MXA910-US, released on June 1, 2020.

- That Shure induced and induces its customers to infringe all asserted claims of the '806 Patent by selling or using Shure's MXA910, MXA910-A, and MXA910-US products.

- That Shure's infringement of the '806 Patent was and is willful and warrants enhanced damages.

---

[1] For purposes of infringement of the '186 Patent, the MXA910 also includes the model number MXA910-60cm.

The Court has already considered Shure's infringement of both patents in the context of ClearOne's motions for preliminary injunction. After full briefing and hearings, the Court found that ClearOne is likely to establish infringement as to both patents. ECF 278; ECF 550. Now, after completion of discovery[2] and claim construction, ClearOne's case is even stronger. There is no dispute about how the accused devices operate. Instead, Shure's noninfringement arguments largely regurgitate claim construction and legal arguments the Court already rejected. Infringement, willfulness, and enhanced damages are therefore ripe for summary judgment.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     ClearOne's Inventions and Patents at Issue

This case is about audio conferencing systems—an increasingly indispensable part of how the world conducts business. In audio conferencing, audio quality and aesthetics have long been conflicting and competing priorities: for best audio quality, the conventional wisdom is to place microphones close to the talkers, but conference participants also prefer to get microphones off the table and out of sight. *See*, *e.g.*, Ex. 181[3]. ¶8. The ClearOne inventors pioneered techniques to allow microphones to pick up voices from far away without sacrificing audio quality.

In 2010, ClearOne inventors created an efficient way to combine beamforming (which allows voice pickup from farther away than traditional microphones) and acoustic echo cancellation ("AEC") (which removes echoes for a comfortable conferencing experience). *See*,

---

[2] The only exceptions are that additional narrow discovery relating to Shure's newest beamforming microphone array product, MXA910-US, may be warranted, as well as additional discovery into willfulness issues surrounding Shure's MXA910-A product.
[3] Unless otherwise specified, all exhibit cites in this motion and the accompanying Statement of Undisputed Facts refer to the exhibits attached to the concurrently filed Declaration of Christina Von Der Ahe Rayburn ("Rayburn Decl."). For ease of reference, ClearOne also submits an index of all exhibits as **Appendix A**.

*e.g.*, Ex. 182 ¶¶9-10. This became the '186 Patent. Ex. 2. Armed with this invention, ClearOne created its pioneering BMA, the first pro-audio beamforming microphone array, which ClearOne announced in June 2012 at Infocomm, the largest professional audio/video convention in North America. Ex. 181 ¶8. ClearOne's BMA was wildly successful until Shure released its competing and infringing products. Ex. 185 ¶10.

Building on ClearOne's years of knowledge and experience with its BMA product, ClearOne inventors realized that beamforming worked so well that it actually could allow the beamforming microphone array to be installed out of sight in a drop ceiling without compromising audio quality. Ex. 181 ¶10. This unexpected discovery led to the '806 Patent, which covers a beamforming microphone array integrated into a ceiling tile and configured to be used in a drop ceiling mounting configuration. *Id.*; Ex. 183 at 75:18-76:9, 77:10-78:2; Ex. 2.

Today ClearOne sells four BMAs—the BMA, BMA2, BMA CT, and BMA CTH, which all practice the '186 Patent. SOF[4] ¶7. The BMA CT/CTH also practice the '806 Patent. *Id.* ¶10.

### B.    Shure's Infringing Products

Shure is a latecomer to the installed audio conferencing market. Ex. 187 at 5 (As of December 2016, "major audio conferencing endpoint vendors" did not include Shure). Shure began shipping its MXA910 in late 2016, four years after ClearOne released the BMA. Ex. 185 ¶17.

The '186 Patent issued on April 25, 2017. SOF ¶5. Shure's MXA910, alone, did not practice every element of the claims of the '186 Patent. As such, it did not offer the same benefits offered by the inventions claimed in the '186 Patent and by ClearOne's BMA. To be able to offer those benefits in association with its MXA910, Shure: (1) partnered with Biamp in

---

[4] "SOF" refers to the concurrently-filed Statement of Undisputed Facts.

December 2016 to promote and sell the MXA910 in combination with Biamp's

Tesira/TesiraFORTÉ digital signal processor ("DSP") products; (2) partnered with QSC in

January 2017 to promote and sell the MXA910 in combination with QSC's Q-SYS DSP product;

and (3) sold the MXA910 in combination with its own P300 DSP product, which was offered for

sale in December 2017. Those combinations all practice the inventions claimed in the '186

Patent. *See*, *e.g.*, Ex. 4 ¶¶52-71. Despite being on notice of ClearOne's '186 Patent and Shure's

infringement, Shure continued to promote these infringing combinations through at least June 12,

2019, when it released a firmware update (version 4.0.12) for its MXA910. SOF ¶¶67-68.

The '806 Patent issued on November 7, 2017. SOF ¶8. Shure's MXA910 (offered August

2016-August 23, 2019), MXA910-A (offered November 2019-June 1, 2020), and MXA910-US

(released June 1, 2020) are beamforming microphone arrays sized and shaped like a ceiling tile

capable of being installed in a drop ceiling configuration as described in the '806 Patent. *Id.* ¶¶7,

40, 69. Shure was on notice of the MXA910's infringement of the '806 Patent by January 2018.

*Id.* ¶¶13-14. Despite that, Shure continued to market the MXA910 until after this Court issued a

preliminary injunction on August 5, 2019. ECF 550 ('806 PI Order); SOF ¶69. Shure later

released the MXA910-A, and then the MXA910-US. SOF ¶¶41, 70. Both products are versions

of the MXA910 with only minor variations. *Id.* ¶¶40-41. Neither effectively designed around the

'806 Patent. *Id.* ¶¶40-41, 46, 70-72.

### C. The Court's Prior Relevant Rulings

Early in the case, ClearOne moved for preliminary injunction ("PI") as to both the '186

and '806 Patents. For each patent, the Court found that ClearOne is likely to prove infringement

by Shure. *See*, *e.g.*, ECF 278 at 49 ("ClearOne had the better of the arguments on . . .

infringement. . . .") and ECF 550 at 63 ("Shure is likely infringing the '806 Patent.").

The Court has also construed disputed claim terms. *See*, *e.g.*, ECF 550 and ECF 613.

## III. LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prove infringement, a patentee must show that each claim limitation is met, either literally or under the doctrine of equivalents. *Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc.*, 347 F.3d 1314, 1324 (Fed. Cir. 2003). Infringement is properly decided on summary judgment when no reasonable jury could find that any limitation recited in a claim is not found in the accused device literally or under the doctrine of equivalents. *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001), *cert. denied*, 534 U.S. 1114 (2002).

## IV. ARGUMENT

### A. Direct Infringement of Claims 1, 3, 7, 9, 13, and 15 of the '186 Patent.

Claim 1 of the '186 Patent recites:

| Preamble | *A conferencing apparatus that combines a beamforming microphone array with an acoustic echo canceller, comprising:* |
|---|---|
| Limitation 1 | *a beamforming microphone array that further comprises a plurality of microphones wherein each microphone is configured to sense acoustic waves and said plurality of microphones are oriented to develop a corresponding plurality of microphone signals;* |
| Limitation 2 | *a processor, memory, and storage operably coupled to said beamforming microphone array, said processor configured to:* |
| Limitation 3 | *perform a beamforming operation with a beamforming module to combine the plurality of microphone signals from said beamforming microphone array into a plurality of combined signals that is greater in number than one and less in number than the plurality of microphone signals, each of the plurality of combined signals corresponding to a different fixed beam;* |
| Limitation 4 | *perform an acoustic echo cancellation operation with an acoustic echo canceller on the plurality of combined signals to generate a plurality of combined echo cancelled signals; and* |
| Limitation 5 | *select with a signal selection module, one or more of the combined echo cancelled signals for transmission to the far end,* |

| Limitation 6 | *wherein said signal selection module uses the far end signal as information to inhibit said signal selection module from changing the selection of the combined echo cancelled signals while only the far end signal is active.* |
|---|---|

SOF ¶¶17-18. Claim 3 depends on claim 1 and recites an additional "noise filtering" limitation: "*The apparatus of claim 1 wherein said processor is further configured to noise filter the plurality of combined echo cancelled signals.*" *Id.* Claims 7 and 13 are method of manufacture and use claims that otherwise correspond with claim 1. *Id.* Similarly, claims 9 and 15 are method of manufacture and use claims that otherwise correspond with claim 3. *Id.*

          1.    <u>The '186 Accused Products practice each limitation of the asserted claims</u>

For purposes of this motion, the '186 Accused Products consist of the Shure MXA910 with firmware versions before version 4.0.12,[5] when combined with Shure's P300, Biamp's Tesira/TesiraFORTÉ, or QSC's Q-SYS DSP products. As discussed below, the '186 Accused Product combinations practice each limitation of the asserted claims. In addition, ClearOne relies on the October 22, 2019 Opening Report of Professor Dan Schonfeld and associated claim chart, which show, on a limitation-by-limitation basis, how the '186 Accused Products meet each limitation of the asserted apparatus claims and how Shure and its customers, by manufacturing and using the '186 Accused Products, practice each step of the asserted method claims. Ex. 4; Ex. 47; SOF ¶¶19-38.

          a)    *Preamble*

Regardless of whether the preamble is limiting, it is met because the '186 Accused Products are "conferencing apparatus[es]" that "combine[] a beamforming microphone array with an acoustic echo canceller." The three accused product combinations (MXA910-P300,

---

[5] In connection with infringement of the '186 Patent, any discussion herein of the MXA910 refers to the MXA910 with firmware version before version 4.0.12.

MXA910-Q-SYS, MXA910-Tesira/TesiraFORTÉ) all make up "conferencing apparatuses." Ex. 47 at 2-9. Additionally, for each product combination, the Shure MXA910 satisfies the "beamforming microphone array" element, while the Shure P300, QSC Q-SYS, and DSP Biamp Tesira/TesiraFORTÉproducts satisfy the "acoustic echo canceller" element. *See* SOF ¶27; Ex. 4 ¶¶54-55; Ex. 47 at 1-10, 105-106, 111. Shure does not dispute these facts.[6] *See* Ex. 22 at 1-2.

### b) Limitation 1

Limitation 1 is met because, as Shure admits, the "MXA910 is a beamforming microphone array that comprises a plurality of microphones, each configured to sense acoustic waves." *See* Ex. 22 at 2; SOF ¶20. The microphones are also oriented to develop a plurality of microphone signals. *See* Ex. 4 ¶56; Ex. 47 at 10-14, 106, 111-112.

Shure's only noninfringement argument relating to Limitation 1 is that the MEMS microphones used in the MXA910 are omnidirectional, and therefore they are not "oriented," because they do not "gather[] sounds from different directions." *See* Ex. 22 at 2; Ex. 53 ¶34. This argument fails. Limitation 1 does not require the microphone signals to be "oriented" to gather sounds from different directions. Rather, it requires them to be "oriented to develop a . . . plurality of microphone signals." Shure does not dispute that the MEMS microphones develop a plurality of microphone signals. Shure's argument appears to be a belated attempt to construe the term "oriented" to require a directional element, but Shure cites nothing in the intrinsic evidence supporting such a construction. *See Callpod, Inc. v. GN Netcom, Inc.*, 703 F. Supp. 2d 815, 819-20 (N.D. Ill. 2010) (excluding expert opinion relating to claim construction at summary judgment when parties did not dispute the meaning of the term during claim construction). Regardless, even omnidirectional microphones can be oriented to sense acoustic waves

---

[6] ClearOne addresses Shure's noninfringement arguments relating to joint enterprise and inducement liability in sections IV.A.2 and IV.C below.

differently from others based on their relative locations. *See* Ex. 187 at 206:4-16, 207:14-22.

c)      *Limitation 2*

Limitation 2 is met because the '186 Accused Products have processors, memories, and storages operably coupled to the beamforming microphone array. SOF ¶21; Ex. 4 ¶57; Ex. 47 at 14-35, 107, 112. In fact, Shure admits that "[e]ach of the accused devices has a processor, memory and storage." *See* Ex. 22 at 3.

Shure's only noninfringement argument unique to Limitation 2[7] is that no single processor of the '186 Accused Product combinations is configured to perform all of: (1) a beamforming operation, (2) an AEC operation, and (3) a signal selection operation; because these operations are divided between the processor in the MXA910 and the processors in the DSP products. *See id.* at 3. This noninfringement argument fails as a matter of law. It is settled patent law that a singular noun encompasses the plural. *01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012). There is thus no requirement that a single processor perform all the recited operations.

Shure also attempts to belatedly introduce a claim construction argument through its expert about the term "operably coupled." Shure's expert opines that "a POSITA would recognize the phrase 'operably coupled to a beamforming microphone array' to indicate more than just receipt of an audio signal, but rather a connection for purposes of instructing the beamforming microphone array to perform some operation." Ex. 53 ¶39. This opinion lacks any support in the '186 Patent. Accordingly, it cannot create a material factual dispute to preclude summary judgment. *See Novartis Corp. v. Ben Venue Labs.*, 271 F.3d 1043, 1051 (Fed. Cir.

---

[7] Shure also makes a noninfringement argument based on whether the processor in the '186 Accused Products performs Limitation 6, which ClearOne addresses below in connection with Limitation 6. *See* Ex. 22 at 3.

2001) ("The necessity for such an explicit factual foundation should be self-evident. If all expert opinions on infringement or noninfringement were accepted without inquiry into their factual basis, summary judgment would disappear from patent litigation."); *see also Callpod*, 703 F. Supp. 2d at 819-20 (excluding untimely expert opinion relating to claim construction). Neither party argued during claim construction that the term "operably coupled to a beamforming microphone array" required construction. Therefore, the term should have its plain and ordinary meaning, under which Limitation 2 is met. Ex. 4 ¶57; Ex. 47 at 14-35, 107, 112.

### d) Limitation 3

The Court has construed the term "fixed beam" of Limitation 3 to mean a "beam defined by parameters that remain fixed during a conference." ECF 613 at 20. This limitation is met because Shure's MXA910 performs a beamforming operation that "uses over ███ microphone signals to form up to 8 beam-formed signals" that are fixed with a "delay and sum algorithm" during a conference. SOF ¶¶22-26; Ex. 4 ¶¶58-63; Ex. 47 at 35-49, 107-109, 112-114.

Shure argues that the MXA910 does not practice this limitation because the MXA910's "beam-formed signals are not 'fixed' as that term is properly construed in light of ClearOne's disavowal during prosecution." Ex. 22 at 3. Shure argues that its beam coefficients *can* be adjusted during a conference, and that ClearOne disavowed such beams during patent prosecution. *Id.* Shure made this argument during claim construction. *See* ECF 508 at 14-17. As ClearOne explained in response, Shure's argument misreads the prosecution history, which includes no disavowal by ClearOne of beams that *can* be adjusted. *See, e.g.* ECF 520 at 13-14. The Court sided with ClearOne. ECF 613 (*Markman* Order) at 6-9; *see also* ECF 278 ('186 PI Order) at 7-10 ("Shure's prosecution history argument does not hold water"). Shure's attempt to relitigate issues decided on claim construction does not create an issue of material fact. *See Enzo*

*Biochem, Inc. v. Amersham PLC*, 902 F. Supp. 2d 308, 313 (S.D.N.Y. 2012) (rejecting plaintiff's request to relitigate issues of claim construction at the summary judgment stage).

Shure's expert cites a third party's deposition testimony that purportedly shows one specific instance in which the MXA910's beams were adjusted during a conference. Ex. 53 ¶42. That testimony shows, ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████. Ex. 188 at 81:9-16. The same witness testified that ██████ ████████████████████████████████████████████. *Id.* at 82:5-19. In addition, Shure's Rule 30(b)(6) witness testified that ██████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████." Ex. 25 at 99:21-100:13, 102:11-103:9. And every single third party who produced evidence relating to their use of the MXA910 testified that they do not adjust the beams during a conference. SOF ¶26. Shure's single example of a time when beams were adjusted between different phases of a meeting does not create a material factual dispute as to how the MXA910 is used most of the time. *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001) ("[A]n accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation.").

   e)  *Limitation 4*

Limitation 4 is met because, as Shure admits, "the accused DSPs could perform this limitation." Ex. 22 at 8; *see also* SOF ¶27; Ex. 4 ¶64; Ex. 47 at 49-77, 109, 114.

   f)  *Limitation 5*

Limitation 5 is met because the automixers in the P300, Tesira/TesiraFORTÉ, and Q-

SYS products select one or more of the combined echo cancelled signals for transmission to the far end. *See* SOF ¶¶28-30; Ex. 4 ¶65; Ex. 47 at 77-101, 109-110, 114-115. Shure's main noninfringement arguments relating to Limitation 5 are based on claim construction positions on "signal selection module" already considered and rejected by the Court. Ex. 22 at 9.

For example, Shure continues to assert that the attenuation performed by the P300, Tesira/TesiraFORTÉ, and Q-SYS products is not signal selection. *Id.* As the Court recognized during the PI proceedings, this noninfringement argument "actually depends on the construction of the word 'select.'" ECF 278 ('186 PI Order) at 13. The Court has considered and rejected this argument. *See*, *e.g.*, *id.* at 13-14 ("Selection by attenuation is an accepted method of signal selection in the audio industry, known to skilled artisans, as even Shure's expert agrees. . . . Even the language Shure uses to describe how its own automixer combines signals—calling unattenuated signals 'gated on,' and attenuated signals 'gated off'—confirms that attenuation is widely understood as a form of selection."); *id.* at 17. Shure's expert now relies on an example given by Shure former expert Dr. Kellermann where attenuation is "by infinitely many dBs" to argue that selection by attenuation is "an exception rather than the rule." Ex. 53 ¶49. But Shure's expert ignores Dr. Kellermann's more general testimony that "[b]asically if you attenuate all but one signal in this scheme of '186 or also in the voting stage in my book chapter, then, of course, you make it a selector." Ex. 39 at 131:19-25. Shure's expert also ignores the fact that, as the Court observed, Shure and others in the audio industry describe unattenuated signals as "gated on" and attenuated signals as "gated off." SOF ¶29; ECF 278 at 13. Thus, this recycled claim construction argument fails and does not present a material factual dispute.

Shure also continues to assert that the "'signal selection module' triggers Sec. 112(f) because it lacks any known or specific structure that a POSITA would recognize." Ex. 22 at 9.

The Court twice rejected this claim construction argument. ECF 613 at 9-13 ("[A] skilled artisan would recognize the 'signal selection module' as structure …."); ECF 278 at 10-13 ("The term 'signal selection module' is neither indefinite nor a trigger for § 112(f).").

> g)   Limitation 6

Limitation 6 is met because the automixers in the accused DSP products use the far end signal as information to inhibit the selection of signals while only the far end is active, for example, through their "Last Mic On," "Gate Inhibit," or "pre-dynamics" features. *See* SOF ¶¶31-36; Ex. 4 ¶65; Ex. 47 at 77-101, 109-110, 114-115. Each of Shure's non-infringement arguments is without merit.

*First*, Shure continues to argue that the "signal selection module" is a means-plus-function claim and insists that the "structure" in the means-plus-function claim must "require a DOA determination." *Id.* As discussed in the previous section, the Court has twice rejected Shure's means-plus-function argument. ECF 613 at 9-13; ECF 278 at 10-13. The "direction of arrival" argument also fails because the Court specifically found that, without triggering §112(f), "there is no reason to think that [Limitation 6] requires the signal selection module to use direction of arrival." ECF 278 at 18.

*Second*, Shure argues that the '186 Accused Products do not "inhibit" selection of signals. Ex. 22 at 11. Shure argues that because "all signals are always transmitted to the far end by the automixers of the accused DSPs," the '186 Accused Products do not "inhibit" selection of a signal. *Id.* As Shure admits, this argument is similar to Shure's argument that attenuation is not selection. *Id.* For the same reasons, Shure's "inhibit" argument fails. *See supra* Section IV.A.1.f. Indeed, another one of the Shure P300's infringing features that satisfies Limitation 6 is named "Gate *Inhibit*." SOF ¶33.

*Third*, Shure argues that the "Last Mic On" feature does not meet Limitation 6 because it does not "inhibit" or "use the far end signal" in any way. *Id.* As discussed in the prior paragraph, Shure's "inhibit" argument fails. Shure's "use the far end signal" argument also fails because it repeats another twice-rejected claim construction position—that the signal selection module must receive the far end signal directly. ECF 613 at 14 ("[A] skilled artisan would understand the plain and ordinary meaning of this term to focus on the information provided by the far end signal. As a result, it is not necessary to explicitly require that the signal selection module actually receive the far end *signal* itself."); ECF 278 at 19-20 ("But even if the accused devices do not *directly* receive the far-end signal, they could still *use* it as information to inhibit a change in signal selection. In fact, the accused devices *must* use the far-end signal as information to inhibit changes in signal selection."). Shure additionally argues that the "Last Mic On" feature "only considers levels of near-end audio input." Ex. 22 at 11. This is contrary to undisputed facts about the purpose and operation of "Last Mic On." As the Court recognized, "for last mic on to work properly, the selector must either be able to recognize the far-end signal as the far-end signal (to avoid treating it as a near-end talker), filter out the far-end signal to prevent it from being transmitted, or recognize that only the far-end is active and halt the signal selection process accordingly." ECF 278 at 19-20; *see also id.* at 20 ("This means that last mic on can only work if the selector *uses* the far-end signal as a reference.").

*Fourth,* Shure argues that the Biamp and QSC automixers do not use the far end as information "to do anything." Ex. 22 at 11. This argument relies on Shure's previous argument that the '186 Accused Products must receive the far-end signal directly and fails for the same reasons. Notably, Shure does not dispute that the Shure P300 receives the far-end signal directly and uses it to inhibit signal selection. *Id.* Indeed, the P300's "Gate Inhibit" and "pre-dynamics"

features ███████████████████████████. SOF ¶33; Ex. 4 ¶65; Ex. 47 at 82-83. They are

████████████████████████████. SOF ¶33.

*Fifth*, Shure argues that the '186 Accused Products "never enter into a state where 'only

the far end signal is active,' because at least one near end signal is always active – i.e.,

transmitted in an attenuated state." Ex. 22 at 11. This is essentially another untimely claim

construction argument. *See Callpod*, 703 F. Supp. 2d at 819-20. Shure would have the Court

construe "active" to mean "transmitting." If Shure's belated construction is adopted, it would

exclude a preferred embodiment. One embodiment of the '186 Patent teaches that "the DOA

Module 950 and the Signal Selection Module 901 use the far end signal 964 as information to

inhibit the Signal Selection Module 901 from changing the selection of the combined echo

cancelled signals while only the far end signal is active." Ex. 2 col. 14:2-7. To inhibit the Signal

Selection Module 901 from changing the selection of the combined echo cancelled signals would

necessarily "hold the last unattenuated channel in that condition"—which is also how Shure's

expert describes "Last Mic On." Ex. 53 ¶56. If Shure's construction of "active" is adopted, this

preferred embodiment would also, as Shure argues in the case of "Last Mic On," "violate the

very condition on which Limitation 6 is based – that only the far end be active." Ex. 53 ¶61. A

claim construction that excludes a preferred embodiment, such as Shure's proposed construction,

"is rarely, if ever, correct." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir.

1996). Instead, a skilled artisan would recognize that the "active" refers to whether the talker is

speaking, which can be detected by numerous known methods. *See* Ex. 48 at 64:12-19 ██████

████████████████████████████████████████████████████████████████

████████████."); Ex. 24 at 222:8-16 ("████████████████████████████████████

████████████████████████████████████████████████████

- 14 -

████████████████████████████.”), 224:3-13; Ex. 53 ¶23 (“The phrase 'while only the far end is active' would be recognized as a state condition, e.g., 'far end only' or 'Rx Only' as the patent refers to it.”).

*Lastly*, Shure argues that the '186 Accused Products have non-infringing uses because the accused DSP products have other gating features such as “Always On” and “Designated Mic On” and because a user could use the automixer of the MXA910 to send only a single mixed and beam-formed signal to the DSP products. Ex. 22 at 11. As discussed above in Section IV.A.1.d, this argument, even if established, would fail as a matter of law as a defense to direct and induced infringement. *See Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1364 (Fed. Cir. 2012); *Hilgraeve*, 265 F.3d at 1343.

> h)    *"Noise filtering" limitation*

The “noise filtering” limitation of claims 3, 9, and 15 is met because the '186 Accused Products employ various noise filtering techniques such as noise reduction, noise suppression, and non-linear processing. SOF ¶37; Ex. 4 ¶66; Ex. 47 at 101-105, 110, 115-116. In fact, Shure admits that “[a]ssuming the signals were fixed beam-formed signals (and all other limitations of claim 1 were met given this claim's dependency on claim 1), the DSPs could then practice this claim.” Ex. 22 at 12-13.

Shure's expert appears to assert a non-infringement argument in one sentence: “I note that the noise reduction of the TesiraFORTÉ relied upon by ClearOne to meet the dependent claims is off by default.” Ex. 53 ¶64. Because this noninfringement theory (applicable only to the TesiraFORTÉ) was never disclosed in Shure's Final Noninfringement Contentions, it should be excluded. *See Avnet, Inc. v. Motio, Inc.*, No. 12-cv-02100, 2016 WL 3365430, at *1 (N.D. Ill. June 15, 2016) (striking expert opinions relating to theories undisclosed in final contentions);

*Pactiv Corp. v. Multisorb Techs., Inc.,* No. 10-cv-00461, 2013 WL 2384249, at *1(N.D. Ill. May 29, 2013) (same). Even if the Court considers this argument, it fails for two reasons. *First*, ClearOne also relies on Non-Linear Processing (NLP) in the TesiraFORTÉ, which is set to "Low" by default," to meet the "noise filtering" limitation. Ex. 4 ¶66; Ex. 47 at 103. *Second*, the Noise Reduction function has four possible settings, three of which are not off. *Id.* Therefore the TesiraFORTÉ is *configured to* noise filter even based on Noise Reduction alone.

### 2.    Joint enterprise

Direct infringement of method claims occurs when each claim limitation is practiced. *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) ("*Akamai III*"). When multiple actors are involved in practicing the steps of a method claim, one actor will be responsible for another's performance—and both will be liable for infringement—where "the actors form a joint enterprise." *Id.* Direct infringement by joint enterprise requires: "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Id.* at 1023 (quoting Restatement (Second) of Torts § 491 (1965)). Here, Shure has formed separate joint enterprises with Biamp and QSC to practice every limitation of the asserted claims. The Court, considering this issue during PI proceedings, held that "ClearOne will likely be able to prove its joint enterprise theory." ECF 278 at 21.

All the evidence ClearOne presented during the PI proceedings continues to hold true. *See, e.g.*, ECF 148 at 16-20; ECF 195 at 21-26; Ex. 4 ¶¶68-71; Ex. 47 at 7-9, 54-55, 88-89; SOF ¶¶56-65. Among other things, Shure reached agreements with Biamp and QSC to integrate their products, partnered with Biamp and QSC to "co-develop" a software block (Biamp) and plug-in

(QSC) designed for the MXA910, developed instructional materials with mutual feedback, and collaborated on press releases related to the '186 Accused Products. SOF ¶¶56-65. Shure makes no new legal arguments to counter joint enterprise liability. *See*, *e.g.,* Ex. 22 at 2, 14, 28, 35.

Instead, Shure purports to raise three new "facts" to support its noninfringement argument. They do not warrant a different result. *First*, Shure's technical expert relies on another Shure expert's testimony to conclude that, even though Shure, QSC, and Biamp released marketing statements announcing how the companies had "partnered" to offer compatible products, the word "partnership" does not necessarily "indicate any agreement between the parties other than to agree to release the statement." Ex. 53 ¶25. But ClearOne relies on more than just marketing statements about "partnerships." *See*, *e.g.*, SOF ¶¶56-65; Ex. 4 ¶¶68-71 and Ex. 47 at 7-10, 88-89. Indeed, the Court has already held that "Shure had informal agreements with both Biamp and QSC to further a common purpose of increasing interoperability and marketing the products' compatibility." ECF 550 at 23. In reaching that holding, the Court did not rely on the usage of a single word; rather the Court considered Shure, Biamp, and QSC's actions in the joint enterprise. *See id.* ("All these actions satisfy the first three elements of the joint-enterprise test.").

*Second*, Shure's technical expert relies on a Shure employee and another Shure expert to opine that Shure "████████████████████████████████████████ ███████████████████████████████████." Ex. 53 ¶26. Even if that were true, ████████████ ████████ is not a required element of joint enterprise and therefore does not avoid joint enterprise liability as a matter of law.

*Third*, Shure's technical expert relies on an interview with a Shure employee to speculate that "Biamp markets the ceiling mounted Parle TCM-X product as a direct alternative to the

MXA910, so it would make no sense for Biamp to cooperate with Shure to encourage the sales

of MXA910s." Ex. 53 ¶26. That Biamp may wish to also sell an allegedly competitive product,

without more, does not mean Biamp withdrew from the joint enterprise with Shure. In fact, to

this day Biamp continues to promote interoperability between Tesira/TesiraFORTÉ and the

MXA910 and provide instructions for its customers to combine them. Ex. 184; Ex. 45.

Because Shure's new arguments fail, there is no material factual dispute on this issue.

The Court should find, once more, that Shure entered into joint enterprises with Biamp and QSC.

**B.** **Direct Infringement of Claims 1, 4, 5, 6, 11, 12, 13, 18, 19, and 20 of the '806 Patent**

Claim 1 of the '806 Patent recites:

| Preamble | A ceiling tile beamforming microphone array that integrates a ceiling tile with a beamforming microphone array into a single unit where the ceiling tile is used in a drop ceiling mounting configuration, comprising: |
|----------|-------------|
| Limitation 1 | a beamforming microphone array that includes a plurality of microphones that picks up audio input signals; and |
| Limitation 2 | a ceiling tile with an outer surface on the front side of said ceiling tile wherein said outer surface is acoustically transparent, said beamforming microphone array integrated into said ceiling tile as a single unit, |
| Limitation 3 | said beamforming microphone array picks up said audio input signals through said outer surface of said ceiling tile; |
| Limitation 4 | wherein the ceiling tile beamforming microphone array is used in a drop ceiling mounting configuration, |
| Limitation 5 | wherein said beamforming microphone array is coupled to the back side of said ceiling tile and all or part of said beamforming microphone array is in the drop space of the drop ceiling. |

SOF ¶¶39, 42. Claim 4 of the '806 Patent depends on claim 1 and recites: "The claim according

to claim 1, wherein said ceiling tile comprises acoustic or vibration damping material." *Id.* Claim

5 of the '806 Patent depends on claim 1 and recites: "The claim according to claim 1, wherein

said outer surface comprises a grille." *Id.* Claim 6 of the '806 Patent depends on claim 1 and

recites: "The claim according to claim 1, wherein said outer surface is coplanar with said ceiling

tile." *Id.* Claim 8 and its dependent claims 11, 12, and 13 are method of use claims that otherwise correspond with claims 1, 4, 5, and 6. *Id.* Similarly, claims 18, 19, and 20 are method of manufacture claims that otherwise correspond with claims 4, 5, and 6. *Id.*

       1.      The '806 Accused Products practice each limitation of the asserted claims

For purposes of this motion, the '806 Accused Products consist of the Shure MXA910, the Shure MXA910-A, and the Shure MXA910-US. As discussed below, the '806 Accused Products each practice each limitation of the asserted claims. In addition, ClearOne relies on Professor Schonfeld's October 22, 2019 report and associated claim chart relating to the MXA910, as well as Professor Schonfeld's February 7, 2020 supplemental report relating to the MXA910-A, which show, on a limitation-by-limitation basis, how the MXA910 and MXA910-A meet each limitation of the asserted claims. Ex. 4 ¶¶150-171; Ex. 96; Ex. 17; SOF ¶¶39-55. Finally, ClearOne submits its proposed Final Infringement Contentions relating to the MXA910-US and a brief declaration from Professor Schonfeld showing that the MXA910-US infringes similarly to the other two MXA910 products. Ex. 18; Ex. 19.

       a)     *Preamble*

Whether or not the preamble is limiting, it is met by the '806 Accused Products. *See* SOF ¶43-46; Ex. 4 ¶152; Ex. 96 at 1-28, 107-108; Ex. 17; Ex. 18; Ex. 19. Each of the '806 Accused Products is a "ceiling tile beamforming microphone array that integrates a ceiling tile with a beamforming microphone array into a single unit where the ceiling tile is used in a drop ceiling mounting configuration." *Id*. The only difference between the '806 Accused Products for the purpose of this limitation is that: (1) the MXA910 was configured to sit flush in a standard ceiling grid; (2) the MXA910-A was configured to sit either flush or with its front face protruding approximately 0.7" below a standard ceiling grid; and (3) the MXA910-US is

configured to sit with its front face protruding approximately 0.7" below a standard ceiling grid. SOF ¶40. Regardless of whether the front face of the '806 Accused Product sits flush or 0.7" below a standard ceiling grid, that device meets this limitation. *See* Ex. 17 ¶¶47-54; SOF ¶¶40-41, 46, 70-72.

Shure does not dispute that the MXA910 and MXA910-A are beamforming arrays, but argues that they are not "ceiling tile[s]" and are not 'integrated into' a ceiling tile." Ex. 68 at 1-2, 4. These arguments mirror Shure's claim construction and noninfringement arguments rejected by the Court.[8] ECF 550 at 28-33 ("Shure's argument here is unconvincing: the MXA910 is indeed a beamforming microphone array integrated with a ceiling tile. The fact that it may not look like every other ceiling tile in a given room does not matter. The bottom line is that it fits the plain meaning of a 'ceiling tile,' that is, a tile that forms part of the boundary between the drop space and the rest of the room."). With respect to the MXA910-A in particular, Shure argues that ClearOne has failed to identify, separately, "ceiling tile" and a "beamforming microphone array" that are then "integrated into a single unit." Ex. 68 at 4-5. This argument has also been rejected by the Court. ECF 550 at 30 ("The MXA910 is a BFMA in the form of a ceiling tile—ClearOne does not have to point to one particular component of the MCA910 as the ceiling tile, distinct and separate from the beamforming microphone array. That is the point of the invention: they are *integrated* together.").

Shure's expert does not offer any noninfringement opinions for either the MXA910 or the MXA910-A relating to the Preamble. *See* Ex. 57 ¶45-46 (analysis begins with Limitation 2); Ex. 55 ¶24 (same).

---

[8] To the extent the Court finds that the MXA910, MXA910-A and MXA910-US are not "ceiling tiles" within the meaning of the '806 Patent, they still meet this limitation under the Doctrine of Equivalents. Ex. 96 at 28, 66, 87, and 98; Ex. 17; Ex. 18; Ex. 19.

> b) *Limitation 1*

The Court construed the term "beamforming microphone array" of this limitation as "a plurality of microphones positioned at predetermined locations that produce audio signals to be used to form a directional pick up pattern." ECF 550 at 20. The '806 Accused Products practice Limitation 1 because each one comprises a beamforming microphone array that includes over █ MEMS microphones positioned at predetermined locations to pick up and produce audio input signals to be used to form a directional pick up pattern. *See* SOF ¶47; Ex. 4 ¶¶153-156; Ex. 96 at 28-37, 107-108; Ex. 17; Ex. 18; Ex. 19. There is no difference between the three accused products for the purposes of this limitation. SOF ¶¶40-41, 47. Shure admits that the MXA910 and MXA910-A have "an array of MEMS microphones that produce audio input signals" and does not raise any non-infringement arguments. Ex. 68 at 11; Ex. 57 ¶¶45-46 (analysis begins with Limitation 2); Ex. 55 ¶24 (same).

> c) *Limitation 2*

The Court construed the term "acoustically transparent" in this claim limitation as "provides no or minimal resistance to sound." ECF 613 at 15. The Court also held that the term "ceiling tile" should be given its plain and ordinary meaning, noting that "the plain and ordinary meaning of the term 'ceiling tile' is not limited in terms of the material from which the tile is made." ECF 550 at 28. Limitation 2 is met because the '806 Accused Products contain an acoustically transparent outer surface and integrate a beamforming microphone array into a ceiling tile as a single unit. *See* SOF ¶¶43-50; Ex. 4 ¶¶157-159 and Ex. 96 at 37-67, 107-108; Ex. 17; Ex. 18; Ex. 19. There is no difference between the three accused products for the purposes of this limitation. SOF ¶¶40-41, 47.

The only non-infringement arguments raised in Shure's Final '806 Noninfringement

Chart are the same ones about discussed above in Section IV.B.1.a. *See* Ex. 68 at 11, 14; *see also* Ex. 57 ¶57-66; Ex. 55 ¶24. As explained in that section, those arguments fail because the Court has already rejected them. Shure's expert also attempts to relitigate the construction of "ceiling tile" by arguing that a "ceiling tile" must be a standard, acoustic ceiling tile. Ex. 68 ¶48-56; Ex. 55 ¶24; *see also* Ex. 91 at 113:15-114:3, 114:20-24, 140:15-142:9. This argument was already litigated and rejected as well. *See, e.g.*, ECF 156 at 3, 5, 8, 11-12, 17, 30; ECF 550 at 28-29. Shure "cannot relitigate claim construction at the summary judgment stage and then cry dueling experts." *Intellectual Ventures I, LLC v. NetApp, Inc.*, Civil Action No. 16-10860-PBS, 2020 WL 1644227,at *7 (D. Mass. Apr. 2, 2020)).

> d)  Limitations 3 and 4

The Court construed the phrase "used in a drop ceiling mounting configuration" of Limitation 4 as "configured for use in a drop ceiling mounting configuration." ECF 613 at 16. Limitations 3 and 4 are met because the '806 Accused Products pick up audio signals through the outer grille and are used in a drop ceiling mounting configuration. SOF ¶¶43-48; Ex. 7 ¶¶157-161 and Ex. 96 at 37-87, 107-108; Ex. 17; Ex. 18; Ex. 19. There is no difference between the three accused products for purposes of these limitations. SOF ¶¶40-41, 47.

Shure's only non-infringement argument relating to Limitations 3 and 4 is based on the already-rejected assertions that the MXA910 and MXA910-A are not "ceiling tile[s]" or "integrated into" a ceiling tile. Ex. 68 at 20; Ex. 57 ¶73; Ex. 55 ¶24. As discussed above in Section IV.B.1.a, these claim construction arguments have been rejected by the Court and should not be relitigated at the summary judgment stage.

> e)  Limitation 5

The Court construed the term "drop space" of this limitation as "the space between the

structural ceiling of the room and the plane defined by the drop-ceiling support beams." ECF 550 at 22. Limitation 5 is met because the '806 Accused Products' beamforming microphone array is coupled to the backside of the ceiling tile frame and the '806 Accused Products either partially or entirely reside in the drop space as construed by the Court. SOF ¶¶43-46, 52; Ex. 4 ¶¶162-163; Ex. 96 at 87-94, 107-108; Ex. 17; Ex. 18; Ex. 19. Specifically, the MXA910, when installed in its drop ceiling configuration, resides entirely in the drop space. ¶¶44-47; Ex. 4 ¶¶162-163; Ex. 47 at 87-94, 107-108. The MXA910-A, when installed in the drop ceiling configuration, can either reside entirely in the drop space, when installed flush in a 15/16" ceiling grid, or can reside partially in the drop space, when installed in a 9/16" or 15/16" grid in a way that allows the front face of the device to protrude approximately 0.7" downward from the plane of the drop space. SOF ¶¶40, 46, 70-72; Ex. 17 ¶¶20-46. The MXA910-US resides partially in the drop space, with its front face protruding about 0.7" downward from the plane of the drop space. SOF ¶41.

Shure argues that the MXA910 and MXA910-A do not comprise beamforming microphone arrays coupled to the backside of ceiling tiles. Ex. 68; Ex. 57 ¶74. This argument is based on Shure's mistaken belief that ClearOne is required to delineate a "ceiling tile" portion and a "beamforming microphone array" portion of the MXA910. *Id.* This is a legal argument and not a genuine dispute of material fact. And the Court already rejected it: "ClearOne does not have to point to one particular component of the MXA910 as the ceiling tile, distinct and separate from the beamforming microphone array." ECF 550 at 30.

Shure argues that if the MXA910 is considered a ceiling tile, then the beamforming microphone array would not be coupled to the back side, but rather encased within the ceiling tile. Ex. 68 at 8-9; Ex. 57 ¶74. But there is no reason why the beamforming microphone cannot be coupled to the backside of the ceiling tile from within, and neither Shure nor Shure's expert

cites any evidence to support their argument to the contrary. For example, a cellular phone battery can be both coupled to at least one side of the cell phone and also encased within it.

Shure next argues that the MXA910-A (and presumably the MXA910-US) does not meet this limitation because the *microphones* of that accused product, when properly installed in a drop ceiling, sit approximately a quarter inch below the plane of the drop ceiling. Ex. 68 at 26; Ex. 55 ¶¶26-29. As a preliminary matter, this argument ignores the fact, explained in detail in ClearOne's briefing on its Motion for Contempt, that the MXA910-A was configured to sit flush in 15/16" ceiling grids, which comprise the majority of ceiling grids into which MXA910-As were likely to be installed, and that Shure's customers in fact installed them that way. ECF 718; ECF 785; *see also* Ex. 17 ¶¶20-46; SOF ¶¶46, 70-72. For such installations, the MXA910-A infringed the asserted claims of the '806 Patent precisely as the MXA910 did. *Id.*

Even when they are installed such that their microphones sit a quarter inch below the plane of the drop ceiling, both the MXA910-A and MXA910-US meet Limitation 5. Ex. 17 ¶¶47-54; Ex. 19 ¶8. Shure's argument to the contrary is based on a misread of the Court's claim construction order, which was decided when neither the MXA910-A nor MXA910-US existed. Specifically, Shure argues that the Court construed the "beamforming microphone array" of Limitation 2 as "a plurality of microphones positioned at predetermined locations that produce audio signals to be used to form a directional pickup pattern." Ex. 55 ¶36. Shure argues based on that language that the claimed BFMA can be *nothing* other than the microphones of the device, such that the claim limitation "all or part of said [BFMA] is in the drop space of the drop ceiling" can be satisfied *only* by the microphones, and not by any other portion of the device. *Id.*

As explained in detail in ClearOne's Opposition to Shure's Motion for Modification of the PI Order, Shure's argument is contrary to the claim language and the '806 Patent

specification. ECF 665 at 15-17. Limitation 2 claims "a beamforming microphone array that *includes* a plurality of microphones," thus implying that the BFMA can also include other elements, such as the structure that contains those microphones and holds them in place, and electrical components related thereto. *Id*. at 6 (emphasis added). This understanding is consistent with the figures and language of the specification, which consistently treat the beamforming microphone array as a structure that contains microphones, and potentially other things. SOF ¶44. Indeed, Shure's expert has admitted that the '806 Patent figures depict the beamforming microphone array as a structure that contains microphones. *Id.* In the absence of any briefing or argument on this point, the Court's construction cannot be read to limit the meaning of BFMA to *only* the microphones. To the contrary, the Court specifically ruled in the PI context that "The MXA910 is a BFMA in the form of a ceiling tile—ClearOne does not have to point to one particular component of the MXA910 as the ceiling tile, distinct and separate from the beamforming microphone array. That is the point of the invention: they are *integrated* together." ECF 550 at 30.

> f) *"Vibration damping material" limitation*

The "vibration damping material" limitation in claims 4, 11, and 18 is met because the '806 Accused Products contain poron pads made of foam. SOF ¶¶52-53; *see also* Ex. 4 ¶¶164-165, 168; Ex. 96 at 94-98; Ex. 17 ¶66-67; Ex. 19 ¶7 n.1. Shure's only noninfringement argument unique to this limitation is that the poron pads "are not vibration damping pads, but are in fact structural spacers." Ex. 68 at 33-34; Ex. 57 ¶76. Shure's expert does not cite to any new facts, but only a single paragraph in a declaration of David Cerra (Shure's Associate Vice President of Engineering for Conferencing and Audio Processing) submitted during the '806 PI proceeding. Ex. 55 ¶76; SOF ¶53. The Court already considered the same declaration and rejected Shure's

arguments. ECF 550 at 33-36 ("In the end, Cerra never averred that the seven pads identified by Schonfeld are not foam pads. . . . All of the circumstantial evidence shows that the pads within the red circles identified by Schonfeld are made of foam or some other vibration-damping material. Whether or not they are necessary for acoustic dampening, or whether Shure placed them on the board for that purpose, is irrelevant. If the material dampens, as this does, then it practices Claim 4."). Since the Court's '806 PI ruling, Mr. Cerra, in his Rule 30(b)(6) capacity, confirmed that the pads are indeed made of "█████████████." Ex. 25 at 165:19-166:3; SOF ¶53.

g) "Grille" limitation

The "grille" limitation in claims 5, 12, and 19 is met because Shure admits that the MXA910 and MXA910-A do include grilles "attached to the housing for [their] MEMS microphones." Ex. 21 at 35-36; *see also* Ex. 4 ¶¶166, 169; Ex. 96 at 98-99; Ex. 17 ¶¶68-69; Ex. 19 ¶6-7; SOF ¶54. This admission applies equally to the MXA910-US. Ex. 19 ¶6-7. Shure raises a new and belated claim construction argument that the grille of the MXA910 cannot be the "outer surface" of the ceiling tile because it is a "removable component." *Id.*; Ex. 57 ¶79. But the claims do not limit the "outer surface" to only *non*-removable components of the finished product, and there is no reason to import an unsupported limitation into the claims. *Cf.* ECF 550 at 49 ("It is possible for an apparatus to have an outer surface that is part of the apparatus but also be considered distinct from the rest of it.").

h) "Coplanar" limitation

The "coplanar" limitation in claims 6, 13, and 20 is met because the '806 Accused Products include an outer surface that is "'coplanar with the apparatus itself", rather than being "an additional structure that—although still part of the apparatus—is lower than the rest of the

tile." ECF 550 at 49. Because each of the '806 Accused Products has the same physical relationship between the outer surface and the rest of the apparatus, they all meet this limitation in the same way. SOF ¶55; Ex. 4 ¶¶167 and 170; Ex. 96 at 99-108; Ex. 17 ¶70-71; Ex. 19 ¶6-7.

Shure argues that "[a] removable component of the housing cannot also be the 'outer surface' of any ceiling tile" and therefore cannot be "both part of a ceiling tile and 'coplanar with' that ceiling tile." Ex. 68 at 13. For the same reasons discussed in the previous section, a "removable" outer surface is not precluded by the claim language and should not be read out of the claim scope.

### C.    Induced Infringement of the '186 and '806 Patents

Induced infringement occurs where: (1) the infringer knew of the patent in question and knew the induced acts were infringing; (2) the infringer had specific intent to induce infringement by another; and (3) there is direct infringement by the induced entity. *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926–31 (2015). A defendant's belief regarding patent validity is not a defense to induced infringement. *Id.* at 1928. Like direct infringement, induced infringement can be proven through circumstantial evidence. *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986). "[W]here an alleged infringer designs a product for use in an infringing way and instructs users to use the product in an infringing way, there is sufficient evidence for a jury to find direct infringement." *Toshiba*, 681 F.3d at 1365.

As discussed above, the '186 and '806 Accused Products practice each element of the asserted claims. By making, using, selling, offering to sell the'186 and '806 Accused Products to its customers, Shure induces infringement by its customers, who in turn make, use, sell, or offer to sell those products to end users. SOF ¶¶66. Shure further induces infringement by the end users, who use those products. *Id.* Direct evidence shows that numerous customers use the

the '186 and '806 Accused Products in an infringing manner. SOF ¶¶26, 36, 45, 46.

Circumstantial evidence shows that other customers also likely use the the '186 and '806

Accused Products in an infringing manner. SOF ¶¶66-73.

Shure has known of ClearOne's patent rights under the '186 Patent since at least March

10, 2017, when ClearOne notified Shure about the soon-to-issue '186 Patent and enclosed the

Notice of Allowance. SOF ¶11; *see Kid Stuff Mktg., Inc. v. Creative Consumer Concepts, Inc.*,

No. 15-2620-JWL, 2015 WL 3485759, at *2 (D. Kan. June 2, 2015) (finding that defendant had

knowledge of patent after receiving notice of allowance); *Intellect Wireless Inc. v. Sharp Corp.*,

No. 10 C 6763, 2012 WL 787051, at *11 (N.D. Ill. Mar. 9, 2012) ("Defendants' knowledge of

the patent as of the time of the suit's commencement can satisfy the knowledge requirement for

conduct that post-dates the date of the complaint."). Similarly, Shure has been aware since then

that the '186 Accused Products[9] infringe the '186 Patent, because ClearOne's letter included a

detailed claim chart. SOF ¶11; *see also Cascades Computer Innovation, LLC v. Samsung Elecs.

Co.*, 77 F. Supp. 3d 756, 766–67 (N.D. Ill. 2015) (holding that defendant could be found to have

knowledge that it was inducing infringement after receiving a "detailed claim chart").

Despite this knowledge, Shure has exhibited specific intent to induce infringement by

continuing to advertise the benefits of combining the '186 Accused Products, and instructing

customers on how best to do so. SOF ¶¶67-68; *see also i4i Ltd. P'ship v. Microsoft Corp.*, 598

F.3d 831, 851–52 (Fed. Cir. 2010) (finding that knowledge of the patent combined with

instructions to customers on how to infringe can demonstrate specific intent to infringe). A

finding of specific intent is justified when the language of the accused infringer's instructions

"would inevitably lead some consumers to practice the claimed method." *Astrazeneca LP v.*

---

[9] Even though the P300 was released later, Shure would have known that its relevant operations would similarly infringe the '186 Patent based on the claim chart.

*Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2011). That is the case here.

For the '186 Accused Products, Shure "recommend[s] and agree[s] that the best way to use this mic is with individual channel processing inside your DSP; individual echo cancellation, individual noise reduction, individual EQ, everything, outside of the array itself; that's really the gold standard." SOF ¶67. To provide system integrators and end users with this "gold standard," Shure issued press releases advertising the benefits of integrating the MXA910 with Shure's, Biamp's, and QSC's DSP products. *Id.*

Shure also provided detailed instructions on combining and using the '186 Accused Products in an infringing manner. Shure instructed customers how to improve audio transmitted to the far-end by using "Last Mic On." *See, e.g.*, SOF ¶68. Last Mic On is ███████████ in the Shure and Shure-QSC '186 Accused Products and encouraged in the Shure-Biamp '186 Accused Products. *Id.* ¶34. When users use the '806 Accused Products with Last Mic Lock On enabled, they directly infringe the '186 Patent. *Supra* Section IV.A. Because these features improve audio quality, integrators and end users will not disable them. SOF ¶34.

Similarly, Shure has known about ClearOne's claim that Shure infringes the '806 Patent since at least January 23, 2018. SOF ¶¶12-13. Despite this knowledge, Shure has exhibited specific intent to induce infringement by continuing to sell and promote the '806 Accused Products in an infringing manner until 18 days after the Court issued its PI Order relating to the '806 Patent when ClearOne posted the bond. SOF ¶¶69-73. Indeed, S███████████████ ████████████████████████████████████████████████████ . SOF ¶69. In ████████████████ ████████████████████████████████████████████████ . SOF ¶¶70-72. ███████████████████████████████

██████████████████████████████████ . SOF ¶70. ████████████

████████████████████████████████████████████████████████████

████████████████ . SOF ¶70-72; *see also* ECF 718; ECF 785. Shure also induced

infringement by selling its MXA910-A for the non-flush ceiling mounting configuration, which

also infringes. Ex. 66; SOF ¶46. Starting on June 1, 2020, Shure began inducing infringement by

its customers and end users by selling its MXA910-US for the non-flush ceiling mounting

configuration, which infringes in the same way. SOF ¶41; Ex. 19.

### D. Contributory Infringement of the '186 Patent

"Contributory infringement occurs if a party sells or offers to sell, a material or apparatus

for use in practicing a patented process, and that material or apparatus is material to practicing

the invention, has no substantial non-infringing uses, and is known by the party to be especially

made or especially adapted for use in an infringement of such patent." *In re Bill of Lading*

*Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1337 (Fed. Cir. 2012 (internal

quotations omitted); 35 U.S.C. § 271(c).

Here, there is no material dispute that: (1) Shure knew of the '186 Patent (SOF ¶11); (2)

Shure encouraged its customers and end users to infringe; and (3) Shure's customers and end

users indeed combined the MXA910 with the accused DSP products in an infringing manner (*see*

*supra* Sections IV.A and IV.C and SOF ¶¶26, 36). The MXA910 is also a material part of the

claimed system and method because it meets all or part of every limitation of the asserted claims.

*See supra* Section IV.A; *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 444, 466 (D.

Del. 2004) (granting summary judgment of contributory infringement in part because "the

microarray component is a material part of the invention because it is the support upon which the

claimed methods of use are performed."). There is also no significant non-infringing use for the

MXA910. Shure "recommend[s] and agree[s] that the best way to use this mic is with individual channel processing inside your DSP; individual echo cancellation, individual noise reduction, individual EQ, everything, outside of the array itself; that's really the gold standard." SOF ¶67. Shure also admits that ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████." Ex. 135 ¶56. Even though the MXA910 has an automix output, which Shure argues is a significant non-infringing use (Ex. 22 at 2), Shure advises users to "not use the automix output from the MXA910 to the P300." Ex. 29.

### E.    Willful Infringement and Enhanced Damages Relating to the '806 Patent

If the Court finds that summary judgment of infringement as to the '806 Patent is warranted, there is also no genuine dispute of material fact precluding a finding of Shure's willful infringement and enhanced damages for ClearOne.

#### 1.    Willfulness

"[T]he concept of 'willfulness' requires a [factfinder] to find no more than deliberate or intentional infringement." *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020) (citing *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1933 (2016)). "[A] preponderance of the evidence standard is applicable to willfulness …." *Loggerhead Tools, LLC v. Sears Holding Corp.*, No. 12-cv-9033, 2016 WL 6778881, at *2 (N.D. Ill. Nov. 15, 2016) (citing *Halo*, 136 S. Ct. at 1933).

There is no material factual dispute that Shure has deliberately or intentionally infringed the '806 Patent. Shure has known about the '806 Patent and Shure's infringement since January 2018. SOF ¶¶12-13. This Court found that "Shure is likely infringing the '806 Patent" on August 5, 2019. ECF 550. Instead of ceasing its infringing activities, ████████████████████████ing

██████████████████████████████████████████████████████. SOF ¶69. As

explained in detail in ClearOne's contempt briefing, Shure then rushed to market with a

product—the MXA910-A—that ████████████████████████████████████

████████ SOF ¶¶69-72; Ex. 17 ¶¶24-46; *see also* ECF 718; ECF 785. Shure did so despite the

fact that it could easily have developed a product that could not be installed in that manner—as

evidenced by Shure's prompt release of the MXA910-US. SOF ¶¶41, 75-77.

### 2. Enhanced Damages

Section 284 of the Patent Act "gives district courts the discretion to award enhanced

damages against those guilty of patent infringement." *Halo*, 136 S. Ct. at 1935 (2016). The

statute provides that "the court may increase the damages up to three times the amount found or

assessed." 35 U.S.C. § 284.

"The question of enhanced damages is addressed by the court once an affirmative finding

of willfulness has been made." *Eko Brands*, 946 F.3d at 1378 (citing *Halo*, 136 S. Ct. 1933-34).

"The subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced

damages, without regard to whether his infringement was objectively reckless." *Georgetown Rail

Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1244 (Fed. Cir. 2017) (quoting *Halo*, 136 S. Ct. at

1932). When deciding how much to award in enhanced damages, district courts consider several

non-exclusive *Read* factors:

> (1) "whether the infringer deliberately copied the ideas of another"; (2) "whether
> the infringer, when he knew of the other's patent protection, investigated the
> scope of the patent and formed a good-faith belief that it was invalid or that it was
> not infringed"; (3) "the infringer's behavior as a party to the litigation"; (4) the
> "[d]efendant's size and financial condition"; (5) the "[c]loseness of the case"; (6)
> the "[d]uration of the defendant's misconduct"; (7) "[r]emedial action by the
> defendant"; (8) the "[d]efendant's motivation for harm"; and (9) "[w]hether the
> defendant attempted to conceal its misconduct."

*Georgetown Rail*, 867 F.3d at 1244 n.6 (quoting *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed.

Cir. 1992)). As with willfulness, the patentee must establish enhanced damages by "a preponderance of the evidence." *Halo*, 136 S. Ct. at 1934.

If the Court finds that Shure has willfully infringed the '806 Patent, many *Read* factors weigh in favor of enhanced damages.

*First*, when Shure learned of ClearOne's '806 Patent, it did not perform a good-faith investigation to form a good-faith belief that it was invalid or not infringed. SOF ¶74. Shure did not seek an invalidity opinion, and sought its noninfringement opinion from Shure's litigation counsel's former law partner. *Id.* That opinion was not rendered in writing until late September 2018, *nine months* after Shure learned of the '806 Patent. *Id.*

*Second*, Shure's litigation behavior with respect to the '806 Patent warrants enhanced damages. Immediately after the Court issued the '806 PI Order, ███████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████ SOF ¶¶75-77. *The next day*, Shure misleadingly argued to this Court that there should not be a recall of sold MXA910s, because "[i]t is not the nature of this market for integrators to hold or warehouse products, and certainly not expensive ones such as the MXA910." ECF 575 at 12.

Shortly thereafter, Shure rushed to market with a minimally modified MXA910-A, which ███████████████████████████████████████████████. SOF ¶¶69-72. Shure released the MXA910-A ██████████████████████████████████████—the MXA910-US—that would fix the flush-mount issue. SOF ¶¶75-76.

During this time, Shure resisted discovery into the development of the MXA910-A, forcing ClearOne to move to compel discovery in association with its Motion for Contempt. ECF 718; ECF 785. The Court ordered Shure to provide some of that discovery on March 10, 2020.

At the same time, Shure was actively concealing information about the MXA910-US from both ClearOne *and* the Court. On March 10, 2020, less than three months before the MXA910-US would be released, ██████████████████████████████, Shure's counsel informed the Court that a product like the MXA910-US would be too difficult and time-consuming to develop. SOF ¶¶75-76.

When Shure finally did inform ClearOne's counsel of the MXA910-US on April 17, 2020, it designated all communications relating to that product Highly Confidential-Attorneys' Eyes Only, so that ClearOne's counsel could not communicate with its client about this important development. SOF ¶77; ECF 761 at 6. ClearOne's counsel requested de-designation of limited information. SOF ¶77; ECF 761 at 6. Shure refused, and filed a motion for protective order that misrepresented the scope of what ClearOne sought to de-designate. SOF ¶77; ECF 761 at 6. Shure thus ran out the clock until the public release of the MXA910-US, and then withdrew its motion. ECF 816. Shure also opposed ClearOne's Motion for Leave to Amend its Infringement Contentions to add the MXA910-US, despite the fact that the MXA910-A and MXA910-US are identical, and infringe identically, in several respects. ECF 829. Shure set forth no legal basis for opposing ClearOne's Motion for Leave to Amend, instead arguing that the Court should resolve Shure's later-filed Motion for Clarification before addressing ClearOne's Motion for Leave to Amend. *Id.* at 3. In all these ways, Shure has driven up the litigation costs for ClearOne on issues that should be straightforward.

*Third*, Shure's size and financial condition, especially in comparison to ClearOne's, warrants enhanced damages. Shure's annual revenue is approximately $██ million; ClearOne's is approximately $25 million. SOF ¶78. Shure sold over $██ million of MXA910 and P300 from their introduction through August 2019 as their sales grew exponentially. *Id*. Meanwhile,

ClearOne's revenues overall and from the BMA products continue to decline. *Id.*

*Fourth*, the case is not close. The Court found that Shure was likely infringing the '806 Patent and issued a preliminary injunction. ECF 550. As discussed above, Shure continues to pursue numerous already-rejected noninfringement and claim construction arguments, forcing ClearOne to address them and further driving up the cost of this litigation.

*Fifth*, the duration of Shure's willful infringement started at least by January 2018 when Shure was notified that ClearOne intended to add the '806 Patent to the case. SOF ¶¶12-13. Shure's willful infringement continues to this day, *after* the Court enjoined Shure from further infringement, because even Shure's twice-attempted design-around solution still infringes the '806 Patent. *See, e.g.*, SOF ¶¶40-41, 46, 69-72.

*Sixth*, Shure did not take any real remedial action even after the Court issued the PI Order. SOF ¶79. Shure's two attempted design-around products still infringe the '806 Patent.

*Lastly*, Shure had motivation for harm. Shure admits that ClearOne is a direct competitor. SOF ¶80. "Some courts find that motivation to compete is motivation to harm." *See, e.g.*, *Cobalt Boats, LLC v. Brunswick Corp.*, 296 F. Supp. 3d 791, 804 (E.D. Va. 2017) (finding motivation to compete weighs in favor of enhanced damages); *Parker–Hannifin Corp. v. Wix Filtration Corp.*, No. 1:07cv1374, 2011 WL 976559, at * 17 (N.D. Ohio Mar. 17, 2011) (same).

In conclusion, the Court should find that enhanced damages are appropriate with regard to at least the '806 Patent and treble any damages awarded to ClearOne by the jury.

## V. CONCLUSION

For the reasons set forth above, ClearOne respectfully requests that the Court grant its Motion for summary judgment, or, in the alternative, partial summary judgment.

Dated: July 9, 2020                                    By: */s/ Xinlin Li Morrow*

John C. Hueston, *pro hac vice*
Douglas J. Dixon, *pro hac vice*
Christina V. Rayburn, *pro hac vice*
Sourabh Mishra, *pro hac vice*
jhueston@hueston.com
ddixon@hueston.com
crayburn@hueston.com
smishra@hueston.com
Hueston Hennigan LLP
523 West 6th Street, Suite #400
Los Angeles, CA 90014
Telephone: (213) 788-4340

And

Xinlin L. Morrow, *pro hac vice*
xinlin@morrowfirm.com
The Morrow Firm, P.C.
1880 Century Park E, Ste 815
Los Angeles, CA 90067
Telephone: (213) 282-8166

And

Garret A. Leach, P.C.
(IL Bar No. 6237520)
garret.leach@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for ClearOne, Inc.*