# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Shure Incorporated, | Civil Number 1:17-cv-03078 |
| Plaintiff, | |
| v. | Jury Trial Demanded |
| ClearOne, Inc., | |
| Defendant. | Hon. Edmond E. Chang<br>Mag. Judge Hon. Maria Valdez |
| | **REDACTED VERSION FILED PUBLICLY** |
| ClearOne, Inc., | |
| Counter-Plaintiff, | |
| vs. | |
| Shure Incorporated | |
| Counter-Defendant. | |

**CLEARONE'S OPPOSITION TO SHURE'S MOTION FOR SUMMARY JUDGMENT ON INVALIDITY AND MEMORANDUM IN SUPPORT OF ITS CROSS MOTION FOR SUMMARY JUDGMENT OF VALIDITY AND ENFORCEABILITY OF U.S. PATENT NOS. 9,635,186 AND 9,813,806**

# TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ................................................................................................. 1

II. THE PATENTS-IN-SUIT ARE NOT INVALID UNDER 35 U.S.C. § 112................... 1

    A.    Relevant Legal Standards ....................................................................... 1
        1.    Written Description ...................................................................... 1
        2.    Enablement ................................................................................... 2
        3.    Indefiniteness .............................................................................. 3

    B.    The '806 Patent provides sufficient disclosure under 35 U.S.C. § 112............... 3
        1.    "said beamforming microphone array integrated into said ceiling tile as a single unit"............................................................................. 3
        2.    "all or part of said beamforming microphone array is in the drop space of the drop ceiling" ............................................................ 13
        3.    "drop space" ............................................................................... 18
        4.    Claims 5, 12, and 19: "grille" .................................................... 19
        5.    "beamforming microphone array" is not indefinite................................ 20
        6.    "said beamforming microphone array picks up audio input signals through said outer surface of said ceiling tile" is not indefinite ......................... 21
        7.    "said beamforming microphone array coupled to the backside of said ceiling tile" ................................................................................ 21
        8.    Claims 6, 13, and 20: "outer surface is coplanar with said ceiling tile" is not indefinite................................................................... 22
        9.    Claims 1, 4, 5, and 6 are not indefinite because they are not mixed apparatus and method claims.............................................................. 23
        10.    Claims 15, 18-20 are not indefinite for reciting "is used in a drop ceiling mounting configuration" in method of manufacture claims.................. 23

    C.    The '186 Patent provides sufficient disclosure under 35 U.S.C. 112................ 23
        1.    "signal selection module"........................................................... 23
        2.    "fixed beam" is not indefinite .................................................... 27

III. CLAIMS 1, 4-6, 15, AND 18-20 OF THE '806 PATENT ARE NOT INVALID UNDER 35 U.S.C. 101 ..................................................................................... 28

IV. THE PATENTS-IN-SUIT ARE NOT OBVIOUS ......................................................... 28

    A.    Relevant Legal Standard............................................................................. 28

    B.    The '186 Patent Is Not Obvious ................................................................ 29
        1.    K-01 and Beaucoup, With or Without K-91 and Martin, Do Not Render The Asserted Claims Obvious ..................................................... 29
        2.    Valve and Hamalainen Do Not Render The Asserted Claims Obvious . 35

3.     Beaucoup '639 in Combination with Vortex EF2241 in View of K-97 and Smith, Does Not Render the Asserted Claims Obvious ........................ 40

4.     Buchner in Combination with XAP 800 in View of K-91 Does Not Render the Asserted Claims Obvious ................................................................ 42

C.     The '806 Patent is Not Obvious ...................................................................... 46

1.     Non-Obviousness in Light of the CTG System...................................... 46

2.     Shure's "Loudspeaker" Prior Art Combinations .................................... 50

D.     Secondary Considerations of Non-Obviousness ................................................. 56

1.     Secondary Considerations Establish That The '186 Patent Is Nonobvious ................................................................................................ 57

2.     Secondary Considerations Establish That The '806 Patent Is Nonobvious ................................................................................................ 61

E.     Shure's New Priority Date Argument is Flawed ................................................. 62

1.     Background Facts ................................................................................... 62

2.     The Local Patent Rules Bar Shure's Priority Date Argument................. 63

3.     Shure's Priority Date Argument Fails on the Merits.............................. 65

V.     SUMMARY JUDGMENT OF ENFORCEABILITY MUST BE GRANTED ............. 71

A.     Shure's Unenforceability Arguments Against the '186 Patent All Fail ............. 72

1.     Shure Has Not Shown Clear and Convincing Evidence Supporting Its Inequitable Conduct Allegation that ClearOne Withheld Prior Art ....... 72

2.     Shure Has Not Shown Clear and Convincing Evidence Supporting Its Allegation that Booth Committed Inequitable Conduct by Mistakenly Providing the Wrong Copy of the '921 Application to the PTO............ 74

3.     Shure Has Not Shown Clear and Convincing Evidence Supporting Its Inequitable Conduct Claim Relating to the Definition of "Fixed Beam"75

B.     Shure's Unenforceability Arguments Against the '806 Patent All Fail ............. 77

1.     Shure Has Not Shown Clear and Convincing Evidence Supporting its Claim that ClearOne Committed Inequitable Conduct By Failing to Disclose the BMA System.................................................................... 77

2.     Shure Has Not Shown Clear and Convincing Evidence Supporting its Claim that ClearOne Committed Inequitable Conduct By Failing to Disclose the CTG System..................................................................... 78

3.     Shure Has Not Shown Clear and Convincing Evidence Supporting its Inequitable Conduct Claim Regarding "New Matter" ........................... 79

VI.     CONCLUSION ......................................................................................... 80

## TABLE OF AUTHORITIES

Page(s)

Cases

*1st Media, LLC v. Elec. Arts, Inc.,*
   694 F.3d 1367 (Fed. Cir. 2012) ...............................................................73, 74, 78, 79

*Automotive Techs. v. BMW of N.A.,*
   501 F.3d 1274 (Fed. Cir. 2007) .........................................................................10

*Adams v. Joliet Mfg. Co.,*
   1 F. Cas. 123 (N.D. Ill. 1877) .....................................................................67, 68

*AK Steel v. Sollac & Ugine,*
   344 F.3d 1234 (Fed. Cir. 2003) .........................................................................17

*All Dental Prodx v. Advantage Dental Prods.,*
   309 F.3d 774 (Fed. Cir. 2002) ..........................................................................24

*ALZA Corp. v. Andrx Pharms., LLC,*
   603 F.3d 935 (Fed. Cir. 2010) ...........................................................................3

*Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.,*
   725 F.2d 1350 (Fed. Cir. 1984) .........................................................................67

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
   314 F.3d 1313 (Fed. Cir. 2003) .........................................................................17

*Amstar Corp. v. Envirotech Corp.,*
   730 F.2d 1476 (Fed. Cir. 1984) .........................................................................20

*Arendi S.A.R.L., v. Apple, Inc.,*
   832 F.3d 1355 ...........................................................................................47, 49

*Ariad Pharm., Inc. v. Eli Lilly & Co.,*
   598 F.3d 1336 (Fed. Cir. 2010) ...................................................................1, 2, 19

*Aristocrat Techs Australia PTY Ltd. v. Int'l Game,*
   543 F.3d 657 (Fed. Cir. 2008) .....................................................................68, 70

*ATD Corp. v. Lydall, Inc.,*
   159 F.3d 534 (Fed. Cir. 1998) ..........................................................................79

*AVNET, Inc. v. MOTIO, Inc.*,
   2016 WL 3365430 (N.D. Ill. June 15, 2016) ..........................................................................65, 66

*Baxter Int'l v. McGraw, Inc.*,
   149 F.3d 1321 (Fed. Cir. 1998) .................................................................................................71

*Blackbird Tech LLC v. ELB Elecs., Inc.*,
   895 F.3d 1374 (Fed. Cir. 2018) ...................................................................................................4

*Bone Care Intern., LLC v. Pentech Pharm., Inc.*,
   862 F. Supp. 2d 790 (N.D. Ill. 2012) ........................................................................................52

*Boston Sci. Corp. v. Johnson & Johnson*,
   647 F.3d 1353 (Fed. Cir. 2011) ...................................................................................................7

*Boyden v. Comm'r of Patents*,
   441 F.2d 1041 (D.C. Cir. 1971) ................................................................................................70

*CFMT, Inc. v. Yieldup Intern. Corp.*,
   349 F.3d 1333 (Fed. Cir. 2003) .................................................................................................10

*Chamberlain Group. Inc. v. Interlogix, Inc.*,
   2002 WL 1263984 (N.D. Ill. June 3, 2002) ..............................................................................70

*Chamberlain Group, Inc. v. Lear Corp.*,
   756 F. Supp. 2d 938 (N.D. Ill. 2010) ..................................................................................74, 78

*Chamberlain Grp. v. Techtronic Indus. Co.*,
   2017 WL 3493799 (N.D. Ill. Aug. 14, 2017) .....................................................................73, 78

*Cheese Systems, Inc. v. Tetra Pak Cheese and Powder Sys., Inc.*,
   725 F.3d 1341 (Fed. Cir. 2013) .................................................................................................29

*Chiron Corp. v. Genentech, Inc.*,
   266 F. Supp. 2d 1172 (E.D. Cal. 2022) ...............................................................................77, 80

*Chiron Corp. v. Genentech, Inc.*,
   363 F.3d 1247 (Fed. Cir. 2004) ...................................................................................................9

*Cochrane v. Deener*,
   94 U.S. 780, 24 L.Ed. 139 (1876).......................................................................................20, 21

*Cordis Corp. v. Medtronic AVE, Inc.*,
   339 F.3d 1352 (Fed. Cir. 2003) ...........................................................................................2, 5, 6

*Core Wireless Licensing S.A.R.L. v. Apple Inc.*,
    899 F.3d 1356 (Fed. Cir. 2018) ...............................................................................28

*De Soto Sec. Co. v. C.I.R.*,
    235 F.2d 409 (7th Cir. 1956) .....................................................................................69

*Display Sys., Inc. v. Kent State Univ.*,
    212 F.3d 1272 (Fed. Cir. 2000) ................................................................................59

*Dow Chem. Co. v. Am. Cyanamid Co.*,
    816 F.2d 617 (Fed. Cir. 1987) ....................................................................59, 60, 62

*Durel Corp. v. Osram Sylvania Inc.*,
    256 F.3d 1298 (Fed. Cir. 2001) ..................................................................................3

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
    227 F.3d 1361 (Fed. Cir. 2000) ..........................................................................58, 59

*Eiselstein v. Frank*,
    52 F.3d 1035 (Fed. Cir. 1995) .............................................................................2, 22

*Eli Lilly Co. v. Barr Labs., Inc.*,
    251 F.3d 955 (Fed. Cir. 2001) ....................................................................1, 34, 72

*Encyclopedia Britannica v. Alpine Elecs. of Am.*,
    609 F.3d 1345 (Fed. Cir. 2010) ................................................................................71

*Fujitsu Ltd. v. Tellabs, Inc.*,
    898 F. Supp. 2d 1047 (N.D. Ill. 2012) .........................................................16, 24, 27, 64

*Graham v. John Deere Co. of Kan. City*,
    383 U.S. 1 (1966)......................................................................................................38, 40

*Gummow v. Snap-On Tools, Inc.*,
    2001 WL 290609 (N.D. Ill. Mar. 13, 2001).............................................................12

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
    802 F.2d 1367 (Fed. Cir. 1986) ..................................................................................3

*HZNP Medicines LLC v. Actavis Labs. UT, Inc.*,
    940 F.3d 680 (Fed. Cir. 2019) ..................................................................................13

*In re Bosies*,
    207 U.S.P.Q. 1139 (Dec. Comm'r Pat. 1979) (USPTO enforcing ......................70, 71

*In re Clay*,
966 F.2d 656 (Fed. Cir. 1992) ...................................................................51, 52

*In re Mother Tucker's Food Experience (Canada) Inc.*,
925 F.2d 1402 (Fed. Cir. 1991) ..............................................................70

*In re Paulsen*,
30 F.3d 1475 (Fed. Cir. 1994) ...............................................................9

*In re Skvorecz*,
580 F.3d 1262 (Fed. Cir. 2009) ...........................................................24, 25

*In re Wands*,
858 F.2d 731 (Fed. Cir. 1988) ..............................................................3

*Karsten Mfg. Corp. v. Cleveland Golf Co.*,
242 F.3d 1376 (Fed. Cir. 2001) ............................................................30

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) .............................................................................39

*Liebel-Flarsheim v. Medrad*,
481 F.3d 1371 (Fed. Cir. 2007) ............................................................8

*Lizardtech, Inc. v. Earth Resource Mapping*,
424 F.3d 1336 (Fed. Cir. 2005) ...........................................................2, 5

*Magnivision, Inc. v. Bonneau Co.*,
115 F.3d 956 (Fed. Cir. 1997) ..............................................................69, 70

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
579 F.3d 1363 (Fed. Cir. 2009) ............................................................2

*Micro Int'l Ltd. v. O2 Micro, Inc.*,
467 F.3d 1355 (Fed. Cir. 2006) ............................................................65

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014).............................................................................3

*Net MoneyIN, Inc. v. Verisign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008) ...........................................................30, 32, 33

*Pactiv Corp. v. Multisorb Techs.*,
2013 WL 2384249 (N.D. Ill. May 29, 2013).........................................66

*Paragon Sols., LLC v. Timex Corp.*,
    566 F.3d 1075 (Fed. Cir. 2009) .................................................................5

*Peer Commc'ns v. Skype Techs. SA*,
    2008 WL 4831001 n.3 (E.D. Tex. May 29, 2008)................................7, 8

*Peerless Indus, Inc. v. Crimson AV, LLC*,
    2018 WL 6178237 (N.D. Ill. Nov. 27, 2018) ..........................................65

*Pharmacia Corp. v. Par Pharm., Inc.*,
    417 F.3d 1369 (Fed. Cir. 2005) .........................................................74, 76

*PowerOasis, Inc. v. T–Mobile USA*,
    522 F.3d 1299 (Fed.Cir.2008) ...........................................................25, 26

*Research Corp. Techs. v. Microsoft Corp.*,
    627 F.3d 859 (Fed. Cir. 2010) ..................................................................4

*Rexnord Corp. v. Laitram Corp.*,
    274 F.3d 1336 (Fed. Cir. 2001) ..................................................8, 13, 14

*Rothman v. Target Corp.*,
    556 F.3d 1310 (Fed. Cir. 2009) ...............................................................76

*Schwendimann v. Arkwright Advanced Coating*,
    2011 WL 4007334 (D. Minn. Sept. 8, 2011)..................................... Passim

*ScriptPro LLC v. Innovation Assocs., Inc.*,
    833 F.3d 1336 (Fed. Cir. 2016) (reversing ...........................................2, 6

*Sitrick v. Dreamworks, LLC*,
    516 F.3d 993 (Fed.Cir.2008) ....................................................................3

*Sloan Valve Co. v. Zurn Indus.*,
    2013 WL 6132598 (N.D. Ill. Nov. 20, 2013) ..........................................64

*Spectra-Physics, Inc. v. Coherent, Inc.*,
    827 F.2d 1524 (Fed. Cir. 1987) .............................................................8, 9

*Spinmaster Ltd. v. Overbreak LLC*,
    404 F. Supp. 2d 1097 (N.D. Ill. 2005)....................................................67

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107, (Fed. Cir. 1985) .............................................................11

*Standard Oil Co. v. American Cyanamid Co.*,
   774 F.2d 448 (Fed. Cir. 1985) ...................................................................52

*Star Sci. v. R.J. Tobacco*,
   537 F.3d 1357 (Fed. Cir. 2008) .......................................................... Passim

*Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*,
   339 F. Supp. 3d 803 (N.D. Ill. 2018) .........................................................74

*Techtronic Indus. v. Chevron Holdings*,
   395 F. Supp. 2d 720 (N.D. Ill. 2005) ....................................................57, 58

*Therasense, Inc. v. Becton, Dickinson & Co.*,
   649 F.3d 1276 (Fed. Cir. 2011) .......................................................... Passim

*TQ Delta, LLC v. CISCO Sys., Inc.*,
   942 F.3d 1352 (Fed. Cir. 2019) ...........................................................38, 39

*Transocean Offshore Deepwater v. Maersk Contractors USA*,
   617 F.3d 1296 (Fed. Cir. 2010) .................................................................10

*Urologix, Inc. v. ProstaLund AB*,
   227 F. Supp. 2d 1033 (E.D. Wis. 2002).................................................71, 72

*Vas-Cath Inc. v. Mahurkar*,
   935 F.2d 1555 (Fed. Cir. 1991) ...................................................................2

*Verizon Commc'n., Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012) .......................................................... Passim

*WMS Gaming v. Int'l Game*,
   184 F.3d 1339 (Fed. Cir. 1999) ...........................................35, 36, 37, 38

*Young v. Lumenis, Inc.*,
   492 F.3d 1336 (Fed. Cir. 2007) .................................................................76

*Zachariah v. Comm'r of Patents & Trademarks*,
   2000 WL 1120185 (Fed. Cir. 2000) ..........................................................69

*Zimmer Surgical, Inc. v. Stryker Corp.*,
   365 F. Supp. 3d 466 (D. Del. 2019)..............................................................6

**Statutes**

35 U.S.C. § 27 ...............................................................................................70

35 U.S.C. § 103 ...........................................................................................................28

35 U.S.C. § 111(c) ................................................................................................Passim

35 U.S.C. § 112(a) .........................................................................................................1

35 U.S.C. § 120 ...........................................................................................................71

35 U.S.C. § 282 .............................................................................................................1

**Rules**

Fed. Cir. R. 32.1 .........................................................................................................69

Fed. R. Civ. P. 56(a) .....................................................................................................1

**Regulations**

37 C.F.R. 1.16(f) .........................................................................................................68

37 C.F.R. 1.17(i) .........................................................................................................68

37 C.F.R. 1.53(b) .........................................................................................................63

37 C.F.R. § 1.183 .........................................................................................................67

37 C.F.R. § 1.57 ...............................................................................................67, 71, 72

37 C.F.R. § 1.57(a) .......................................................................................................66

37 C.F.R. § 1.57(a)(1) ..................................................................................................67

## TABLE OF ABBREVIATIONS

| Abbreviation | Full Text |
|---|---|
| '135 Application | U.S. Patent Application No. 15/040,135, issued as U.S. Patent No. 9,854,101 |
| '186 Patent | U.S. Patent No. 9,635,186 |
| '424 Application | U.S. Patent Application No. 15/190,424, issued as '186 Patent |
| '524 Provisional | U.S. Provisional Patent Application No. 61/828,524 |
| '553 Patent | U.S. Patent No. 9,264,553 |
| '751 Provisional | U.S. Provisional Patent Application No. 61/771,751 |
| '806 Patent | U.S. Patent No. 9,813,806 |
| '849 Application | U.S. Patent Application No. 14/475,849, issued as '806 Patent |
| '921 Application | U.S. Patent Application No. 13/493,921, issued as '553 Patent |
| '968 Provisional | U.S. Provisional Patent Application No. 61/495,968 |
| ClearOne | Defendant/Counter-Plaintiff ClearOne, Inc. |
| DEX | Defendant's Exhibit |
| DSOF | Defendant's Statement of Facts |
| PEX | Plaintiff's Exhibit |
| PMSJ | Plaintiff's Opening Brief in Support of its Motion for Summary Judgment |
| POA | Power of Attorney |
| PSOF | Plaintiff's Statement of Facts |
| PTAB | Patent Trial and Appeal Board |
| Shure | Plaintiff/Counter-Defendant Shure Incorporated |
| USPTO | United States Patent and Trademark Office |

## I.     INTRODUCTION

The Court already considered numerous issues relating to Shure's invalidity arguments in the context of ClearOne's motions for preliminary injunction (under a more favorable standard of proof for Shure) and claim construction. Now, after discovery and claim construction, Shure's invalidity case is even weaker and ripe for summary judgment. ClearOne moves for summary judgment that the patents-in-suit are not invalid and not unenforceable on each of the grounds discussed below, and submits its opposition to Shure's Motion for Summary Judgment of Invalidity ("PMSJ"), as detailed in sections II.B.1, II.B.2, IV.B.1, IV.B.2, and IV.E.

## II.     THE PATENTS-IN-SUIT ARE NOT INVALID UNDER 35 U.S.C. § 112

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because patents are presumed valid under 35 U.S.C. § 282, "a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise. Alternatively, a moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent." *Eli Lilly Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).

### A.     Relevant Legal Standards

#### 1.     Written Description

35 U.S.C. § 112(a) requires a patent specification to "contain a written description of the invention." *Id*. Compliance with this requirement is a question of fact, judged from the perspective of a skilled artisan as of the patent's filing date. *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1355 (Fed. Cir. 2010) (*en banc*). The level of detail required to satisfy the written

- 1 -

description requirement therefore "varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id.* at 1351.

To find sufficient written description, a court "need not find that the application describes exactly the subject matter claimed, but rather must find that the disclosure of the application relied upon reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991) (internal citations omitted). Indeed, "[a]n applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention." *Cordis Corp. v. Medtronic AVE, Inc.* 339 F.3d 1352, 1365 (Fed. Cir. 2003) (internal citations omitted). Moreover, the specification "need not describe the claimed subject matter in exactly the same terms as used in the claims." *Eiselstein v. Frank*, 52 F.3d 1035, 1038 (Fed. Cir. 1995). Thus, "[a] specification may, within the meaning of 35 U.S.C. § 112 para. 1, contain a written description of a broadly claimed invention without describing all species that [the] claim encompasses." *Id.*

Therefore, "[a] claim will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language." *Lizardtech, Inc. v. Earth Resource Mapping*, 424 F.3d 1336, 1345 (Fed. Cir. 2005); *see also Martek Biosciences Corp. v. Nutrinova, Inc.,* 579 F.3d 1363, 1371 (Fed. Cir. 2009) ("[A] patent claim is not necessarily invalid for lack of written description just because it is broader than the specific examples disclosed."); *ScriptPro LLC v. Innovation Assocs., Inc.*, 833 F.3d 1336, 1341 (Fed. Cir. 2016) (reversing summary judgment of invalidity because "a specification's focus on one particular embodiment or purpose cannot limit the described invention where that specification expressly contemplates other embodiments or purposes.").

      2.    <u>Enablement</u>

Enablement is a question of law based on underlying factual determinations. *Durel Corp. v. Osram Sylvania Inc.,* 256 F.3d 1298, 1307 (Fed. Cir. 2001). The test for enablement is whether a person "skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation." *Sitrick v. Dreamworks, LLC,* 516 F.3d 993, 999 (Fed.Cir.2008) (internal citation omitted). In determining whether a disclosure requires undue experimentation, courts may consider the following factors:(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims. *ALZA Corp. v. Andrx Pharms., LLC,* 603 F.3d 935, 940 (Fed. Cir. 2010) (quoting *In re Wands,* 858 F.2d 731, 737 (Fed. Cir. 1988)). Similar to the written description requirement, to satisfy the enablement requirement, "a patent need not teach, and preferably omits, what is well known in the art." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986).

        3.    <u>Indefiniteness</u>

A patent is invalid for indefiniteness "if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

**B.    The '806 Patent provides sufficient disclosure under 35 U.S.C. § 112**

        1.    <u>"said beamforming microphone array integrated into said ceiling tile as a single unit"</u>[1]

---

[1] Shure's Final '806 Invalidity Contentions also assert written description and enablement arguments based on the word "integrating" for method claims 15, and 18-20, but Shure's motion combined that argument into its written description and enablement arguments relating to the entire limitation. DEX 194 at 30-31; PMSJ at 3-8. ClearOne thus addresses both arguments in this section.

Shure argues that "said beamforming microphone array integrated into said ceiling tile as a single unit" in Limitation 2 of the independent claims fails to satisfy § 112's three disclosure requirements. PMSJ at 9-13; DEX[2] 194 at 27-29, 30-31, 34. These arguments are variations of Shure's noninfringement and claim construction arguments that this Court has already rejected—specifically, that the '806 Patent requires a *standalone* beamforming microphone array combined with a *standalone* ceiling tile. R. 550 at 30-33.

### a) Written Description

The heart of Shure's argument is that the '806 Patent does not describe integration of a ceiling tile beamforming microphone array that does not start with: (1) a standalone beamforming microphone array; and (2) a standalone ceiling tile. PMSJ at 3-6; DEX 194 at 27-29, 30-31. This argument fails for several reasons.

*First*, as against apparatus claims 1 and 4-6, Shure's written description argument fails as a matter of law. Even though this Court found that claim 1, an apparatus claim, "does not set limits on *how* the 'single unit' must be created" (R. 550 at 31-32), Shure asserts that claim 1 must nonetheless disclose the *how* of the mechanical integration because claim 1, like claim 15, uses the word "integration." PMSJ 4. Shure's assertion is without legal support and in fact contrary to Federal Circuit law. *Blackbird Tech LLC v. ELB Elecs., Inc.*, 895 F.3d 1374, 1379 (Fed. Cir. 2018) ("An apparatus claim is not required to include all elements necessary for the claimed structure's installation. This claim does not recite how the lighting apparatus is installed into an existing light fixture, and it is not required to do so."); *Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 873 (Fed. Cir. 2010) ("Apparatus claims do not need to recite every method of making the claimed apparatus."). The *Paragon* case cited by Shure simply stands for the unremarkable proposition that

---

[2] For ease of reference, ClearOne submits the an index of DEX as **Appendix A**, filed concurrently herewith.

"the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Paragon Sols., LLC v. Timex Corp.*, 566 F.3d 1075, 1087 (Fed. Cir. 2009).

*Second*, Shure's argument that claim 15, because it is a method claim, "must disclose *how* such a step is performed, for ***all claimed embodiments***" is directly contrary to Federal Circuit law. PMSJ at 4 (emphasis added); *see Lizardtech*, 424 F.3d at 1345 ("A claim will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language."); *Cordis*, 339 F.3d at 1365 ("As our case law makes clear, however, "[a]n applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention."). Shure does not cite any legal authority to the contrary.

*Third*, even assuming the '806 Patent must disclose the mechanical integration of a ceiling tile beamforming microphone array that does not start with a standalone beamforming microphone array and ceiling tile (which Shure has not established by clear and convincing evidence[3]), Shure's invalidity argument still fails. By Shure's own admission, the '806 Patent specification *does* describe such an embodiment in at least one sentence of the specification. PMSJ at 5; *see also* DEX 7 at 9:26-29 ("In some embodiments, the Array 116 may be integrated with the ceiling tile **264** as a single unit. Such construction of the unit may be configured to prevent any damage to the ceiling tile 264 due to the load or weight of the Array 116."). The Court considered that embodiment in detail when rejecting Shure's argument regarding how to construe claim 1. *See* R. 30-33 ("[T]he second, integrated embodiment ('806 Patent Col. 9:26-27) is an alternative to the first, separate-structures embodiment ('806 Patent Col. 8:58-63)—an alternative that might alleviate at least one potential issue with using two separate structures as the starting point for

---

[3] Shure's expert did not opine that Limitation 2 lacks written description. DSOF 82.

manufacturing."). And ClearOne's expert has opined that the '806 Patent specification "would have made clear to a [POSITA] that the beamforming microphone array could be integrated into a ceiling tile by bringing together two separate structures or by building a ceiling tile that includes the beamforming microphone array." DEX 199 ¶ 309; *see also infra* Section VI.B.3. The idea that the inventors did not have possession of the "integrated embodiment" when they wrote about it in the specification makes no sense. This is especially so in light of the many figures in the patent disclosing lighting fixture/beamforming microphone array combinations. *See, e.g.*, DEX 7, Figs. 2B-2E. Those figures clearly depict devices designed as integrated lighting fixture/beamforming microphone array combinations, rather than depicting pre-existing elements brought together. *Id.* For this reason as well, it is clear from the specification that the inventors had possession of the "integrated embodiment."

Shure admits that the '806 Patent specification discloses that "[t]he ceiling tile 264 may be combined with the Array 116 in a variety of ways." PMSJ at 5. Shure's argument is that *additional* "description, examples or figures" are required. *Id.* But Shure's main legal support, *Gentry Gallery*, is distinguishable. In *Gentry Gallery*, the specification "clearly limited the scope of the invention[] in ways that the claims clearly did not." *ScriptPro LLC v. Innovation Assocs., Inc.*, 833 F.3d 1336, 1341 (Fed. Cir. 2016) (The "express disclosure that sorting and storing can be done in a number of ways distinguishes this case from *Gentry Gallery ....*"); *see also Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 483 (D. Del. 2019) (distinguishing *Gentry Gallery* for this reason). The '806 Patent does not limit the invention to *only* embodiments combining standalone parts. *See, e.g.*, DEX 7 at 9:26-27, 8:58-59.

Moreover, Shure has offered no evidence to show why a POSITA would not understand that the ClearOne inventors were in possession of routine mechanical integration of components.

*Boston Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366 (Fed. Cir. 2011) ("[A] patentee may rely on information that is 'well-known in the art' for purposes of meeting the written description requirement."). In fact, this Court found that the language "a beamforming microphone array" "integrated into [a] ceiling tile as a single unit" readily conveys "to a skilled artisan that the BFMA and the ceiling tile together form a single unit." R. 550 at 31.

*Lastly*, Shure inexplicably fails to consider whether the provisional application to which the '806 Patent claims priority (the "'524 Provisional Application), expressly incorporated by reference in the '806 Patent, provides written description. *Peer Commc'ns v. Skype Techs. SA*, No. 6:06CV370, 2008 WL 4831001 at *4 n.3 (E.D. Tex. May 29, 2008) ("As the Provisional Application was incorporated by reference, Skype correctly asserts that the Provisional Application is an express part of each patent."); DSOF 81. Without considering the '524 Provisional Application, Shure declares that "[t]here is no disclosure in the '806 Patent for a BFMA that is in the form of a ceiling tile." DEX 194 at 28; R. 855 (Shure's Statement of Undisputed Facts "PSOF") 8 (same); PMSJ at 3, n.3. But the '524 Provisional Application literally discloses that "[a] variation of this product could be offered ***in the form of a ceiling tile*** (with or without sound absorbing material)." DSOF 83 (emphasis added). Indeed, the '524 Provisional Application discloses several ways to create a ceiling tile beamforming microphone array that does not start with a standalone beamforming microphone array and a standalone ceiling tile. *Id*. For example, the '524 Provisional Application discloses an embodiment of "'disguising' the microphone array as a standard drop ceiling tile" where "the microphone elements are placed at locations that correspond to the depressions in the ceiling tile" and "which also allows the ceiling tile façade to be made with different textures and colors." *Id*. Another embodiment discloses using "a distribution of microphones that appears almost random, but which satisfies certain constraints

[and] would be a different pattern than the microphone pattern currently used in the shipping beamformer." *Id*. Yet another embodiment discloses hiding "1,024 (32x32) tiny microphones hidden in the small depressions in a normal looking ceiling tile." *Id*. None of these embodiments start with a standalone beamforming microphone array separate and distinct from a standalone ceiling tile. Instead, these embodiments disclose designing a beamforming microphone array in the form of a ceiling tile to form an integrated single unit.

*b)*  *Enablement*

Shure argues that the '806 Patent is not enabling because it does not enable a POSITA to make an integrated single unit. Shure's argument is both legally and factually unsupported.

*First*, Shure's argument that the '806 Patent does not disclose how a POSITA could make an integrated single unit without a separate ceiling tile, PMSJ at 6, is legally flawed because the enablement requirement does not require disclosure of every single embodiment. *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1533 (Fed. Cir. 1987) (reversing the district court's judgment of lack of enablement because, in part, "[i]f an invention pertains to an art where the results are predictable, e.g., mechanical as opposed to chemical arts, a broad claim can be enabled by disclosure of a single embodiment"). The inventor is "not required to describe in the specification every conceivable and possible future embodiment of his invention." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001). The case Shure relies on, *Liebel-Flarsheim*, is distinguishable. There, the Federal Circuit found that the patent at issue lacked enablement not only because the specification did not teach a particular embodiment, but because the specification "taught away from" that embodiment and called it "impractical." *Liebel-Flarsheim v. Medrad*, 481 F.3d 1371, 1379-1980 (Fed. Cir. 2007).

Here, in contrast, the '806 Patent specification never teaches away from the embodiment

- 8 -

that Shure claims lacks enablement. In fact, as described in the written description section above, the '806 Patent and '524 Provisional Application expressly disclose that embodiment, as well as several other iterations. *See also* DSOF 83. This case is thus more similar to *Spectra-Physics*, in which the Federal Circuit held that disclosure of "at least one attachment means" enabled the claim terms "means for attaching" and "permanently securing," even though the patent did not disclose details of other ways to attach components. *Spectra-Physics*, 827 F.2d at 1533; *see also In re Paulsen*, 30 F.3d 1475, 1481-81 & n.9 (Fed. Cir. 1994) (finding an anticipating prior art reference that "discloses a box for a calculator" enabling even without "detailed disclosure regarding implementation of known electronic and mechanical components necessary to build a computer").

*Second*, Shure's analysis of *Wands* factors 2, 3, 5, and 8 is deficient:

*Wands factor 2 (direction or guidance)*. Shure erroneously claims that "there is no disclosure as to any other *integrated* single tile, much less building an integrated single unit 'in the form of a ceiling tile.'" PMSJ at 6-7. But as discussed above, Shure ignores the '524 Provisional Application, which literally discloses that "[a] variation of this product could be offered in the form of a ceiling tile (with or without sound absorbing material)," as well as several other embodiments of integrated ceiling tiles. DSOF 83. Shure then argues that the '806 Patent "fails to specify any size or shape of such a structure." PMSJ at 7. But Shure again ignores that the '524 Provisional Application specifically refers to "standard drop ceiling tile[s]," which Shure's expert testified have commonly understood sizes. DSOF 83-84. He further testified that a POSITA would be familiar with various ceiling tile configurations used in the marketplace. DSOF 84; *see also Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1254 (Fed. Cir. 2004) ("[A] patentee preferably omits from the disclosure any routine technology that is well known at the time of application.").

*Wands factor 3 (working example)*. For this factor, Shure mainly relies on the fact that

ClearOne did not release its *commercial* embodiment until several years after the '806 Patent's priority date. But "[e]nablement does not require an inventor to meet lofty standards for success in the commercial marketplace." *CFMT, Inc. v. Yieldup Intern. Corp.*, 349 F.3d 1333, 1338 (Fed. Cir. 2003) (reversing summary judgment when district court erroneously required enablement of an embodiment to meet commercial standards); *Transocean Offshore Deepwater v. Maersk Contractors USA*, 617 F.3d 1296, 1307 (Fed. Cir. 2010) (reversing summary judgment because "the district court erroneously required Transocean to enable the most efficient commercial embodiment, rather than the claims"). Shure cannot rely on ClearOne's commercial development timeline to prove nonenablement. Shure also fails to consider the numerous working examples disclosed in the '524 Provisional Application. DSOF 83.

The case Shure relies on, *Automotive Techs. v. BMW of N.A.*, is distinguishable. There, the Federal Circuit relied on the fact that "side impact sensing is a new field," and the patentee "did not know of any electronic sensors used to sense side impact crashes." 501 F.3d 1274, 1284 (Fed. Cir. 2007). Here, in stark contrast, the alleged missing disclosure is directed at the mechanical integration of components. Tellingly, Shure does not dispute that the '806 Patent enables the mechanical integration of components to form a standalone beamforming microphone array or a standalone ceiling, just the formation of a beamforming microphone array *in the form of* a ceiling tile. This makes no sense. If a POSITA is enabled to build a standalone beamforming microphone array, she is equally enabled to build one in a ceiling-tile-shaped box.

*Wands factor 5 (state of the prior art)*. Shure argues that ClearOne's non-obviousness argument regarding Chhetri and CTG somehow suggests that Limitation 2 is not enabling. But unlike the '806 Patent, neither Chhetri nor CTG discloses any integration of a beamforming microphone array with a drop ceiling tile. R. 550 at 25 ("[A] BFMA that is not in the drop space

at all—and is instead located totally beneath it, like Chhetri—would not … be covered by the patent."); *id.* at 37 ("First, the CTG system is not an array. … Second, the CTG System is not 'integrated with a ceiling tile….'"); DSOF 85-86. Chhetri does not refer to any ceiling tiles. DSOF 85. As to CTG, Shure claims that ClearOne argues that a POSITA would not have a reasonable expectation of success, but cites only to ClearOne's position that a POSITA would not have been motivated to include multiple CM-01 microphones in a single ceiling tile (PSOF 11). ClearOne maintains that position, as explained in detail below in Section V.C.b. As the Court found, "it is not clear *why* a consumer would" place multiple CM-01 microphones in a single ceiling tile. R. 550 at 37. That point has no bearing on whether Limitation 2 is enabling.

*Wands factor 8 (breadth of the claim)*. Shure argues that the asserted claims are too broad, because their scope is "beyond what is explicitly described and depicted in the specification." PMSJ at 8. Again, that is not the law. As the *en banc* Federal Circuit held, if that were the law, "there would be no need for claims." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121, (Fed. Cir. 1985) (*en banc*). Shure also asserts, without analysis, that the '806 Patent does not describe how two other limitations—"picks up said audio input signals through said outer surface of said ceiling tile" and "is coupled to the back side of said ceiling tile"—"are met when there is no identifiable ceiling tile." PMSJ at 8. This conclusory argument is contrary to issues already decided by the Court. R. 550 at 49 ("It is possible for an apparatus to have an outer surface that is part of the apparatus but also be considered distinct from the rest of it."); *id.* at 46-47 ("the term 'coupled to the back side' describes where and how the array is attached to the rest of the tile").

Shure also fails to consider other *Wands* factors that weigh in favor of enablement:

*Wands factor 6 (the relative skill of those in the art)*. Shure acknowledges that a POTISA would have "a. A bachelor's degree in mechanical or electrical engineering or the equivalent, and

- 11 -

at least one year of work experience designing or developing commercial audio systems (and Shure has proposed and [sic] alternate level of skill whereby a POSITA has three to six years of experience as a designer, system integrator or installer of ceiling-mounted or wall-mounted commercial systems") and b. at least one year of work experience in the field of digital signal processing.)" DSOF 87. Shure offers no evidence to explain why such a POSITA would require undue experimentation to create a beamforming microphone array shaped like a ceiling tile.

*Wands factors 4 and 7 (the nature of invention and predictability of art)*. Even though the patent is directed at digital signal processing with an interior design element, the specific issue that Shure claims lacks enablement is a mechanical one—namely the mechanical integration of components into a single unit without starting with: (1) a standalone beamforming microphone array; and (2) a standalone ceiling tile. "[I]n mechanical cases, the specification need not spell out every detail of every possible embodiment to fulfill the purpose of the enablement requirement [because m]echanical cases involve a high level of predictability." *Gummow v. Snap-On Tools, Inc.*, No. 98 C 8013, 2001 WL 290609 at *2 (N.D. Ill. Mar. 13, 2001).

### c) Indefiniteness

Shure argues, in merely six lines and with no evidentiary support, that if "integrated" means anything other than "combined," the asserted claims of the '806 Patent are indefinite. PMSJ at 8. Notably, Shure's expert did not opine that Limitation 2 is indefinite. DSOF 82. To the extent Shure still argues that "integrate" must be limited to a combination of two separate structures, the Court already rejected this argument. R. 550 at 30-33.

As for indefiniteness, the *HZNP* case Shure cites is distinguishable. There, the claim term "better drying time" meant several different things, because the specification failed to enlighten a POSITA whether "better drying time" should be evaluated at the five-minute, three-minute, or

four-hour marks, because it provided inconsistent test results at these marks. *HZNP Medicines LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 698 (Fed. Cir. 2019).

Here, in contrast, where the claim term encompasses several different, but not fundamentally inconsistent, embodiments, it simply informs the POSITA that the claim scope includes all embodiments, and is not indefinite. This is so even if the claim term includes structurally different embodiments. *Rexnord*, 274 F.3d at 1345 ("When the claim language is assessed on its own, and when the written description is examined carefully, one finds that the patentee has described an invention that embraces, through the word 'portion,' structure that may be either 'integral' or 'separate.'"). Shure should not be allowed to relitigate claim construction of a phrase the Court already found "readily understandable to a skilled artisan," and summary judgment should be entered against Shure on this point. R. 550 at 31.

2.    "all or *part* of said beamforming microphone array is in the drop space of the drop ceiling"

a)    *Written Description*

Shure argues that the '806 Patent does not provide written description for when only *part* of the beamforming microphone array is in the drop space. These arguments are without merit.

*First*, Shure argues that the '806 Patent does not disclose having only *part* of the beamforming microphone array in the drop space, simply because "the term 'drop space' was not added to the specification or claims until June 7, 2017." PMSJ at 9; DEX 194 at 25-26. This argument is essentially the same one the Court rejected during the '806 PI proceeding, namely, that the term "drop space" lacks written description. *See* R. 550 at 45-46.

*Second*, Shure argues that ClearOne's validity contentions cite "only" a single statement in the '806 Patent as support for *part* of a beamforming microphone array in the drop space. PMSJ at 10. That is incorrect. In ClearOne's validity contentions, before the sentence Shure cites,

- 13 -

ClearOne makes multiple citations to the '806 Patent specification, discusses the disclosure in the '524 Provisional Application (PEX 3), discusses what a POSITA would have known about ceiling tile shapes at the relevant time, and explains how those disclosures, taken together, make clear that there is adequate written description for this claim limitation. PEX 14 at 48-50; *see also infra* Section VI.B.3. In particular, ClearOne explains that the '524 Provisional disclosed positioning microphones on or in a ceiling tile. *See* PEX 14 at 48-49; PEX 3 at [20], [72], [77], Figs. 1-5, 9, 12, 44-48, & 50-55. ClearOne further explains that, as Shure's expert admits, known ceiling tiles at the relevant time were configured to be placed partially below the drop space:

> In the case of a Tegular Edge ceiling tile, even with the microphones of the device inserted from the back, *see, e.g.*, '806 Patent 8:65-67, it is very possible that the microphones of the device would be positioned below the drop space, while other portions of the device would be positioned in the drop space. *See* Prelim. Inj. Hrg. Tr. at 90:1-10 (inventor Graham testifying that it could be possible for the "front surface, the acoustically transparent outer surface, to be lowered somewhat to allow the microphones to be dropped down a little bit into the room.").

PEX 14 at 49-50; *see also* DSOF 83.[4] ClearOne's expert similarly opined that the original '806 specification supports "all or part of the beamforming array" being in the "drop space," reasoning:

> Figures 2G and 2H of the original specification depict at least two different ways to combine the ceiling tile with a beamforming microphone array, which depict at least two different planes on which the beamforming microphone array can be as compared with the plane of the front surface of the ceiling tile. And ¶ [55] makes clear that at least one additional embodiment, disclosing yet another plane on which the beamforming microphone can be as compared with the plan[e] of the front surface of the ceiling tile, is not depicted. In this way, the inventors both showed that they were in possession of, and enabled, a beamforming microphone array on various planes as compared to the front surface of the ceiling tile, including an embodiment in which the front surface of the ceiling tile is below the plane of the drop ceiling and only part of the beamforming microphone

---

[4] ClearOne's reliance on substantial evidence from the '524 Provisional Application and language from the original specification moots Shure's argument that the June 7, 2017 amendment cannot provide written description because it is not part of the original disclosure. PMSJ at 10. It also moots Shure's argument that the June 7, 2017 amendment provides insufficient disclosure. *Id.*

array is in the drop space.

DEX 199 ¶¶ 302-306. Indeed, the Court considered this claim language during '806 PI proceedings, and found that it made sense in the context of the specification, inventor testimony, and known forms of ceiling tiles at the relevant time. R. 551 at 23-26.

*Third*, Shure makes the curious argument that the embodiment where only part of the beamforming microphone array is in the drop space is contrary to the purpose of the limitation "all or *part* of said beamforming microphone array is in the drop space of the drop ceiling." PMSJ at 9-11. Shure fails to explain how an embodiment that literally meets the limitation can also be contrary to its purpose. To the extent Shure argues that a beamforming microphone array partially residing in the drop space does not distinguish prior art like Chhetri, the Court already rejected that argument. R. 550 at 25-26 ("But Shure's argument is not quite right—at least not with regard to Chhetri as prior art…. Here is why: a BFMA that is not in the drop space at all—and is instead located totally beneath it, like Chhetri—would not be covered by the patent.").

Shure's arguments ignore a key issue—that while Limitation 5 was added to distinguish Chhetri, it never altered the scope of the invention, which has covered a beamforming microphone in the form of a ceiling tile since the filing of the '524 Provisional Application. DSOF 83, 89. As Shure acknowledges, during prosecution ClearOne proposed the amendment that became Limitation 5 to distinguish Chhetri. DSOF 89; PSOF 23. But the later-added language simply clarifies how the invention described in the original disclosure differs from Chhetri. Specifically, being entirely or partially in the drop space is a property of all ceiling tile beamforming microphone arrays, in contrast to Chhetri, which does not disclose "using this product as a replacement tile for a drop celling configuration." DSOF 89. Shure does not appear to dispute this inherent property of a ceiling tile beamforming microphone array. *See* R. 550 at 26-27 ("A BFMA integrated with any

- 15 -

of the tiles shown above could sit either totally or partly in the drop space.") (citing a figure of various ceiling tiles produced by Shure); DSOF 84. Nothing requires ClearOne to distinguish Chhetri by specifying the locations of the individual microphone elements (as opposed to the apparatus as a whole) relative to the drop space. This is especially so because the individual microphones are purposefully placed behind the outer surface.

Lastly, Shure appears to make a written description argument based on ClearOne's infringement contentions. PMSJ at 11. This argument is backwards. The relevant inquiry under § 112 is whether the patent describes the "invention," not the accused product. 35 U.S.C. § 112.

### b) Enablement

Shure argues that the '806 Patent does not enable the embodiment where only *part* of the beamforming microphone array is in the drop space. PMSJ at 11-12.

First and foremost, this enablement argument should be rejected because of Shure's failure to disclose it in its Final Invalidity Contentions. *Fujitsu Ltd. v. Tellabs, Inc.*, 898 F. Supp. 2d 1047, 1051 (N.D. Ill. 2012) ("bar[ring] Defendant] from advancing a new invalidity theory" at summary judgment); DSOF 88. As Shure's Final Invalidity Contentions make clear, after "the Court has construed the term 'drop space'," Shure maintains its written description invalidity contentions related to the entire claim limitation that 'all or part of said beamforming microphone array is in the drop space of the drop ceiling." DEX 194 at 27. There was no disclosure that Shure also maintained an enablement argument related to the entire limitation. *Id.* The only disclosed enablement argument relating to this limitation is based on the phrase "drop space" alone, and is addressed separately below. *Id.* at 26.

If the Court is inclined to address this previously-undisclosed enablement argument, Shure's argument should still be rejected because it is based on the erroneous assumption that a

specific embodiment must be *explicitly* disclosed to meet the enablement requirement. PMSJ at 11-12. That is not the law. *See*, *e.g.*, *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1334 (Fed. Cir. 2003) ("The specification need not explicitly teach those in the art to make and use the invention; the requirement is satisfied if, given what they already know, the specification teaches those in the art enough that they can make and use the invention without "undue experimentation.'"); *AK Steel v. Sollac & Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003) ("That is not to say that the specification itself must necessarily describe how to make and use every possible variant of the claimed invention, for the artisan's knowledge of the prior art and routine experimentation can often fill gaps, interpolate between embodiments, and perhaps even extrapolate beyond the disclosed embodiments, depending upon the predictability of the art."); *see also* DEX 199 ¶¶ 305 (opining that this claim term is enabled).

Moreover, Shure's argument is based on the mistaken belief that the "beamforming microphone array" of Limitation 5 can only mean the individual microphone elements of the overall device, and nothing more. This is really a noninfringement argument (which is addressed in ClearOne's motion for summary judgment of infringement), and lacks support in the intrinsic record. As discussed above, Limitation 5 merely describes an inherent property of ceiling tile beamforming microphones sufficient to distinguish Chhetri. There was no need to specify the locations of the individual microphones to distinguish Chhetri. Also, as discussed above, the '806 Patent provides numerous enabling disclosures to allow a POSITA to create a beamforming microphone in the form of a ceiling tile (DSOF 83), which, by definition and without dispute, can reside entirely or partially in the drop space. *See* R. 550 at 26-27 ("A BFMA integrated with any of the tiles shown above could sit either totally or partly in the drop space.") (citing a figure of various ceiling tiles produced by Shure); DSOF 84. Thus, a POSITA enabled to create a ceiling

- 17 -

tile beamforming microphone array is necessarily enabled to create one that extends partially into the space of the room, while remaining partially in the drop space.

> ### c) *Indefiniteness*

Shure argues, without analysis, that Limitation 5 is indefinite because "there is no distinction between a practicing and nonpracticing apparatus." PMSJ at 12. This argument fails as a matter of law. *Star Sci. v. R.J. Tobacco*, 537 F.3d 1357, 1373 (Fed. Cir. 2008) (reversing summary judgment because the "test for indefiniteness does not depend on a potential infringer's ability to ascertain the nature of its own accused product to determine infringement, but instead on whether the claim delineates to a skilled artisan the bounds of the invention."). Shure also fails to explain what is so difficult about determining whether an apparatus is entirely or partially in the drop space. To the extent Shure's argument relies on a determination of "where the beamforming microphone array' ends and the ceiling tile begins for purposes of assessing infringement," the Court has rejected that argument. DEX 194 at 33; R. 550 at 30 ("The MXA910 is a BFMA in the form of a ceiling tile—ClearOne does not have to point to one particular component of the MXA910 as the ceiling tile, distinct and separate from the beamforming microphone array. That is the point of the invention: they are *integrated* together."); DEX 199 ¶305 (opining that this claim term is not indefinite).

> ### 3. "drop space"

> ### a) *Written Description*

Shure argues that the term "drop space" lacks written description. DEX 194 at 25-26. But the Court already considered and rejected this argument. R. 550 at 45-47. To the extent Shure maintains its written description argument based on "drop space" separate from its argument based on "all or part of said beamforming microphone array is in the drop space of the drop ceiling," Shure proffered no new evidence or theory in its final contentions, and summary judgment should

be granted as to this invalidity ground. DEX 194 at 25-26.

        *b)*    *Enablement*

      Shure argues that the term "drop space" also lacks enablement. *Id.* To the extent Shure

maintains its enablement argument based on "drop space" alone,[5] Shure proffered nothing new in

its final contentions, and summary judgment should be granted as to this ground. *Id.*; *Ariad*, 598

F.3d at 1352 ("[W]ritten description and enablement often rise and fall together").

        4.    <u>Claims 5, 12, and 19: "grille"</u>

        *a)*    *Written Description*

      Shure argues that the term "grille" lacks written description because it was added through

a later amendment and was not in the original patent disclosure. DEX 194 at 29-30. The Court

considered and rejected this argument during the '806 PI proceeding under a more favorable

standard for Shure. R. 550 at 47-48 ("Shure contends that a 'grille' is not similar enough to a

'contour' or 'corrugation,' and as a result, the additions of the term 'grille' to the specification

should have been rejected as new matter. . . . The bottom line is that it is . . . not so incongruous

with other items listed in the original filing that it creates a substantial question of the '806 Patent's

validity."); *see also infra* Section VI.B.3. To the extent Shure still maintains its failed written

description argument based on "grille," Shure has proffered no new theory in its final contentions.

DEX 194 at 29-30. And Dr. Roy in fact admits that "a POSITA would know what a grille is."

DSOF 91. Dr. Roy simply disagrees with this Court's finding. R. 550 at 47; DSOF 92.

        *b)*    *Enablement*

      Shure argues that the term "grille" lacks enablement because it was added through a later

---

[5] The only enablement theory Shure advances in its final contentions is based on the difference between "coupled to the back side" and "part[ially] … in the drop space." DEX 194 at 26-27. This is the *exact* argument the Court rejected. R. 550 at 45-47.

amendment. DEX 194 at 29-30. The Court considered and rejected Shure's written description argument based on "grille," and Shure's enablement argument fails similarly. R. 550 at 47-48. To the extent Shure maintains this enablement argument, Shure proffered no new evidence or theory in its final contentions. DEX 194 at 29-30. As the Court noted, a "'grille' is not categorically dissimilar to contours, corrugations, and depressions" which are "all 'surface configurations' of the tile" that are indisputably disclosed. R. 550 at 47-48. To the extent those other surface configurations are enabled, a grille is enabled as well.

5.      "beamforming microphone array" is not indefinite

Shure argues that "beamforming microphone array," a term this Court construed after full briefing and a hearing, is indefinite if the Court finds that a "beamforming microphone array" can include additional components beyond the individual microphone elements. DEX 194 at 33. This is a noninfringement argument rather than an indefiniteness or claim construction issue. Just because "beamforming microphone array" does not *require* "any other hardware at all," it does not follow that the "beamforming microphone array" *cannot include* other hardware. *See* R. 613 at 16, n.11 ("Shure's construction does not require that the processing hardware be *included* with the BFMA, but it also does not require that the processing hardware be *excluded* from the apparatus entirely."); *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482 (Fed. Cir. 1984) ("Modification by mere addition of elements or functions, whenever made, cannot negate infringement without disregard of the long-established, hornbook law expressed in *Cochrane v. Deener*, 94 U.S. 780, 786, 24 L.Ed. 139 (1876) ….").

Shure's argument is also directly contrary to the plain language of the specification, which indicates the Array 116 *can* include other components beyond microphones. DSOF 93. For example, "the Array 116 may include a link-in expansion bus (E-bus) connection 402, a link-out

E-bus connection 303, a USB input port 406, a power-over-Ethernet (POE) connector 408, retention clips …, and a device selector 412." *Id.*; *see also* PMSJ 9, n.10 ("Shure understands the claimed BFMA to be the 'Array 116' described throughout the '806 Patent."). The '806 Patent also refers to "the microphones of the Array 116." DSOF 93. If the Array 116 can include only microphones and nothing else, there would be no need to specifically refer to *the microphones* of the Array 116. Moreover, Dr. Roy admits that the array depicted in the '806 Patent includes the box containing the microphones. DSOF 44.

6.  <u>"said beamforming microphone array picks up audio input signals through said outer surface of said ceiling tile" is not indefinite</u>

Shure argues that "said beamforming microphone array picks up audio input signals through said outer surface of said ceiling tile" is indefinite because, under ClearOne's infringement contentions, the terms "ceiling tile," "beamforming microphone array," and "ceiling tile beamforming microphone array" have the same meaning. DEX 194 at 34-35. *First*, to the extent Shure argues the term is indefinite because of difficulty determining infringement, "[t]he test for indefiniteness does not depend on a potential infringer's ability to ascertain the nature of its own accused product to determine infringement…." *Star Sci.*, 537 F.3d at 1373 (reversing summary judgment of indefiniteness). *Second*, Shure's argument fails because the fact that all three claim terms are present in a single device, in a patent that requires the apparatus to be "integrated …as a single unit," does not mean that the three claim terms have the *same meaning* or are indefinite. *See* R. 550 at 30 ("The MXA910 is a BFMA in the form of a ceiling tile—ClearOne does not have to point to one particular component of the MCA910 as the ceiling tile, distinct and separate from the beamforming microphone array. That is the point of the invention: they are *integrated* together."). Shure cites no legal support to the contrary.

7.  <u>"said beamforming microphone array coupled to the backside of said ceiling</u>

tile"

Shure argues that "said beamforming microphone array coupled to the backside of said ceiling tile" is indefinite because, under ClearOne's infringement contentions, the terms "ceiling tile," "beamforming microphone array," and "ceiling tile beamforming microphone array" have the same meaning. DEX 194 at 35-36. For the same reasons discussed in the previous section, Shure's argument fails.

In addition, Shure argues that, in the '806 Patent, the Array 116 is coupled to the back side of the ceiling tile 264 in one embodiment and coupled to the front side of the ceiling tile in another, therefore this limitation is "important in determining which of the described embodiments is claimed." *Id.* at 35. But such a determination is unnecessary. As a matter of law, the embodiments "need not describe the claimed subject matter in exactly the same terms as used in the claims." *Eiselstein*, 52 F.3d at 1038. As a practical matter, however, these embodiments are not mutually exclusive and can both be claimed. The claim language is clear that any *claimed* embodiment must be "coupled to the backside," but it does not exclude embodiments that are *also* "in contact or coupled with the front side." DSOF 42. The claim is not indefinite.

### 8. Claims 6, 13, and 20: "outer surface is coplanar with said ceiling tile" is not indefinite

Shure argues that "outer surface is coplanar with said ceiling tile" is indefinite. DEX 194 at 36-37. The Court already rejected this argument. R. 550 at 48-50 ("[T]he outer surface could be … 'coplanar' with the apparatus itself (precisely what Claim 6 sets forth). … There is no indefiniteness problem here."). Shure now argues that the phrase is nonetheless indefinite based on one of ClearOne's infringement theories relating to Shure's MXA910-A. DEX 194 at 36-37. This argument fails as a matter of law. *See Star Sci.*, 537 F.3d at 1373 (definiteness does not depend on infringement). Notably, Dr. Roy did not offer opinions relating to this new theory. DSOF 94.

Instead, Dr. Roy simply disagrees with Court's finding that "[i]t is possible for an apparatus to have an outer surface that is part of the apparatus but also be considered distinct from the rest of it," claiming that "the outer surface of the ceiling tile is always coplanar with itself, thus Claims 6, 13, and 20 do not add any meaningful limitation to Claim 1." *Id.* This is not new. *See* R. 508 at 35. The Court already rejected this argument, and the result should be no different now.

9.  Claims 1, 4, 5, and 6 are not indefinite because they are not mixed apparatus and method claims

Shure argues that apparatus claims 1, 4, 5, and 6 are indefinite because they cover both an apparatus and a method. DEX 194 at 37-38. The Court and the parties previewed this during claim construction. The Court adopted ClearOne's construction that the claimed apparatus is "*configured for use in a drop ceiling mounting configuration.*" R. 613 at 16-19. Shure has not offered any new evidence or legal theory to contradict the Court's finding that "[a] skilled artisan reading Claims 1 and 15 would not understand them to require certain day-to-day choices by the users of the invention, but instead simply that the invention is configured for use in a drop-ceiling mount." *Id.*

10.  Claims 15, 18-20 are not indefinite for reciting "is used in a drop ceiling mounting configuration" in method of manufacture claims

Shure argues that claims 15, 18-20 are indefinite because they are method claims that "include a limitation relating to a method of use." DEX 194 at 38. Again, the Court previewed and rejected this exact argument: "reading Claim 1 or Claim 15 to impose a limitation on how the invention is *used* would essentially make Claim 8[, a method of use claim,] redundant." R. 613 at 19. Shure has not offered any new evidence or legal theory to contradict the Court's finding.

**C.  The '186 Patent provides sufficient disclosure under 35 U.S.C. 112**

1.  "signal selection module"

a)  *Written Description*

Shure argues that the term "signal selection module" lacks written description because the

exact phrase "'signal selection module' is neither found in the specification of the grandparent '553 Patent nor any provisional patent application to which it claims priority." DEX 195 at 6. But "[i]n order to comply with the written description requirement, the specification 'need not describe the claimed subject matter in exactly the same terms as used in the claims.'" *All Dental Prodx v. Advantage Dental Prods.,* 309 F.3d 774, 779 (Fed. Cir. 2002) (reversing summary judgment based on lack of written description). Instead, the written description requirement can be satisfied by "such descriptive means as words, structures, figures, diagrams, formulas, etc." *In re Skvorecz*, 580 F.3d 1262, 1269 (Fed. Cir. 2009). As the Court recognized, "[t]he specification makes clear what the module does, including the inputs it uses and the output it yields: it 'select[s] … one or more of the combined echo cancelled signals for transmission to the far end' and 'uses the far-end signal as information to inhibit … changing the selection of the combined echo cancelled signals while only the far end is active. … And it even provides an example of a signal selection module, citing types of devices well known in the art." R. 613 at 12; DSOF 95.

In addition, Shure's expert[6] criticizes a specific flowchart (which shows a decision tree used by the direction of arrival determination and not an entire signal flowchart) in the specification for not disclosing "uses the far end signal as information to inhibit said signal selection module from changing the selection of the combined echo cancelled signals while only the far end signal is active. DSOF 97. Again, this argument fails, because Dr. LeBlanc fails to analyze whether other parts of the specification can also provide written description. *Skvorecz*, 580 F.3d at 1269. Here, Figures 9A and 9B and their corresponding descriptions in the specification

---

[6] Shure's expert also impermissibly raises two previously-undisclosed written description arguments. First, Shure's expert argues that the "signal selection module" is limited to a multiplexer specifically disclosed in the specification. DSOF 96. Second, he argues that because the multiplexer and DOA algorithm disclosed in the specification cannot select more than one signals, the term "signal selection module" does not disclose the selection of more than one signals. *Id.* Because Shure failed to disclose these arguments in its final contentions, they should be stricken. *Id.*; *Fujitsu*, 898 F. Supp. 2d at 1051.

provide sufficient written description to a POSITA. DSOF 98. Moreover, as Dr. Schonfeld explained, inhibiting change in the selection of signals using the far end signal as information was well-known by 2011. DSOF 99. A POSITA would know that the inventors were in possession of this particular element, because the specification explains why this element is useful and provides at least one working example. *Id.*

### b) Enablement

Shure argues that the "signal selection module" is not enabling because a POSITA would have to "engage in undue experimentation" to design a special purpose selector that can select more than one signal and use "any type of 'information' provided by the far end signal." DEX 195 at 5. *First*, the claim does not require the signal selection module to use "any type" of information "provided by the far end signal," just that it "use the far end as information." DSOF 18. *Second*, Shure's expert offers largely conclusory opinions on a subset of *Wands* factor to argue lack of enablement, while in fact conceding that several factors "are neutral or slightly favor" enablement. *See* DEX 196 ¶¶170-174; *see PowerOasis, Inc. v. T–Mobile USA*, 522 F.3d 1299, 1310 (Fed.Cir.2008) (holding that conclusory expert declaration was not sufficient to create issue of fact on summary judgment). Indeed, as the Court has noted, Dr. LeBlanc previously agreed that "a skilled artisan would probably know that a signal selection module selects signals." R. 613 at 12; DEX 197 at 20:10-21:20. Moreover, as explained by Dr. Schonfeld, both the multiplexer and automixer, which Dr. LeBlanc claims cannot select multiple signals, can in fact do just that. DSOF 100. To the extent Dr. LeBlanc still insists that an "automixer doesn't select," Dr. Schonfeld and Shure's previous expert Dr. Kellermann both disagree. *Id.*; *see also* R. 278 at 13-14 ("Selection by attenuation is an accepted method of signal selection in the audio industry, known to skilled artisans, as even Shure's expert agrees. . . ."); *id.* at 17; DSOF 19.

In addition, before the Court's *Markman* ruling, Shure asserted that "signal selection module" is a means-plus-function term and not enabling for lack of disclosure of a structure to select a signal. DEX 198 at 18-19. Despite the Court's ruling that "signal selection module" is not a means-plus-function term, Shure continues to assert this unsuccessful argument. R. 613 at 9-13; DEX 195 at 2. Shure should not be allowed to relitigate claim construction as an enablement issue.

### c) Indefiniteness

Shure argues that the Court's construction of "signal selection module" makes the '186 Patent indefinite because the "signal selection module, as-construed, must receive 'information provided by the far end.'" DEX 195 at 4. *First*, the Court construed "signal selection module" to have its plain and ordinary meaning and did not construe the term to require, as Shure claims, that it "*receive* 'information provided by the far end signal.'"[7] R. 613 at 13-14. The claims require only that the signal selection module "use[] the far end signal as information." DSOF 18. *Second*, Shure takes issue that "the Court's construction [which is plain and ordinary meaning] allows for secondary, tertiary, or even more remote signals to qualify as 'information' if the far end signal is within the signaling pathway." DEX 195 at 5. The Court's construction does not require the information to be a *signal* that is *received* by the signal selection module. Quite the contrary, the Court ruled that the signal selection module does not need to receive the far end signal directly. R. 613 at 13-14. But if in fact Shure is right that the "plain and ordinary meaning" of signal selection module allows it to use secondary, tertiary, or even more remote signals, then a POSITA would understand that as well, and therefore there is no indefiniteness problem.

As with enablement, Shure continues to assert indefiniteness based on its already-rejected

---

[7] The Court stated that "a skilled artisan would understand the plain and ordinary meaning of this term to focus on the information provided by the far end signal." R. 613 at 14. The Court did not construe "use the far end signal as information" to "*receive* information provided by the far end signal," as Shure seems to suggest.

means-plus-function argument, with no new evidence. DEX 198 at 18-19; DEX 195 at 2; R. 613 at 9-13. There is no reason to disturb the Court's prior ruling.

### 2. "fixed beam" is not indefinite

The Court has construed "fixed beam" to mean "beam defined by parameters that remain fixed during a conference." R. 613 at 20. Shure raises two indefiniteness arguments based on the Court's construction in its final contentions.[8]

*First*, Shure argues that the Court's construction is indefinite because the construction would also cover adaptive beams "used in a conference room where the sound sources do not move." DEX 195 at 2-3. Shure, however, fails to cite any evidence showing that the beam parameters of adaptive beams would remain fixed if used in a conference room where the sound sources do not move. In fact, Shure's expert's testing of Shure's MXA910-IMX with Autofocus shows that Autofocus caused the beams to move even when the sound sources remained still. DSOF 101.

*Second*, Shure argues that the Court's construction would render apparatus claims 1-6 mixed apparatus-and-method claims and therefore indefinite. DEX 195 at 3. Shure erroneously argues that under the Court's construction, infringement would depend on the actual usage because: (1) an adaptive beamforming system can meet this limitation if the sound sources remain still; and (2) a fixed beamforming system would only meet this limitation if the system and user do not update the beam parameters during a conference. *Id.* at 3.

As the Court noted, this is at most a noninfringement argument. R. 613 at 7 ("[T]he quantum of proof on infringement has no bearing on how to interpret the claims in the first place.").

---

[8] Shure's expert also makes written description arguments relating to "fixed beam," "microphone," and "processor, memory and storage." DSOF 102. These should be disregarded for Shure's failure to disclose them in its Final Invalidity Contentions. DSOF 102; *Fujitsu*, 898 F. Supp. 2d at 1051.

And Shure fails to cite any evidence that the first scenario actually exists; in fact, Shure's own expert proved otherwise. DSOF 101. In any case, the claims are directed at an apparatus with processors that are "configured to" form "fixed beams." DSOF 18. Contrary to Shure's assertion, "configured to" apparatus claims do not depend on the actual usage (e.g. updates by user). *See Core Wireless Licensing S.A.R.L. v. Apple Inc.*, 899 F.3d 1356, 1363 (Fed. Cir. 2018).

## III. CLAIMS 1, 4-6, 15, AND 18-20 OF THE '806 PATENT ARE NOT INVALID UNDER 35 U.S.C. 101

Shure argues that claims 1, 4-6, 15, and 18-20 are invalid because they overlap "two (or more) different classes of inventions set forth in Section 101." DEX 194 at 39. Again, this is the same mixed-apparatus-and-method argument that the Court addressed in claim construction by adopting ClearOne's construction of "used in a drop ceiling mounting configuration" (R. 613 at 16-19), which makes clear that the claims do not overlap apparatus and method claims. Shure has not offered any new evidence or legal theory to contradict the Court's finding.

## IV. THE PATENTS-IN-SUIT ARE NOT OBVIOUS

### A. Relevant Legal Standard

Under 35 U.S.C. § 103, a proposed patent must not be granted if the claimed invention would have been obvious to a POSITA before the filing date. Obviousness is a legal determination based on underlying questions of fact, including (1) the scope and content of the prior art; (2) the level of ordinary skill in the art, (3) differences between the prior art and the claims at issue; and (4) evidence of secondary considerations. *See Cheese Systems, Inc. v. Tetra Pak Cheese and Powder Sys., Inc.*, 725 F.3d 1341, 1347 (Fed. Cir. 2013). "To invalidate a patent claim based on obviousness, a challenger must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success

Case: 1:17-cv-03078 Document #: 898 Filed: 08/12/20 Page 40 of 93 PageID #:46073


in doing so." *ActiveNetworks, Inc. v. Verizon Commc'n., Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) (internal quotation marks omitted).

### B. The '186 Patent Is Not Obvious

#### 1. K-01 and Beaucoup, With or Without K-91 and Martin, Do Not Render The Asserted Claims Obvious

Shure moves for summary judgment on the combination of K-01[9] and Beaucoup, arguing that the independent claims of the '186 Patent are obvious in view of those references. PMSJ at 27-30. This is an argument the Court has addressed before. First, in the context of the '186 PI proceeding, the Court found that K-01 "is similar enough to the '186 Patent to raise a substantial question of the patent's validity." R. 278 at 28. On the critical point of whether K-01 discloses the "fixed beams" claimed in the '186 Patent, the Court held that "the fact that Kellerman discloses the *option* of updating the fixed beams during [a] conference does not change the fact that his book chapter *first* disclosed the basic idea of holding the beams fixed." *Id.* at 31. The Court concluded that the '186 Patent "would likely have been obvious to a person of skill in the art in light of Kellerman." *Id.* at 32. On the other hand, the Court noted that secondary considerations of non-obviousness weigh in ClearOne's favor, including the fact that K-01 had been well-known for a decade before anyone in the industry arrived at the method of the '186 Patent. *Id.* at 33. It held:

> The Court cannot say at this point that it is *likely* that ClearOne will be able to withstand Shure's validity challenge, even taking into account Shure's enhanced burden at trial. But this is a close call. It might be that, at the summary judgment stage or at trial, after more discovery (and when Shure bears the burden), Shure will be the one to fall short.

*Id.* at 35.

In so holding, the Court found "persuasive" the PTAB's initial decision to institute IPR against a related ClearOne patent, U.S. Patent No. 9,264,553 ("the '553 Patent") in view of K-01.

---

[9] ClearOne herein makes use of Shure's abbreviations for pieces of prior art.

*Id.* at 28. Later, the PTAB found that K-01 did *not* invalidate the '553 Patent, holding that Shure failed to establish "by a preponderance of the evidence that Kellermann 2001 disclose[d] 'fixed beams' as required by claims 1, 8, and 15." DSOF 104. Accordingly, ClearOne sought reconsideration of the Court's '186 PI Order. *See* R. 481.

The Court denied ClearOne's request for reconsideration, once more emphasizing "the high bar for preliminary injunctive relief." R. 612 at 7. The Court reasoned:

> [T]he PTAB's final decision does not appear to consider in detail the possibility that [K-01] discloses *both* fixed and adaptive beamforming, as this Court previously decided it did. The prior Opinion acknowledged that Kellerman 2001 disclosed adaptive beamforming. But because it *also* disclosed fixed beamforming, the Court reasoned, it still essentially previewed the representative claims of the '186 Patent.

*Id.* at 8-9. The Federal Circuit has since affirmed the PTAB's finding that the '553 Patent is not invalid over K-01, finding, as Shure explains, that "substantial evidence supports the Board's factual finding that the beamformer in Figure 13.8 of Kellermann does not have parameters that remain fixed throughout the conference." PMSJ at 28; *see also* DSOF 105.

ClearOne respectfully submits that K-01 does *not* disclose both fixed and adaptive beams in the context of its described system.[10] The Court's prior orders describe K-01 as disclosing fixed beams as the default, or baseline, functionality of that system, with adaptive beams as a desirable feature on top of that baseline functionality. *See, e.g.*, R. 278 at 31. Shure relies on a similar

---

[10] ClearOne concedes that K-01 does describe fixed beams generally, when introducing the basic principles underlying the chapter. *See* PEX 62 at 23. That general disclosure is irrelevant for the purposes of this analysis. *See, e.g.*, *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001) ("The invention must have been known to the art in the detail of the claim; that is, all of the elements and limitations of the claim must be shown in a single prior reference, **arranged as in the claim**.") (emphasis added); *Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008) ("[I]t is not enough that the prior art reference . . . includes multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention."). Indeed, K-01 specifically limits the use of fixed beams to "applications where the beamformer does not have to change the 'look direction' and where the potential nonstationarity of the involved signals . . . is not accounted for," which is *not*, in K-01's view, a teleconferencing application. *See* PEX 62 at 23, 33.

argument. PMSJ at 25-26 (calling adaptive beams an "optional feature" applied to fixed beams). That is not what K-01 discloses. At the time K-01 was published, the default, baseline functionality for conferencing applications was *adaptive* beams. DSOF 106. Indeed, the prior art system that K-01 specifically disclosed as being improved was a "[s]ignal-dependent, time-varying beamformer" that was tested in a teleconferencing situation with "slight movements of the desired local source." DSOF 107. The problem with that system was that the acoustic echo canceller could find a useful echo path only when the beams "remain[ed] time-invariant *for a sufficiently long time*." DSOF 107. K-01's proposed solution in that context was not beams held fixed for the duration of a conference. Rather, K-01's proposed solution was to hold its adaptive beams fixed for shorter, discrete periods of time.

K-01 in fact teaches away from the "fixed beams" claimed in the '186 Patent, because K-01 never challenges the fundamental understanding that adaptive, not fixed, beams are required to respond to movements in a room. While K-01 discloses modifying adaptive beams to make them *slightly less adaptive*, K-01 did not make the non-intuitive leap to *completely* fixed beams, as the '186 Patent did. Put another way, the Court is correct that "the idea [of K-01] is the same as in the '186 Patent: applying AEC to fixed beams is less computationally burdensome than applying it to adaptive beams . . . ." R. 612 at 10. But K-01 applied that idea only in a limited way, modifying its adaptive beams so that "updates should only occur at certain times." *Id.* In stark contrast, the '186 Patent went all the way, doing away altogether with adaptations during a conference.

"Time-invariant beamforming," or "fixed" beamforming, as used in the K-01 system, means "time varying beamforming, held fixed for discrete periods of time." DSOF 108; *see also* PEX 62 at 33 (describing "the model of time-invariant beamforming" as being justified where beam updates occur "less frequently than significant changes in the acoustic path"); *id.* (stating, in

a section entitled "Fixed beamformer design," that beams should preferably be updated "at the beginning of 'far-end speech only' periods," which necessarily occur multiple times during a conference); *id.* at 30 (describing the problem with "[s]ignal-dependent, time-varying beamformers" in a conferencing application as "[the adaptive filter] can find a useful echo path model only when G(n) remains time-invariant ***for a sufficiently long time***.") (emphasis added); *id.* at Fig. 13.8 (showing a so-called "Fixed beamforming" block that nevertheless receives inputs from a "Beam design and Control" block); *id.* at 14 (Abstract stating that K-01 is directed to "the integration of AEC into time-varying beamforming"); *id.* at 30 (pertinent section titled "Integration of AEC into time-varying beamforming"); DEX 200 at 66:19-22 ("[T]ime-invariant or fixed beamforming may be fixed for only a certain period of time, say 10 seconds, 100 milliseconds [a] within this time frame, it's fixed."); *see also id.* at 92:2-4 (explaining that for the paragraph starting with "$G_F^{(M)}$ *based on time-variant beamforming*," "the understanding is that the fixed beamformer should be fixed for a certain amount of time, let's say seconds."); DEX 199 ¶¶ 47-57.

This understanding—that K-01 describes introducing brief periods of fixed beams into an adaptive beam system—is what caused the PTAB to uphold the '553 Patent's validity, after initially instituting *IPR*. It is not true that the PTAB did not "consider in detail the possibility that Kellerman 2001 discloses *both* fixed and adaptive beamforming." R. 612 at 8. To the contrary, that is the position the PTAB initially took when it instituted *IPR*. DSOF 103. But on further consideration, after a detailed review of K-01, the Board changed its mind. Specifically, the Board originally quoted this sentence from K-01 as supporting the idea that K-01 disclosed "fixed beams": "[T]he beamformer is decomposed into a time-invariant part and a time-varying part in the sequel, with AEC acting only on the output of the time-invariant part." *Id*. In the Final Written Decision, however, the Board conceded in a footnote: "[W]e relied on this statement from

Kellermann 2001 in our Institution Decision for our preliminary finding that the AEC in Kellermann 2001 acts only [on] the fixed beamforming signal. Based on the entire record developed during trial, we have reconsidered our original finding." DSOF 104. This is why the PTAB's Final Written Decision steps, in such a detailed fashion, through each paragraph of the section of K-01 entitled "Fixed beamformer design." PEX 64 at 25-27. In the context of an adaptive beam system describing adopting fixed beams for discrete periods, it was necessary for the Board to evaluate whether K-01 ever took the leap that the '186 Patent did—that of beams that remain fixed for the duration of a conference. The Board appropriately found that K-01 did not take that leap, because "[a]ll of the paragraphs describing the Fixed Beamforming block and the Beam design and Control block in Figure 13.8 contain some reference to adaptive or time-variant beamforming." *Id.* at 27; *see also* PEX 62 (K-01) at 34-35; DSOF 109.

Given that K-01 does not disclose "fixed beams," as that term is used in the '186 Patent, the only question is whether K-01 renders such beams obvious. It does not. As described above, K-01 never challenges the idea that its system should have adaptive beams. Instead, K-01 merely describes a moderate modification to that system, while the '186 Patent claims a much more extreme, non-intuitive solution. As ClearOne's expert Dr. Schonfeld has explained:

> [I]t would be particularly not obvious to rely on the disclosure in K-01 . . . to implement a fixed beam system because it would be contrary to the accepted convention in the field and the specific teachings in K-01 that time-varying adaptive beamforming provides superior beamforming systems. An elegant engineering solution may appear simple, especially with hindsight, but it does not mean it would be easy to come up with such an elegant engineering solution[]. In fact, it would be unlikely and counter-intuitive that a POSITA in 2011 would review K-01, which by that point was already 10 years old, and strip out part of the K-01 adaptive beamforming system that was considered more advanced than fixed beamforming to implement a simple, elegant solution based on fixed beamforming.

DEX 199 ¶ 59 (citations omitted); *see also* DEX 202 (Pandey Tr.) at 153:12-154:6 ("Q. Could an

audio signal processing engineer take teachings from an adaptive beamforming system and apply them to a fixed beamforming system? . . . A. My answer is going to be no. . . . [T]o design fixed beamformers, there are many, many techniques people have written about, if it was as simple as taking adaptive filter – adaptive beamforming and stripping out something, there wouldn't be all that work."). Indeed, when K-01 addresses reducing computational complexity in the "Fixed beamformer design" section, it does not propose making the beams update less frequently. Instead, it suggests using fewer beams, so that the beams can update *more* frequently. DSOF 110; *see also* PEX 62 at 33 ("Aiming at minimal computational complexity for AE, more frequent updates of $G_F^{(M)}$ may be accepted for reduced M."). Therefore, a POSITA concerned with limited processing power, reading K-01, would be motivated to reduce the number of beams rather than keep the beam coefficients fixed during the conference. DEX 199 ¶ 60. K-01 thus does not render the "fixed beams" of the '186 Patent obvious. *Id.* ¶¶ 58-62. This fact is further confirmed by the secondary considerations of non-obviousness discussed below in Section V.D. Because Shure's arguments regarding obviousness are based on a fundamental misunderstanding of K-01, they do not amount to the "clear and convincing evidence of invalidity so that no reasonable jury could find otherwise" required for entry of summary judgment in Shure's favor. *Eli Lilly*, 251 F.3d at 962. To the contrary, because Shure has failed to produce clear and convincing evidence that K-01 discloses or renders obvious the "fixed beams" claimed by the '186 Patent, summary judgment should be entered against this invalidity ground.

This is even more so because, in addition to failing to disclose "fixed beams," K-01 also fails to disclose Limitation 6, which claims "wherein said signal selection module uses the far end signal as information to inhibit said signal selection module from changing the selection of the combined echo cancelled signals while only the far end signal is active." DEX 199 ¶¶ 66-67, 167.

So does Beaucoup, which Shure relies on for this limitation. *Id.* ¶¶ 68-70. And a POSITA would not have been motivated to combine Beaucoup with K-01—and particularly not with any disclosure of purely "fixed beams" within K-01—with or without K-91. *Id.* ¶¶ 71-72; *see WMS Gaming v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) ("When an obviousness determination relies on the combination of two or more references, there must by some suggestion or motivation to combine the references."). Finally, to the extent Shure relies on Martin for a disclosure of "noise filter[ing]" as claimed in Claims 3, 9, and 15, a POSITA would not have been motivated to combine Martin with the three other references or have had a reasonable expectation of success in doing so. DEX 199 ¶¶ 74-78. Shure has failed to set forth clear and convincing evidence on each of these points.

For the foregoing reasons, this Court should grant ClearOne's motion for summary judgment on Shure's invalidity theories based on K-01, Beaucoup, K-91, and Martin, and deny Shure's motion for summary judgment based on K-01 and Beaucoup.

2.     Valve and Hamalainen Do Not Render The Asserted Claims Obvious

Shure moves for summary judgment on the combination of Valve and Hamalainen, arguing that these references render obvious the asserted claims of the '186 Patent. PMSJ at 30-33. Not so. Like K-01, neither Hamalainen nor Valve discloses or makes obvious a system involving the "fixed beams" claimed by the '186 Patent.

As with K-01, Shure's motion misreads Hamalainen. Shure readily admits that "beam steering" can be understood in two different ways in the context of the relevant technology. *See* PMSJ at 30 (contrasting "steering a single adaptive beam by changing its parameters" with "steering a beamforming *system* by switching from one fixed beam to another as in the '186 Patent") (emphasis in original); DSOF 111-112. The first meaning is more technically correct, and

more readily used by POSITAs. *Id.* But Shure's motion incorrectly interprets Hamalainen as referring to the second type of beam steering, when it in fact refers to the first. This error permeates Shure's explanation of Hamalainen. Once corrected, there can be no dispute that Hamalainen does not disclose the '186 Patent's "fixed beams," because it instead discloses a single adaptive beam.

Hamalainen makes clear that its references to beam steering are directed to the steering of a single adaptive beam. *See* DSOF 113; DEX 199 ¶¶ 80-81. For instance, it references "steer[ing]" a single beamforming filter "from one direction to another." PEX 69 (Hamalainen) at 2:64-67. It states that "beam steering can cause an instantaneous change by 180 degrees in the microphone array look direction from looking away from the loudspeaker to looking towards the loudspeaker." *Id.* at 3:5-9. It discusses "steer[ing] the beam toward the active speaker. This type of automatic active source detection and beam steering technology could easily introduce situations where the changes in beam directivity can be instantaneous, unpredictable, and frequent in time." *Id.* at 3:15-21; *see also id.* at 3:47-50 ("[I]t is necessary to estimate the direction of arrival (DOA) of the desired signal and utilize this spatial information to steer the beam pattern towards the desired source . . . ."). Hamalainen references steering "the beam" (singular) "towards any direction," and not just towards one of a few pre-selected directions. *Id.* at 4:30-35. And it specifically states that it supports "full 3D steering," which would not be possible if it were simply selecting among fixed beams. *Id.* at 15:9-10.

With the correct understanding of Hamalainen's "beam steering," Shure's attempt to analogize Hamalainen's Figure 4 to the '186 Patent falls apart. What Hamalainen's Figure 4 shows is the process of forming a single adaptive, "time-variant," beam, with AEC processing happening in the middle. DSOF 114. And that is what Hamalainen describes. *Id.*; *see also* PEX 69 at 4:18-19 ("Partition of beamforming filter to time invariant front-end and the time varying post-filter . . . so

that the time-variant filter is following the time-invariant processing making it possible to process the intermediate signals between these two stages."); *id.* at 13:22-24 ("Said acoustic echo cancellation and a microphone beamforming are performing within a main signal processing stage **730**. In stage **730**, a pre-filter for polynomial beamforming **740**, an acoustic echo cancellation stage **750** and a post-filter for polynomial beamforming **760** are provided as components . . . ."); DEX 199 ¶¶ 81-82. In other words, both the green box below and the blue box below are part of Hamalainen's beamforming process.



DSOF 115. The "PBF" in the blue box is an abbreviation for "Polynomial Beamforming Filter"—indicating that beamforming is happening in that box. *Id.* Indeed, one control block that communicates with the blue box is directed to "Beam steering **and beam shape** control," thus indicating that the blue box does more than simply select from available fixed beams. *Id.* The final beam resulting from the Hamalainen process is depicted in Figure 15. *Id.* Notably, that beam pattern is different from any of the pre-filter beam patterns depicted in Figures 11 to 14. *Id.* Accordingly, contrary to Shure's argument, Hamalainen also does not perform at least the step of "select[ing] with a signal selection module, one or more of the combined echo cancelled signals

for transmission to the far end."[11] DEX 199 ¶ 82.

Shure attempts to match portions of Hamalainen's single polynomial beamforming process to disparate portions of the claims of the '186 Patent. Namely, Shure argues that what Hamalainen routinely calls "intermediate signals," *see, e.g.*, PEX 69 at 4:25-35, 8:55-57, 14:41, 15:3, are the same as the fixed beams claimed by the '186 Patent, and that the "PBF [Polynomial Beamforming Filter] postfilter Time-variant beam steering" step, *see id.* at Fig. 4, is the same as the claimed "signal selection module." This argument "ultimately fails 'to resist the temptation to read into the prior art the teachings of the invention in issue.'" *TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1362 (Fed. Cir. 2019) (quoting *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 36 (1966); *see also id.* at 1361 (cautioning against "the impermissible *ex post* reasoning and hindsight bias that *KSR* warned against"); *see also* DEX 199 ¶ 82. The closest Hamalainen gets to a disclosure of the '186 Patent is when it *expressly teaches away* from the use of fixed beams and signal selection, as follows:

> As a third alternative MMBF-AEC configuration, the dynamic beam steering could be replaced by a large number of ***fixed time-invariant beamforming filters*** looking at all different look directions. In this configuration a dedicated AEC processing is applied to the output of each beamforming filter with a fixed directivity pattern. In this configuration the AEC operation would not be affected by the MMBF processing, because ***the steering would be implemented with output signal selection scheme***. ***This configuration is not very feasible in practice*** because high

---

[11] Shure argues that Hamalainen's "beam steering" is done through a weighted summation of the post-AEC signals, citing Hamalainen at 12:64-67 and 13:33-40. Neither citation supports that assertion. And the portions of Hamalainen that actually describe the "beam steering processing taking place at the post-filter" describe a far more complicated process: "In the literature the PBF filter is also known as a Farrow structure. Farrow (1988) proposed a fractional delay FIR structure where every coefficient of an FIR filter could be expressed as an Nth order polynomial in the delay parameter D. The PBF filter structure, illustrated in FIG. 2, is obtained when the polynomial is evaluated using Horner's rule, which leads to a Taylor polynomial approximation of an ideal beamforming filter. Even if the Taylor polynomial has been applied in the illustrations of this invention, this invention is not limited by the applied polynomial basis functions. E.g. the Chebyshev polynomials have the advantage of limiting the required dynamic range of pre-filter $W_i(z)$ coefficient." PEX 69 at 8:57-9:6. Shure also argues that Dr. Schonfeld concedes Hamalainen's "beam steering" block functions as a mixer, but that argument takes Dr. Schonfeld's testimony out of context. *See* DEX 282 at 56:8-22; 147:16-148:9.

> performance dynamic beam steering in 3D cannot be implemented with low
> number of look directions and high number of look directions would
> introduce a very high CPU power processing requirement.

DSOF 117. Thus, Hamalainen does not disclose the fixed beam/signal selection structure claimed in the '186 Patent, and no one would be motivated to combine any disclosure thereof in Hamalainen with any other reference to create such a structure.[12] DEX 199 ¶ 86-89; *see also TQ Delta*, 942 F.3d at 1357 ("Identifying a motivation to combine the prior art is important because 'inventions in most, if not all, instances rely on building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.'") (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-19 (2007)). In particular, in arguing that a POSITA would adopt "inhibit[ing] said signal selection module from changing the selection" from Valve, or that noise filtering is only a "slight modification of Hamalainen," *see* PMSJ at 32, Shure disregards clear case law that identification of a motivation to combine must "explain why a person of ordinary skill in the art would have combined elements from specific references *in the way the claimed invention does*." *TQ Delta*, 942 F.3d at 1360 (quoting *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012)) (emphasis in original). Shure fails to account for how modifications to Hamalainen may be detrimental to its polynomial beamforming structure, how a POSITA would account for the different numbers of beams disclosed in Hamalainen and Valve, and what would motivate a POSITA to change the location of Hamalainen's noise filtering to closer match the '186 Patent. DEX 199 ¶ 86-89. Finally, the secondary considerations, discussed below in Section V.D, weigh against a finding of obviousness.

For the foregoing reasons, Shure has failed to submit "such clear and convincing evidence

---

[12] Hamalainen in fact highlights that K-01 does not render obvious the claims of the '186 Patent, in that Hamalainen addresses K-01, describes it as integrating "time-varying beamforming with acoustic echo cancellation," and comes to a different solution, while expressly teaching away from the use of multiple fixed beams. DSOF 117-118.

of invalidity so that no reasonable jury could find otherwise," and its motion for summary judgment on this ground should be denied, while ClearOne's should be granted.

        3.     <u>Beaucoup '639 in Combination with Vortex EF2241 in View of K-97 and Smith, Does Not Render the Asserted Claims Obvious</u>

Shure's invalidity contentions argue that "Beaucoup '639 in combination with the Vortex EF2241 digital signal processor, [with] additional motivation to combine … provided by Smith and K-97" renders obvious the asserted claims of the '186 Patent. DEX 198 at 10-11. This argument is woefully inadequate, because even if this combination were operable, it would not output any audio.

Beaucoup '639 is directed at only a limited subsystem within a conferencing application. Specifically, it discloses a beamforming microphone array used to improve talker localization in a voice activity detector, and not one that outputs audio signals for transmission. DSOF 119. The specific beamforming array "BA 200" blocks in Fig. 2 of Beaucoup '639, which Shure and Dr. LeBlanc argue disclose the "fixed beams" of the '186 Patent[13] (*see, e.g.*, DEX 288 at 9; DEX 196 ¶96; DEX 203 at 197:22-25), are actually part of a larger structure 120, which is a "voice activity detector," as shown in Figure 2. DSOF 120. The output from the voice activity detector 120 is a decision, and no audio from the beamformer BA 200 blocks is used for transmission to the far end. DSOF 121. Dr. LeBlanc agrees. *Id.* Moreover, Beaucoup '639 specifically teaches that "[s]ince the beamformer instances are used only for energy calculations, the quality of the beamformer output signal is not particularly important." *Id.* And Figure 3 teaches that the "output from

---

[13] During his deposition, Dr. LeBlanc added that the "steered device 150" in Beaucoup '639 discloses an additional beamformer. DSOF 122. Shure did not disclose this theory in its Final Invalidity Contentions, and should not be allowed to belatedly change its invalidity theory. *Id*. In any case, Dr. LeBlanc admits that there is no disclosure in Beaucoup '639 about how the steering is performed in the "steered device 150." *Id.* at 123. The scant description of the "steered device 150" in Beaucoup '639 also fails to teach any details of the type of beamforming performed by the "steered device 150." In fact, the steered device 150 does not need to be a beamformer at all. *Id.* (the steered device 150 could be "a beamformer, an image tracking algorithm, or other system").

beamformers" is to be "disregarded." *Id.*

The Vortex EF2241 is a digital signal processor that performs echo cancellation on individual microphone signals. The Vortex EF2241 manual does not mention "beam" or "lobe," and only describes "Mic/Line Inputs." DSOF 124. The Court already rejected Shure's invalidity challenge based on a similar prior art product, ClearOne's XAP800, which also offers AEC on each individual microphone. R. 278 at 27. Shure nonetheless makes a similar argument that a POSITA would plug Beaucoup '639's beamforming microphone array into the audio inputs of Vortex EF2241 to arrive at the '186 Patent. DSOF 125. That would not work for several reasons.

*First*, as Dr. Schonfeld explains, it would be nonsensical for a POSITA to input the *decisions* from the voice activity detector from Beaucoup into the "mic/line inputs" of the Vortex. DSOF 126. Shure does not offer any evidence that such a combined system would be operable, but even if it were, it would not be a system that selects one or more of the combined echo cancelled (and beamformed) signals "for transmission to the far end," because the beamformer output in Beaucoup '639 is used to create a voice activity detector decision only. DSOF 121.

*Second*, given the prevalence at the time of AEC-first prior art, which operates AEC on each single microphone output, and the specific instruction in Vortex EF2241 that the inputs are for "Mic/Line Inputs," it would not be obvious for a POSITA to connect the beamformed outputs from Beaucoup '639 (if the POSITA could successfully obtain beamformed *audio* signals from the voice activity detector)—rather than the individual microphone outputs from Beaucoup '639— to the "Mic/Line Inputs" of Vortex EF2241. DEX 199 ¶¶93, 96. Indeed, as Dr. LeBlanc admits, Shure has proffered no evidence of even a single instance of anyone actually connecting a beamforming microphone array, whether it is the beamformer within the voice activity detector in the Beaucoup '639 or not, to the Vortex EF2241. DSOF 124.

Shure relies on the Smith '485 Application and K-97 as evidence that a POSITA would be motivated to combine Beaucoup '639 and Vortex EF2241, and not to teach any limitation of the asserted claims. Specifically, Dr. LeBlanc relied on K-97 in this combination "only … to illustrate that it was well accepted long ago, and that a POSITA would know, to use AEC in addition to beamforming," and relied on Smith "only … to show that a POSITA would have had the idea and option and motivation to utilize existing digital signal processing hardware to perform common/standard functions on their beamformed signals." DSOF 127. These generalized motivations, even if true, are insufficient to cure the problem that the combination of Beaucoup '639 and Vortex EF2241 does not (and cannot) select from the beamformer outputs in Beaucoup '639 for transmission, and therefore is not a complete (or even operable) conferencing application.

                4.    <u>Buchner in Combination with XAP 800 in View of K-91 Does Not Render the Asserted Claims Obvious</u>

Shure's invalidity contentions argue that Claims 1, 3-4, 7, 9-10, 13, 15-16, 19, and 21-22 of the '186 Patent are obvious in light of Buchner in combination with XAP 800 in view of K-91. DEX 198 at 14-17. "Buchner" refers to an article entitled "An Acoustic Human-Machine Interface with Multi-Channel Sound Reproduction," authored by Dr. Herbert Buchner and Dr. Walter Kellermann and published in 2001. DEX 204. K-91 refers to an article entitled "A Self-Steering Digital Microphone Array," authored by Dr. Kellermann and published in 1991. DEX 205. "XAP 800" refers to the XAP 800 Audio Conferencing System offered by Gentner Communications (a predecessor of ClearOne) as of 2001. DEX 206. This Court already considered the ClearOne XAP during the '186 PI proceedings. At that time, the Court held:

> Shure argues that the claimed invention was a predictable variation in light of the XAP 800, because all the invention does is add a beamformer to the XAP 800. *See* Shure Resp. Br. 31-33.
> This argument misses the mark. The XAP 800 had eight individual microphones, and one acoustic echo canceller for each microphone signal.

> R. 163, Turner Decl. Exh. 7, Thurston Dep. Tr. 84:4-15. The key insight of the '186 Patent, on the other hand, is to combine the microphone signals from the beamformer into a smaller number of fixed beams, and then perform AEC on the fixed beams. *See* '186 Patent Col. 19:58-67. The point is to save on AEC processing costs while still allowing for a large number of microphones. *See* '186 Patent Col. 1:60-Col 2:9. The XAP 800, on the other hand, suffered from the limitations of the pre-'186 art: echo cancellation had to be performed on each microphone signal, so the number of microphones was limited. So the XAP 800 does not itself render the '186 Patent obvious.

R. 278 at 27.

Shure now relies on Buchner for a disclosure of "a switched-fixed beamformer producing multiple fixed beams from a plurality of microphones, performing per-beam echo cancellation, followed by a 'voting' sequence to select an echo-cancelled beam for transmission." DEX 198 at 14. Shure argues that "[i]f the XAP 800 were utilized to perform the per-channel AEC and voting of Buchner, all of the claim elements would be performed." *Id.* at 15. With respect to K-91, Shure writes, "K-91 is not necessary to combine with Buchner + XAP 800, but it would motivate a POSITA to implement the Buchner system by showing that, even ten years earlier, the fixed beamforming and voting aspects of the system were successfully implemented." *Id.* For the reasons set forth below, Shure is mistaken.

Buchner is about multi-channel sound reproduction in the context of multi-channel AEC. Multi-channel AEC, not to be confused with "per-beam" AEC, refers to cancelling acoustic echoes from multi-channel sound reproduction, *e.g.*, multiple loudspeakers, in the near end room. DSOF 128. Common applications include, for example, multimedia systems, and voice assistance devices that play back both the assistant's response and audio from media files. *Id.* Multi-channel AEC therefore deals with different problems and challenges than in a conferencing application, which does not usually have multi-channel sound reproduction. *Id.* Buchner recognizes that "[t]he problems of M-C AEC include all those known for mono AEC . . . but in addition to that, M-C

AEC has to cope with high correlation of the different loudspeaker signals, which in turn cause correlated echoes which cannot easily be distinguished in the microphone signals." DEX 204 at 2. Buchner further notes challenges in the field of multi-channel AEC: "Until recently, even the step from mono AEC to the stereo case with only one microphone signal to be compensated has been considered to be very difficult in terms of performance and computational complexity." *Id.* The focus of Buchner is therefore to "investigate and extend a recently proposed and promising frequency-domain scheme for ***an increased number of loudspeaker channels***." *Id.* (emphasis added). It is against this background that Buchner shows "how to efficiently combine the presented frequency-domain M-C AEC with a steerable beamforming microphone array (BF)." *Id.* at 5.

Shure's invalidity contentions with respect to Buchner rely heavily on Figure 3 therein. *See* DEX 207. That figure, and the four sentences that describe it, are in fact a summary of K-97, a prior reference authored by Dr. Kellermann. DSOF 129. Naturally, if a POSITA had wanted to implement the system described by Buchner as being disclosed in K-97, he or she would have referred to K-97 for details. DEX 199 ¶ 101. It is telling, then, that Shure specifically did *not* rely on K-97 for this combination. This is because the full disclosure of K-97—to which a POSITA would likely refer—shows that Buchner's simple summary of that reference is incomplete, in ways that distinguish it further from the '186 Patent. *First*, like K-01, K-97 discloses adaptive—not fixed—beamforming. This is shown even by its title, "Strategies for Combining Acoustic Echo Cancellation and Adaptive Beamforming Microphone Array." PEX 61 (K-97) at 219.

*Second*, K-97 does not disclose applying AEC to each of M fixed beams, as required by the '186 Patent. DSOF 130. To the contrary, it discloses creating an initial set of "M fixed beams," but then mapping the "M fixed beams" onto L "talker beams" based on the active talker in the conference. *Id.* K-97 teaches that in the BF-I system, "L<M<N," AEC is applied on each of the *L*

- 44 -

*"talker beams*," which are different from the M fixed beams. *Id.*

To the extent Shure argues that the L talker beams in K-97's BF-I system, instead of the M fixed beams, read on the "fixed beams" in the '186 Patent, the L talker beams' parameters do not remain fixed during a conference. DSOF 131. K-97 explains that the mapping is learned and updated during a conference, which means different L talker beams can be used during a conference. *Id.* For example, K-97 emphasizes that "the detection of talker activity is crucial" because the beamformer "needs it for voting and to ***identify periods when mapping for BF-I … can be learned.***" *Id.* K-97 also teaches that estimating the current echo path attenuation provided by AEC during far-end talk remains indispensable for determining the amount of required supplementary loss (notably during initial convergence, at changes of the acoustic path, and ***when the mapping for BF-I … is updated***)." *Id.* K-97 further explains that "[f]or initialization, the results of a ***training procedure*** can be incorporated, or the dominant fixed beams during the ***first periods of local speech*** are used as initial talker beams" and contemplates that "mapping should preferably be ***updated*** during 'far-end talk-only' periods." *Id.*

Shure's invalidity contentions with respect to Buchner also rely on Figure 4 therein. *See* DEX 207. Figure 4 and its accompanying text focus on decomposing the multi-channel AEC further "into parts that can be shared among all *B* beams (or *Q* microphones) and other parts that have to be computed separately for each beam (Fig. 4) or microphone." DSOF 132. This is the real focus of the Buchner article. But it actually proposes a more complicated way to implement AEC than in the '186 Patent. This makes sense, because Buchner is concerned with solving a different set of problems that present more challenges and computational complexities with multi-channel AEC than in the '186 Patent. Therefore, a POSITA interested in reducing computational complexity in combining AEC and beamforming for conferencing applications would not be

motivated to implement the system proposed in Fig. 4 of Buchner, because that system actually adds unnecessary complexity with minimum advantage for normal conferencing applications. DEX 199 ¶ 103. As ClearOne's expert has explained it:

> It is not obvious that a POSITA in 2011 would be motivated to (1) use Fig. 3 in Buchner (which by 2011 was 10 years old), which is a summary of another reference in the background section, (2) disregard Buchner's real focus (decomposed AEC for multi-channel sound reproduction), (3) draw lessons from the 20-year old fixed beamforming system without AEC disclosed in K-91, and (4) combine [] the 10-year old XAP system with per-microphone (not per-beam) AEC to arrive at the invention of the '186 Patent. The three references in this combination disclose three different types of AEC implementations. Dr. LeBlanc and Shure did not cite to any clear and convincing evidence that POSITA would use the per-beam AEC instead of the decomposed AEC or no AEC at all. It is also unlikely that a POSITA would expect such a combined system to work without undue experimentation.

*Id.* ¶ 106; *see also* DSOF 133. For the foregoing reasons, the Court should enter summary judgment against this invalidity ground.

### C. The '806 Patent is Not Obvious

#### 1. Non-Obviousness in Light of the CTG System

Shure argues that the '806 Patent is obvious in view of the CTG Ceiling Audio Conferencing System ("CTG System"), which Shure defines as "comprised of CTG's CM-01 ("Ceiling Mounted") microphones working in connection with its FS-400/800 Beamforming Mixers." *See* DEX 194 at 9. The CM-01 Sell Sheet shows the CM-01 microphones as tube microphones that may be inserted into holes drilled in a ceiling tile. DSOF 143.

During the '806 PI proceedings, Shure argued that the CTG System anticipated the '806 Patent, and the Court disagreed, finding that the CTG System does not disclose several claim limitations. DSOF 134; R. 551 at 36-38. Among other deficiencies, the CTG System does not disclose a beamforming microphone array, is not integrated with a ceiling tile as a single unit, lacks a ceiling tile with an acoustically transparent outer surface, and has no microphone array that

picks up audio signals through the outer surface of a ceiling tile. *See* R. 551 at 37-38. Shure has put forth no evidence demonstrating that a POSITA in 2012 would have had the knowledge or motivation to supply the missing claim limitations. *See Arendi S.A.R.L., v. Apple, Inc.*, 832 F.3d 1355, 1366-67 (reversing obviousness finding because "there is nothing in the record to support the Board's conclusion that supplying the missing limitation would be obvious to one of skill in the art."). Accordingly, the claims cannot be obvious in view of the CTG Conference System.

> a) *"a beamforming microphone array that includes a plurality of microphones that picks up audio input signals"*

The Court has construed "beamforming microphone array" to mean "a plurality of microphones positioned at predetermined locations that produce audio signals to be used to form a directional pickup pattern." R. 551 at 20. The CTG System does not include "a plurality microphones positioned at predetermined locations." Instead, the microphones of the CTG System are packaged individually, such that the purchaser must: (1) decide where to place the microphones for best room coverage; and (2) drill holes into various ceiling tiles to install them. *See* DSOF 137; DEX 208 at 82:20-84:19; DEX 209 at CTG0055. A POSITA would not consider such a "determination" of microphone locations, after manufacturing and purchase, to satisfy the "predetermined locations" requirement. *See* DEX 199 ¶ 224. Furthermore, because the CTG System's mixer never learns the locations of the microphones, the locations are not "predetermined" for the purpose of beamforming.

And indeed, the CTG System did not perform any beamforming process. Although some of CTG's marketing materials describe the FS-400/800 mixers of the CTG System as "███████████," these same documents also make clear that the FS-400/800 mixers ███ ████████████████████████████████████████████████████████████████ ███████████████████████████. CTG's Sales White Paper makes clear that CTG

used the word "███████" interchangeably with "█████" an entirely different concept. DEX 209 at CTG0052 ("███████████████████████████████████████████ ███████████████████████ (emphasis added); *see also* DEX 199 ¶ 221. Indeed, Mr. Joseph Marash, President and former CEO of Phoenix Audio, who manufactured the FS-400/800 mixers for CTG, ███████ ██████████████████████████. *See* DSOF 136.

> b)  *"said beamforming microphone array integrated into said ceiling tile as a single unit,"*

The CTG System does not disclose a beamforming microphone array integrated into a ceiling tile as a single unit. Shure's expert concedes that the claims of the '806 Patent require multiple microphones in a single ceiling tile. DSOF 138. But Shure has not identified any evidence that multiple CM-01 microphones have ever been installed in a single ceiling tile. DSOF 139. Instead, documents regarding the CTG System consistently show the CM-01 microphones ████████████████████████████████████████████████████████ ██████. *See* DSOF 139-40; DEX 211 at SHURE651595; DEX 212 at SHURE651602. Nor has Shure identified any evidence suggesting that a POSITA would be motivated to put multiple CM-01 microphones in a single ceiling tile. To the contrary, the CTG documents teach away from doing so, disclosing that CM-01 microphones are preferably installed ████ feet apart from one another, because "█████████████████████████████████████████████ █████." DSOF 140; DEX 209 at Figs. 1, 2 (showing microphones installed ████ feet apart); *id. at* Figs. 4 and 5 (showing microphones installed ██ feet apart); DEX 213 at CTG0060 (advertising that the system "█████████████████████████████████████████████ ███████████████████."). Indeed, because the CTG System does not perform beamforming and merely █████████████████ to isolate talkers, its omnidirectional CM-01 microphones need to be spaced widely around the room to work well. *See, e.g.*, DEX 212 at

SHURE651602; *see also* DEX 209 at CTG0049 (cautioning against █████████ ██████████████████████████████████████████████████████████████████████ ████████ "). In view of these teachings, Shure's own expert admitted he could think of no reason why a POSITA would be motivated to put more than one microphone in a standard 2 by 2 ceiling tile. DSOF 141. Shure's other expert, Dr. LeBlanc, further testified that if multiple CM-01 microphones were installed in a single ceiling tile, one probably would not want to use them with the CTG System's FS-400/800 mixer. DSOF 142.

> c)  *"a ceiling tile with an outer surface on the front side of said ceiling tile wherein said outer surface is acoustically transparent, . . . said beamforming microphone array picks up said audio input signals through said outer surface of said ceiling tile."*

The CTG System fails to disclose a ceiling tile with an "acoustically transparent" outer surface. The Court has construed "acoustically transparent" to mean "provides no or minimal resistance to sound." But documents describing the CTG System consistently show ██████ ███████████████████████████████████████████████. *See, e.g.*, DEX 213 at CTG0061. A non-acoustically transparent surface with a small hole in it is not an acoustically transparent surface, and picking up audio signals through such a hole is not the same as "pick[ing] up audio input signals through" an acoustically transparent outer surface. *See* DEX 199 ¶ 233. This is particularly true because the CM-01 microphones actually protrude slightly below the outer surface of the ceiling tile. *See* DSOF 143. Because the CTG System's microphones are placed in front of the outer surface of a ceiling tile, they cannot pick up audio signals through the "outer surface" of the tile. *See* DEX 214 ¶ 10 ████████████ █████████████████████████████████████████████████████████████████████ ██████████████ (emphasis added)); DEX 215 at CTG0016.

> d)  *The CTG System lacks additional requirements of dependent claims*

The CTG System does not disclose a ceiling tile comprising "acoustic or vibration damping material." Although Shure's expert has pointed to "silicon potting" placed inside the tube of an individual CM-01 microphone for this limitation, a POSITA would understand this limitation to require acoustic or vibration damping material external to the individual microphones and which dampens sounds or vibrations that would affect the microphones. *See* DEX 199 ¶ 238. A POSITA also would not consider this limitation satisfied by a standard ceiling tile itself. *See id.* ¶ 239.

The CTG System also does not disclose an outer surface with a grille. Even the cover of the CM-01 microphones, which Shure has touted as disclosing a grille, appears actually to have a ██████████████████████████████. *See id.* ¶ 241; *see also, e.g.*, DEX 213 at CTG0060; DEX 216 at CTG0057.

For the foregoing reasons, given the many significant differences between the CTG System and the claims of the '806 Patent, the CTG System does not render the '806 Patent obvious.

### 2. Shure's "Loudspeaker" Prior Art Combinations

Shure's remaining three obviousness grounds seek to combine references involving ceiling-mounted beamforming microphone arrays with loudspeakers mountable in a ceiling grid. Shure made the same obviousness arguments (among others) during the '806 PI proceedings— where the standard of proof was more favorable to Shure—and the Court rejected them, holding:

> It is not at all clear that a skilled artisan would have been motivated to combine any of the loudspeaker prior art references with a BFMA. ClearOne argues that the objectives of loudspeakers are different than those of audio conferencing microphone arrays, and explains that while "an ideal loudspeaker would transmit sound equally well to everyone in the room . . (less directional) . . an ideal microphone would pick up only the active talker and ignore others so that only the active talker is heard (more directional)." The Court agrees: given the differences in the applications of the two types of devices, a person of ordinary skill might very well not have thought to combine them.

*See* R. 551 at 38-44 (citations omitted); DSOF 144. The same result is appropriate now, when it is

Shure's burden to produce clear and convincing evidence that a POSITA would be motivated to combine the references, and where Shure has added no such evidence since the '806 PI proceedings. Indeed, the prevailing wisdom in the art in 2012 was specifically to *separate* microphones from loudspeakers in order to avoid problems like echo and feedback. *See, e.g.*, DEX 212 at SHURE651602 (showing ceiling speakers located in different places than microphones); DEX 209 at CTG0048 ("███████████████████████████████████████ ████████████████████████████████████████████████████████████████.").

A POSITA in 2012 would thus not have considered loudspeaker prior art references to be useful when designing a beamforming microphone array. *See In re Clay*, 966 F.2d 656, 658-60 (Fed. Cir. 1992) (finding clear error where the PTAB found a reference to be analogous art because it related to the same industry as the invention but operated in different conditions and was directed to different purposes).

Moreover, in 2012, the conventional wisdom in audio conferencing was that good audio required close proximity between talkers and microphones. DSOF 145. Because of this conventional wisdom, integrating microphones with ceiling tiles for high-quality sound was unconventional. A Shure webinar from September 2016 clearly reflects this fact:

- The MXA 910 is a "nifty new product[] . . . which puts two words together that Shure has been trying its damnedest not to use in the same sentence for about 20 years, which are 'ceiling' and 'microphone.'"
- "We have been, shall we say, fairly vocal about not putting microphones on the ceiling for a long, long time. So much so that we have written entire papers about why you shouldn't do it. . . . [I]n 'normal rooms,' which have fairly poor acoustics and noise, and the mics are too far from the talkers and too close to loudspeakers, and blah blah blah, it just always turns out to be a disappointment, and so we thought we'd rather not be involved in that disappointment."

DSOF 145. One of the papers mentioned in the webinar states: "Microphones On the Ceiling? Shure Strongly Advises 'No!'" *Id.* Another Shure article from 2013, titled "Can I get acceptable sound quality from microphones placed on a ceiling?" states: "To an experienced audio engineer,

the ceiling is the last place to place a microphone . . . [b]ecause it is far away from the desired audio source (the talker) and close to undesired sound sources (loudspeakers, air conditioning vents, or fluorescent lights that buzz)." DSOF 147; *see also* DEX 217 at CLRONE-00418384 ("The Shure MXA910 answers the age-old question of whether microphones need to be on the conference room table. Prior to this product, the answer was generally "YES" if clear speech was the goal."); DSOF 148. In light of this conventional wisdom, it would not have been obvious for a POSITA to combine a beamforming microphone array with a drop-ceiling-mounted loudspeaker reference. *See Bone Care Intern., LLC v. Pentech Pharm., Inc.*, 862 F. Supp. 2d 790, 818 (N.D. Ill. 2012) (defining a POSITA as "one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights") (quoting *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985)). This is consistent with the testimony of the '806 Patent's lead inventor, Mr. Graham, who stated that when he and others at ClearOne obtained test results from their ceiling-mounted beamforming microphone array in December 2012, those results were unexpectedly positive. DSOF 149; R. 360 (Graham Decl.) ¶ 9.

Additionally, most known beamforming microphone array systems in 2012 placed microphones over a large area, because placing microphones in close proximity was known to adversely to impact frequency response and directional resolution. *See, e.g.*, DSOF 150; R. 360 ¶ 8. Therefore, a POSITA would not have been motivated to place a beamforming microphone array system within a 2' x 2' ceiling tile. Nor would a POSITA have had a "reasonable expectation of success" in doing so. R. 551 at 41-42; *ActiveNetworks*, 694 F.3d at 1327 (Fed. Cir. 2012).

For the foregoing reasons, and as described in more detail below in reference to specific combinations, summary judgment should be granted against Shure's loudspeaker combinations.

a)      *Non-Obviousness in Light of Chhetri and I-Ceilings Panel*

Shure's first "loudspeaker" prior art combination seeks to combine Chhetri with the chassis of the I-Ceilings System. First, as described above, a POSITA would not have been motivated to combine these references. Second, even when combined, the references lack elements of the claims.

Chhetri is a 2012 U.S. patent application publication titled "Signal-Enhancement Beamforming in an Augmented Reality Environment." DEX 218 (Chhetri) at Cover. During prosecution of the '806 Patent, the examiner considered Chhetri and allowed the claims over it, noting that it "fail[s] to teach 'wherein said beamfoming microphone is coupled to the back side of said ceiling tile and all or part of said beamforming microphone array is in the drop space of the drop ceiling. DEX 219 at 2. Chhetri describes a three-dimensional beamforming microphone array



for use in an augmented reality system. Chhetri's figures, including Figure 1 to the right, make clear that the microphones of the array are located a substantial distance from one other, in the airspace of a room, and not within a ceiling tile. *See also* DEX 218 at Figs. 3-5. Shure's expert, Dr. Roy, has opined that Figure 1 of Chhetri is "a perspective engineering drawing that is intended to be drawn to scale as indicated by the angled lines of the room and the waved lines on the outer edges." DSOF 151. Dr. Roy has estimated the total width of the microphone array of Figure 1 to be 50 inches, *id.*, much larger than a standard 2' x 2' ceiling tile.

Chhetri's specification also emphasizes the signficant three-dimensional aspect of Chhetri's array, and suggests that the microphones should be located far from each other. DSOF 152. These disclosures are consistent with the prevailing wisdom that microphones in

- 53 -

beamforming arrays should be placed at sizeable distances from each other. DSOF 150, 152.

Shure argues that Chhetri's beamforming array should be combined with Armstrong's I-Ceilings System, which is described as a "loudspeaker system designed to match Armstrong's market-leading range of ceilings." DEX 222 at SHURE651649. Although Shure's expert claims that the I-Ceilings System could operate as both a microphone and speaker, there is essentially no record evidence to support this, and certainly no evidence to support it being used as a microphone in a situation requiring good audio quality. DEX 199 ¶ 268. Dr. Roy could not confirm whether the I-Ceiling System had ever been used in audio conferencing, *see* DEX 208 at 35:5-16, and the only disclosures of microphones in documents relating to the I-Ceilings System are of handheld or tabletop microphones separate from the loudspeaker system. *See* DEX 222 at SHURE651650, SHURE651656.

Thus, a POSITA trying to combine Chhetri with the I-Ceilings System would have had to make major modifications to Chhetri's beamforming microphone array, without any expectation of success in doing so. *See* R. 551 at 43; DEX 199 ¶¶ 269-71. First, the POSITA would have had to remove the vertical portion of the 3-dimensional microphone array disclosed in Figs. 1 and 5. Then, he or she would have needed to fit the remaining large, cross-shaped array into a 2' x 2' housing. *See* DEX 208 at 190:19-191:24. Chhetri—which discloses its array for use in an augmented reality environment—certainly provides no motivation to do this, as an augmented reality system itself could conceal the array from a user's view.

<em>b)</em>     <em>Non-Obviousness in Light of Chhetri and Atlas System</em>

Shure next tries to combine Chhetri with the Atlas Sound I128SYSM ("Atlas System"), which contains a loudspeaker and a single omnidirectional microphone. DEX 194 at 20-21; DEX 223 ¶ 7. Atlas describes its system as suitable only for "advanced alerting, bell schedules, pre-

recorded & scheduled announcements"—not audio conferencing. DSOF 153. The Atlas system does not comprise a beamforming microphone array or a DSP capable of performing a beamforming algorithm. It measures only 1-foot by 2-foot, and thus could not itself replace a ceiling tile. *See id.*

A POSITA would thus not have been motivated to combine Chhetri with the Atlas System, and even if a POSITA attempted to do so, he would have encountered technical challenges even more severe than when seeking to combine Chhetri with the I-Ceilings Panel. *See* DEX 199 ¶ 276.

c) *Non-Obviousness in Light of Sasaki and A-Net IPSCM*

Shure's final loudspeaker combination seeks to combine Sasaki with Advanced Network Devices IPSCM ("A-Net IPSCM"). Sasaki is a research paper describing a "speech recognition system that detects basic voice commands for a mobile robot operating in a home space." DSOF 154. A POSITA would understand that Sasaki's system is not designed to work in audio conferencing, which is a completely different application and has different audio requirements. *See* DEX 199 ¶ 279. Sasaki describes experiments using a "command dictionary [with] 30 words and 4 sentence constructs, such as 'go to somewhere', 'come here' or greetings." DSOF 154. Even using this limited dictionary, the Sasaki system recognized only between 61.1% and 94.1% of the words spoken. DSOF 155. Sasaki conceded that "[f]uture research" was "needed to detect human voice and reduce error." *Id.* In addition, the microphone arrays of Sasaki are disclosed as being installed hanging down from a ceiling.



*Id.* They are not integrated with a ceiling tile as a single unit, coupled to the back side of a ceiling

- 55 -

tile, or located even partially in the drop space of a drop ceiling. Sasaki does not even disclose a drop ceiling, because it depicts its device in a home. *Id.* Sasaki further does not disclose an acoustically transparent outer surface or picking up audio signals through such a surface. *Id.*

The A-Net IPSMC is a speaker described as suitable for "bell scheduling, alerts, reminders, and clock chimes," as well as "voice paging." DSOF 156. It is not described for use in installed audio conferencing. The A-Net device includes a single omni-directional microphone. It therefore does not comprise a beamforming microphone array or a DSP capable of performing a beamforming algorithm. The A-Net device further does not disclose a ceiling tile with an acoustically transparent outer surface or picking up audio signals through such a surface.

A POSITA would not have been motivated to apply the microphone array of Sasaki to audio conferencing or to combine it with the A-Net IPSCM housing for such a use. Neither device appears capable of producing the audio quality required for such an application. DEX 199 ¶ 282. The Sasaki array, which protrudes significantly into the room, also would not fit in a ceiling tile form factor. *See* DEX 224 at Schonfeld003101. The A-Net IPSCM, in turn, is designed for use as part of a public address system, not audio conferencing. A POSITA would not have had a reasonable expectation of success in integrating Sasaki's array into the housing of the A-Net IPSCM, nor would doing so satisfy the limitations of the claims. Thus, Shure's final prior art combination also fails.

### D. Secondary Considerations of Non-Obviousness

In "reviewing an obviousness challenge," this Court "must consider . . . which, if any, secondary considerations—or objective evidence of nonobviousness—are relevant and the effect of those secondary considerations." *Techtronic Indus. v. Chevron Holdings*, 395 F. Supp. 2d 720, 732-33 (N.D. Ill. 2005). Secondary considerations include, but are not limited to, "commercial

success, long felt but unsolved need for the invention, the failure of others, and copying of the claimed invention." *Id.* (internal quotations omitted). Such secondary considerations can be evaluated with respect to a plaintiff's embodying products, as well as with respect to a defendant's infringing products. *See* R. 551 at 44. Here, the objective evidence of ClearOne's BMA and BMA 2 devices (which practice the '186 Patent), ClearOne's BMA CT devices (which practice the '186 and '806 Patents) and Shure's MXA910 (which practiced the '186 Patent at least through June 2019 and the '806 Patent through at least August 2019) demonstrates that secondary considerations weigh against Shure's obviousness challenges with respect to the '186 Patent, and in favor of ClearOne's motion for summary judgment with respect to the '806 Patent. *See* DEX 4 ¶¶ 199-225; DEX 225 ¶¶ 77-90; *see also* DEX 4 ¶¶ 52-71 (the MXA910 practices the '186 Patent), ¶¶ 122-133 (ClearOne's BMA, BMA 2, and BMA CT practice the '186 Patent); ¶¶ 150-171 (the MXA910 practices the '806 Patent), ¶¶ 185-198 (ClearOne's BMA CT practices the '806 Patent).

### 1. Secondary Considerations Establish That The '186 Patent Is Nonobvious

Several secondary considerations weigh in favor of finding the '186 Patent non-obvious.

*First*, after its release and before Shure's infringement, the ClearOne BMA enjoyed significant industry acclaim and substantial commercial success. It won the Sound & Video Contractor's Most Innovative Products of 2013 award and *AV Technology* "Best of Show" Award in 2017. DSOF 157. Between its release and January 2018, the BMA had over $▮▮▮▮▮▮ in sales, generating over ▮▮▮▮▮ in revenue in 2015 alone, representing more than ▮▮ of ClearOne's U.S. revenue.[14] DSOF 158; *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1377 (Fed. Cir. 2000) (commercial success is usually shown by significant sales in a relevant market).

---

[14] Shure has admitted that the increase in ClearOne's revenue was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," which includes the ClearOne BMA. DSOF 159. And after the introduction of the BMA, ClearOne's market share in the installed audio conferencing market rose from abou▮ ▮% in 2012 to about ▮% in 2015. *Id.*

ClearOne's BMA success even sparked Shure's attention:



*Id.* (emphasis added).

*Id.* at 1-2.

*Second*, as Shure acknowledges, there had been a "long felt" need in the industry for the BMA. DSOF 160. The audio industry had sought a conferencing solution like that enabled by the '186 Patent for decades. *Id.* The audio quality and capabilities of the BMA fulfill that long felt need. DSOF 161. In fact, Shure itself recognized this need in the market almost ▮ years ago:



*Id.* at 9.

Only after the release of the BMA was Shure able to develop and release its MXA910 Ceiling Array product: ▮. *Compare id.* at 8 (▮), *with* DEX 229 (▮).

*Third*, Shure's failure to develop the technology-in-suit and reliance on copying the BMA also demonstrate that the '186 Patent is nonobvious. Shure first attempted to develop a microphone array for teleconferencing in ▮ but could not do so. DSOF 162. And in ▮ Shure concluded that it would be ▮ develop. *Id.*; *see Adv. Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1285 (Fed. Cir. 2000). Indeed, a Shure witness testified that ▮ ." *Id.* It was only in ▮ — ▮

████████████████████████████████████████████

████████████████████████████. DSOF 163. Contemporaneous evidence of Shure's development discloses that a critical part of developing Shure's microphone array was to ██████████████████████. *Id.* [15] Shure's own contemporaneous documents therefore prove that the BMA incorporates technology that is nonobvious. *Dow Chem. Co. v. Am. Cyanamid Co.*, 816 F.2d 617, 622 (Fed. Cir. 1987) (infringer's failed attempts to develop the claimed invention followed by subsequent copying of the invention supports nonobviousness).

ClearOne set forth the foregoing evidence during the '186 PI proceedings, R. 195 at 34-36, and the Court found that these secondary considerations "do cut in ClearOne's favor." R. 278 at 33. The Court further explained:

> What's more, the Kellerman book chapter was hardly hidden away in the archives; according to Kellerman himself, the textbook containing Kellerman 2001 is "the single most cited text in the entire field of microphone array technology." R. 240, Kellerman Supp. Decl. ¶ 4. Yet it apparently took over ten years for anyone in the industry to arrive at the method of the '186 Patent. *See* R. 87, Hakimoglu Decl. ¶ 10; R. 157, Cerra Decl. ¶ 4. This delay would be surprising if Kellerman rendered the patented method obvious, because Shure's own market research shows that there was a long-felt need for a ceiling-mounted microphone that still preserved audio quality. *See* R. 200, Giza Decl. Exh. 30, "2006 U.S. Corporate Boardroom Research" (sealed).

*Id.*; *see also* DSOF 164.

Shure's attempts to argue that ClearOne's secondary considerations evidence has "eroded," PMSJ at 33, all fail. First, Shure argues that ClearOne's secondary considerations evidence as to



the '186 Patent is now weaker because ClearOne has asserted the '806 Patent. But ClearOne's assertion of the '806 Patent has nothing to with ClearOne's evidence of commercial success, industry acclaim, long-felt need, and copying, all of which ClearOne presents in relation to the BMA, which does not embody the '806 Patent. Second, Shure argues that "ample evidence shows that Shure's success stems from features unrelated to ClearOne's claims." PMSJ at 34. But ClearOne has not relied, for the '186 Patent, on Shure's commercial success. Finally, Shure pretends that ClearOne has not shown a nexus between the claims of the '186 Patent and the success of the BMA, claiming that the Court simply "assumed" such a nexus during the '186 PI proceedings. There is no support for that argument in the '186 PI Order, in which the Court in fact explained at length the link between the invention claimed in the '186 Patent and the commercial success of both the BMA and the MXA910:

> It is obvious that audio quality is important to customers buying audio conferencing products, and the evidence on the record bears this out. [Explaining evidence in support.] It is also clear that the patented features improve the sound quality of the accused audio conferencing systems. [Explaining evidence in support.] Without this combination of features—a beamforming microphone array, acoustic echo cancellation, and law mic on, combined in the efficient manner suggested by the '186 Patent—the Shure microphone would not be competing with the ClearOne microphone in the first place.

R. 278 at 43-46; *see also* DSOF 165.

Although the Court found, in the preliminary injunction context, that secondary considerations did not overcome K-01, *see* R. 278 at 34, the calculation is very different in the context of Shure's motion for summary judgment, with a better understanding of K-01, when the evidence is considered in ClearOne's favor, and when Shure needs to show such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise. At the very least, the foregoing considerations of non-obviousness overcome that standard.

- 60 -

2.      <u>Secondary Considerations Establish That The '806 Patent Is Nonobvious</u>

As this Court has previously found, secondary considerations "generally weigh against

finding a substantial question of the '806 Patent's validity":

> ClearOne has pointed to a long-felt need for more remote and aesthetically
> discreet audio conferencing microphones. *See* R. 362, Waadevig Rep. ¶ 31
> ("[E]nd users have long sought microphones that are remote from
> conference participants and functionality invisible to them. But because
> microphones are notorious for producing lower quality audio when placed
> farther away, vendors in the installed audio conferencing market have long
> struggled to meet this demand" (redacted); *see also* R. 360, Graham Decl.
> ¶ 8; R. 367-1, Giza Exh. 22 at 1; R. 372, Schonfeld Decl. ¶ 26 (redacted).
> And it is indisputable that Shure's MXA910 has enjoyed commercial
> success, likely at least in part because of its infringing features—an issue
> the Court will address further below. *See* R. 439, ClearOne Reply at 18
> (sealed).

R. 551 at 44; *see also* DSOF 166. In explaining why Shure's MXA910's commercial success is

due to its practicing the '806 Patent, the Court held:

> There is clearly a nexus between ClearOne's loss of sales, market share, and
> reputation, and the MXA910's integration of a BFMA with a ceiling tile
> that can be mounted flush in a drop ceiling. As noted above, ClearOne lost
> a sale to American Water in part because the MXA910 could be integrated
> into a drop ceiling. ClearOne has also heard from at least one integrator that
> "its end user customers prefer the MXA910's form factor over the BMA's
> due to the MXA910's aesthetic appeal—specifically, because it can drop
> right into a ceiling tile." R. 371, DiCampello Decl. ¶ 8 (redacted). The
> integrator liked the MXA910 for that reason, too. *Id.* (redacted). ClearOne's
> expert, Paul Waadevig, has also explained why the flush mounting option
> is appealing to so many: "[T]he visual integration of such a product into a
> conference room is important as well. . . . [I]nstalled audio end users prefer
> conferencing products that . . . are also unobtrusive once installed." R. 362,
> Waadevig Rep. ¶¶ 31, 35 ("Because [the MXA910] finally satisfies the
> demand for a seamlessly-integrated, high-quality installed audio
> microphone, it is highly innovative.") (redacted). In response, Shure offers
> other reasons for the MXA910's success, ███████████████████
> ███████████████████████. R. 418, Wiggins Decl. ¶¶ 11, 15
> (sealed). But ultimately Wiggins (Shure's own executive) acknowledges
> that "███████████████████████████████████████████
> ███████████████" *Id.*; *see also* R. 442, Giza Exh. 137, Wiggins Dep. Tr.
> at 181:25-182:5███████████████████████████████████████
> ███████████████████████████████████

███████████████████████████ (sealed).

R. 551 at 57-58; *see also* DSOF 167. Secondary considerations thus weigh in favor of entry of summary judgment for ClearOne against Shure's '806 Patent obviousness combinations.

### E.   Shure's New Priority Date Argument is Flawed

Summary judgment against Shure's priority date argument (PMSJ at 13-25) should be granted because: (1) it was not disclosed in Shure's Final Contentions; and (2) 35 U.S.C. § 111(c) does not require the filing of an "actual copy," just a "copy" and, in any event, at most, this is a technical violation that the PTO during prosecution did not enforce and in effect waived.

### 1.   Background Facts

The '186 Patent issued as a continuation of the '135 Application, which was itself a continuation of Patent App. No. 13/493,921 ("'921 Application"). PSOF 46. On February 10, 2016, ClearOne's prosecuting attorney, Matthew Booth, filed the '135 Application as a continuation of the '921 Application via an incorporation by reference of the parent '921 application (in order to incorporate by reference the specifications and drawings of that application). PSOF 33. On February 29, the USPTO issued a notice to file missing parts within two months, with one identified missing part being a copy of the specification and drawings from the previously filed '921 Application that had been incorporated by reference. PSOF 36. The USPTO notice did not mention 35 U.S.C. § 111(c). PSOF 36.

Within two months, on April 20, Booth filed a copy of the specification and drawings that, at summary judgment, Shure does not dispute was substantively the same as the original '921 Application.[16] DSOF 168-69. Booth testified that that he filed a substantively similar application

---

[16] Shure claims separately as a part of its inequitable conduct argument that the filed copy of the specification and drawings contained new matter, but it did not assert that as a basis for its summary judgment motion.

because he was following the provisions of 37 C.F.R. 1.53(b), which permits submissions of amended specifications so long as they do not introduce "new matter." DSOF 179; PSOF 34. The submission thus included 10 sheets of figures that were substantively identical to those in the '921 Application, and a specification with expanded text. DSOF 168-69. It introduced no new matter. DSOF 168. The submission also included a POA signed by ClearOne shortly before the submission, and the required fees. DSOF 170.

The USPTO did not state any objection to Booth's submission. PSOF 39; DSOF 171. Instead, it issued: (1) an updated filing receipt; (2) acknowledgment of payment of the required fees; and (3) notice of acceptance of the submitted POA. DSOF 171.

Shure argues that because 35 U.S.C. § 111(c) requires the submission of a "copy" of the previously-filed application, and because an exact copy was not submitted, the '921 Application should be deemed abandoned, and the '186 Patent invalidated because it can no longer obtain the priority date it needs to maintain validity. PMSJ at 13-25. For the following reasons, this argument cannot survive summary judgment.

2.    The Local Patent Rules Bar Shure's Priority Date Argument

The N.D. Illinois Local Patent Rules ("LPR") contain a strict schedule for disclosing invalidity contentions, in order to "prevent a shifting sands approach to claim construction by forcing the parties to crystallize their theories of the case early in litigation." *Sloan Valve Co. v. Zurn Indus.*, 2013 WL 6132598, at *11 (N.D. Ill. Nov. 20, 2013) (internal citations omitted). Specifically, LPR 3.1 requires that Final Unenforceability and Invalidity Contentions be served "within twenty-one (21) weeks after the due date for service of Initial Infringement Contentions" and, per LPR 3.4, amendments are only proper when the moving party shows "diligence in amending those contentions when new information comes to light in the course of discovery."

Accordingly, where a party fails to identify a basis in its final contentions that it then asserts at summary judgment, summary judgment in favor of the patentee is appropriate. *Fujitsu*, 898 F. Supp. 2d at 1050 ("To the extent Tellabs' argument on summary judgment exceeds the scope of its [] invalidity contentions, the court agrees with Fujitsu that Tellabs is procedurally barred from advancing a new invalidity theory at this stage of the litigation."); *Sloan*, 2013 WL 6132598, at *8-9, 11 ("Zurn failed to seek leave to amend its final non-infringement contentions to include this theory. It is now too late to do so.").

Shure did not disclose this priority-date theory in its Final Contentions. DSOF 172. Nor did it ever seek to amend its Final Contentions to add it. *Id.* The Local Patent Rules thus bar Shure from asserting this theory at trial. *See Fujitsu*, 898 F. Supp. 2d at 1050; *Sloan*, 2013 WL 6132598 at *8-9; *see also O2 Micro Int'l Ltd. v. O2 Micro, Inc.*, 467 F.3d 1355, 1369 (Fed. Cir. 2006) (affirming grant of summary judgment for failure to timely amend contentions).

Shure's failure to comply with the Local Patent Rules is inexcusable. Shure may attempt to argue that it disclosed this theory by referring to facts set forth in its Final Contentions relating to its unenforceability defense. Such an argument would be without merit. Invalidity and unenforceability are distinct theories with varying elements, because a showing of inequitable conduct requires materiality and "intent to deceive." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011). Unaware of Shure's priority date argument, ClearOne focused in discovery, for the purpose of responding to Shure's unenforceability argument, on Shure's inability to prove materiality or intent to deceive. *See Peerless Indus, Inc. v. Crimson AV, LLC*, 2018 WL 6178237, at *11 (N.D. Ill. Nov. 27, 2018) ("The local patent rules are not mere traps for the unwary. Peerless organized its defense of its patent around Crimson's final invalidity contentions. Had Crimson timely disclosed these theories and the evidence supporting them,

Peerless might have marshalled a different or stronger response."). Shure's decision to forego proper disclosure was thus significantly prejudicial to ClearOne's ability to prepare for and defend against this priority date invalidity defense because, for example, ClearOne did not expend resources developing additional evidence regarding PTO practice relating to 35 U.S.C. 111(c) and instances of enforcement thereof. *See AVNET, Inc. v. MOTIO, Inc.*, 2016 WL 3365430, *6-7 (N.D. Ill. June 15, 2016) (agreeing that "anticipation analysis with regard to MotioCI should be stricken because MotioCI was previously disclosed only as an obviousness reference and not as a basis for invalidity based on anticipation").[17]

Nor can Shure claim that its failure should be excused because its expert discussed the priority-date theory in a 50-page expert report. DSOF 173. Courts routinely strike sections of expert reports based on theories not timely disclosed in Final Contentions. *See Pactiv Corp. v. Multisorb Techs.*, 2013 WL 2384249, at *2-3 (N.D. Ill. May 29, 2013) ("Pactiv's experts are limited to the Invalidity Contentions it served on January 17, 2012. To allow an expert to go beyond those would render them useless and ignore the specificity requirements of the Local Patent Rule 2.3."); *AVNET*, 2016 WL 3365430, at *4 ("[I]f Motio wished to have Mr. Moore rely on the White Paper, it should have identified that material as prior art in its L.P.R. 3.1 contentions or timely moved for leave to amend its contentions to include it . . . .").

3.  Shure's Priority Date Argument Fails on the Merits

Shure's priority date argument, which argues that the '186 Patent should be invalidated because Booth filed a slightly different version of the '921 application during the prosecution of a patent not even at issue in this litigation, PMSJ at 13-25, also fails on the merits. At least at

---

[17] Indeed, the fact that Shure *knew* of the underlying facts and yet did not disclose them as a basis for invalidity in its Final Contentions shows that it did not intend to assert these facts as an invalidity defense. The fact that it has now changed its mind should not be held against ClearOne.

summary judgment, Shure does not argue that the submission of this slightly different version was material to any patent examiner decision, that Booth submitted it with ill intent, or that the PTAB was deceived in any way. Instead, Shure seeks an order from this Court invalidating the '186 Patent simply because the copy submitted by Booth was not an "actual copy," a phrase not found in the USPTO's notice to file, in 35 U.S.C. § 111(c), or in 37 C.F.R. § 1.57(a). PMSJ at 13-25.

Summary judgment for ClearOne must be granted on this argument—or at least Shure's motion for summary judgment should be denied—for at least four reasons.

### a)  *ClearOne Complied With the USPTO Requirements*

ClearOne complied with all USPTO requirements, as shown by the prosecution history and the USPTO's actions. In patent law, the Federal Circuit affords significant deference to the actions taken by the USPTO during prosecution, repeatedly stating that there is "'deference [] due to a qualified government agency presumed to have properly done its job.'" *Spinmaster Ltd. v. Overbreak LLC*, 404 F. Supp. 2d 1097 (N.D. Ill. 2005) (citing *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984). "[T]he court should never defeat a patent for a mere technical defect." *Adams v. Joliet Mfg. Co.*, 1 F. Cas. 123, 125 (N.D. Ill. 1877).

Shure claims that ClearOne failed to comply with 35 U.S.C. § 111(c) and 37 C.F.R. § 1.57(a)(1) because both require a "copy" of the "specifications and drawings from the previously filed application" to be filed, and ClearOne filed a different version of that application. PMSJ at 13-25. Shure is wrong about what 35 U.S.C. § 111(c) and 37 C.F.R. § 1.57(a)(1) actually require.

Even assuming it applies, 35 U.S.C. § 111(c) provides only that "***the Director may prescribe the conditions***, including the payment of a surcharge, under which a reference made upon the filing of an application under subsection (a) to a previously filed application . . . shall constitute the specification and any drawings of the subsequent application for purposes of a filing

- 66 -

date," and that "[a] copy of the specification and any drawings of the previously filed application shall be submitted within such period and ***under such conditions as may be prescribed by the Director***." 35 U.S.C. § 111(c) (emphasis added). In other words, the statute expressly permits the USPTO to determine what conditions are required for compliance and what is acceptable to meet those requirements. In contrast to Shure's assertions otherwise, Congress did not mandate specific conditions—it allowed the USPTO to make that decision on an application-by-application basis.

37 C.F.R. § 1.57 is no different. Section 1.57(a)(1) permits the USPTO to provide the applicant a "period of time within which to file a copy of the specification and drawings from the previously filed application." Again, this permits the USPTO to provide specific instructions on an application-by-application basis. *See also* 37 C.F.R. § 1.183 ("In an extraordinary situation, when justice requires, any requirement of the regulations in this part which is not a requirement of the statutes may be suspended or waived by the Director or the Director's designee, sua sponte, or on petition of the interested party, subject to such other requirements as may be imposed.").

Here, the USPTO issued a Notice that required ClearOne to file "a copy of the specification and drawings from the previously filed application, an English translation of the previously filed application and the fee required by 37 C.F.R. 1.17(i) if it is in a language other than English, and the surcharge required by 37 C.F.R. 1.16(f) to avoid abandonment." PSOF 36. This Notice did not contain any requirement that the submitted specification and drawings be an "actual" or "exact" copy. *Id.* Nor did the Notice *even mention* 35 U.S.C. § 111(c). *Id*.

Booth submitted a copy of the application that was substantively the same. DSOF 168. The USPTO showed its acceptance of this copy as fulfilling the requirements of the Notice by proceeding with the prosecution and even issuing a notice of acceptance of the POA submitted at the same time as the copy. DSOF 171. Because there can be no dispute that the USPTO acted

consistently with Booth's compliance with the USPTO's requirements in the specific context of the prosecution of the '135 Application, there can be no violation of 35 U.S.C. § 111(c). *See Aristocrat Techs Australia PTY Ltd. v. Int'l Game Tech.*, 543 F.3d 657, 664 (Fed. Cir. 2008) (reversing district court's finding of invalidity where USPTO did not raise a technical violation during prosecution).

Shure claims that there is nevertheless a violation because copy must mean "actual copy," since the MPEP uses the term "actual copy." PMSJ at 18-21. But the MPEP is clear that "[t]he contents of this document do not have the force and effect of law and are not meant to bind the public in any way" and that "[t]his document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies." DSOF 174. This Court thus should not invalidate the '186 Patent based on guidelines in the MPEP.

Shure also claims that statutory construction requires this Court to read "copy," as used in 35 U.S.C. § 111(c), to mean "actual copy." Not so. "Courts have no right, in the guise of construction of an act, to either add words to or eliminate words from the language used by congress." *De Soto Sec. Co. v. C.I.R.*, 235 F.2d 409, 411 (7th Cir. 1956). Congress could have used the term "actual copy," and yet only used the term "copy," while specifically allowing the USPTO on an application-by-application basis to determine the relevant requirements. It is improper, in this context, to rewrite the statute in order to strictly enforce an "actual copy" requirement in every instance, especially when Shure submits no authority for such a requirement. DSOF 175 (no legislative history requiring an "actual copy"). Indeed, Shure has not identified *any case* invalidating a patent on the facts at issue here.[18]

---

[18] Shure's offered case on this issue, *Zachariah v. Comm'r of Patents & Trademarks*, 2000 WL 1120185 (Fed. Cir. 2000) is nonprecedential (*see* Fed. Cir. R. 32.1) and, in any event, inapposite. There, the USPTO required the applicant to file a copy of his international application, but the applicant filed a copy of his

b)  *The PTO's Acceptance of an Altered Copy was, at Most, a Procedural Irregularity that Cannot Invalidate the Patent*

Booth's filing does not affect the priority date of '186 Patent because it is, at worst, a harmless error that cannot be the basis of an invalidity defense. Per the Federal Circuit, "'prosecution irregularities' by the examiner or the applicant are not relevant to patent validity." *Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956, 960-61 (Fed. Cir. 1997). Indeed, "[p]rocedural lapses during examination, should they occur, do not provide grounds of invalidity." *Id.* This is because there is a "potential prejudice flowing from unwarranted charges of improper conduct" that prey "on the unfamiliarity of decision-makers with the complex procedures of patent examination." *Id.* at 960. Instead, "validity of a patent" should focus on "a plenary challenge on its merits." *Id.*

Tellingly, Shure does not allege that if Booth had filed an actual copy, the USPTO would have reached a different result on the '135 Application, let alone on the '186 Patent. Shure's attempt to escape liability in this way should thus be soundly rejected. *See Aristocrat*, 543 F.3d at 663 ("There is good reason not to permit procedural irregularities during prosecution, such as the one at issue here, to provide a basis for invalidity. Once a patent has issued, the procedural minutiae of prosecution have little relevance to the metes and bounds of the patentee's right to exclude.").[19]

In fact, even in the hypothetical situation where the USPTO did not accept Booth's submission as compliant with its Notice, the '135 Application would not have been abandoned

---

*national* application. *Id.* at *2. It was on that basis that the USPTO vacated its acceptance of the applicant's submission "because of differences between the national application and his international application" and the oath "supported only the invention in the national application, not the invention in the international application." *Id.* at *1. The facts here are very different, as the USPTO required Booth to file a copy of the previous application (which he filed a substantively similar copy of) and the USPTO then *allowed* the submission of that substantially similar copy.

[19] *See also id.* ("If any prosecution irregularity or procedural lapse, however minor, became grist for a later assertion of invalidity, accused infringers would inundate the courts with arguments relating to every minor transgression they could comb from the file wrapper. This deluge would only detract focus from the important legal issues to be resolved—primarily, infringement and invalidity.").

without recourse. DSOF 181. Instead, in such situations, 35 U.S.C. § 111(c) permits applicants to "revive" the application under 35 U.S.C. § 27 and file the correct version of the specification and drawings. *Id*. That means that even today, if Booth's submission were retroactively deemed noncompliant, as Shure urges, ClearOne could revive the '135 Application *nunc pro tunc* by statute, thus reinstating the '135 Application and the priority date for the '186 Patent. *Id*. Granting Shure's argument based on this procedural issue would thus be nothing more than a waste of time and resources for the Court and parties.[20]

> c) *At the Time the '424 Application was Filed, the '135 Application was Not Abandoned*

Pursuant to 35 U.S.C. § 120, a patent application shall have the benefit of the date of filing of a previously-filed application if, *inter alia*, the patent application is "filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application." Here, at the time the '424 Application was filed on June 23, 2016, the '135 Application was still pending and not abandoned. DSOF 180. Thus, irrespective of the section 111(c) issue, the '424 Application fulfilled the requirements of section 120 at the time that it was filed—as the USPTO did not exercise its discretion to order abandonment per section 111(c)—and thus the '186 Patent is entitled to the June 11, 2011 priority date. (*Id*.)[21]

---

[20] Shure's citations to cases involving *different* statutory violations are inapplicable because they involved: (1) substantive, not technical, requirements that were not left statutorily up to the discretion of the USPTO; and/or (2) a USPTO order finding that the applicant failed to meet a requirement. *See, e.g., In re Mother Tucker's Food Experience (Canada) Inc.*, 925 F.2d 1402, 1404 (Fed. Cir. 1991) (involving "use in commerce" requirement to obtain trademark); *Boyden v. Comm'r of Patents*, 441 F.2d 1041, 1044 (D.C. Cir. 1971) (involving statutory filing fee and USPTO refusing to accept application without payment); *Chamberlain Group. Inc. v. Interlogix, Inc.*, 2002 WL 1263984, at *3-4 (N.D. Ill. June 3, 2002) (involving statutory requirement for declarations); *In re Bosies*, 207 U.S.P.Q. 1139, at *3 (Dec. Comm'r Pat. 1979) (USPTO enforcing statutory requirement).

[21] Shure's claim that it would have been deemed abandoned by the USPTO by that date is a counterfactual

> d) *There is At Least a Fact Questioning Precluding Summary Judgment of Invalidity*

In any event, at best for Shure, there are fact questions on which the parties disagree. For example, Mr. Nixon submitted an expert report noting that it was meaningful to a person experienced in patent prosecution that the statute and 37 CFR § 1.57 do not use the term "actual" when referring to a "copy" DSOF 176. He also found the USPTO's lack of any notice of an incomplete response or abandonment meaningful in that it would not have "proceeded in the usual and normal course with prosecution in the expected regular manner" if there in fact had been a violation. DSOF 177. And Mr. Booth, an experienced patent prosecutor, testified that it was permissible to use 37 C.F.R. § 1.57 to fulfill the requirements of section 1.53(b). DSOF 179. Mr. Nixon noted the same regulation and its applicability to Mr. Booth's submission. *Id*. Shure's expert Mr. Godici, of course, disagrees with these contentions. To the extent the Court finds Shure's arguments meritorious, it should first hear from these witnesses before finding "clear and convincing" evidence of invalidity. *Eli Lilly Co. v. Barr Labs., Inc.*, 251 F.3d 955 at 962.

## V.    <u>SUMMARY JUDGMENT OF ENFORCEABILITY MUST BE GRANTED</u>

Unenforceability defenses, particularly specious ones like Shure's, are disfavored. That is because "the remedy for inequitable conduct is the 'atomic bomb' of patent law." *Therasense*, 649 F.3d at 1288-1290. It has been long "overplayed, is appearing in nearly every patent suit, and is cluttering up the patent system." *Id.* at 1289 (internal citations omitted). Indeed, the "habit of

---

for which it has no factual support. And Shure's cited cases involve patentees who knew that the prior application they were claiming priority to had been abandoned at the time they tried to obtain the benefit of its priority date, or did not fulfill other requirements of section 120. *See Baxter Int'l v. McGraw, Inc*., 149 F.3d 1321, 1333 (Fed. Cir. 1998) (involving applicant who sought priority to claims it instructed the PTO "to cancel"); *Encyclopedia Britannica v. Alpine Elecs. of Am*., 609 F.3d 1345, 1348 (Fed. Cir. 2010) (involving applicant who claimed priority to grandparent application despite fact that parent application "did not contain a specific reference to the [grandparent] application"); *Urologix, Inc. v. ProstaLund AB*, 227 F. Supp. 2d 1033 (E.D. Wis. 2002) (involving applicant who claimed priority to prior application even though that it had not responded *at all* to the prior application within the required time).

charging inequitable conduct in almost every major patent case has become an absolute plague. Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds. . . ." *Id.* (internal citations omitted).

That is precisely what has occurred here. Shure has engaged in a shotgun-style approach to unenforceability, asserting various unenforceability theories with scant evidence against both the '186 and '806 Patents. Consistent with the Federal Circuit's instruction in *Therasense* and later cases, summary judgment of enforceability should be granted to ClearOne.

### A. Shure's Unenforceability Arguments Against the '186 Patent All Fail

1. <u>Shure Has Not Shown Clear and Convincing Evidence Supporting Its Inequitable Conduct Allegation that ClearOne Withheld Prior Art</u>

Shure argues that the '186 Patent is unenforceable due to ClearOne's allegedly intentional withholding of various pieces of alleged prior art. But Shure has failed to present any evidence of a deliberate decision to withhold any of these alleged prior art references.

Even if Shure could prove that a ClearOne person or agent with a duty to disclose: (1) knew of the reference, (2) may have known that it was material, *and* (3) did not inform the PTO of the reference; "that is not enough" to support an inequitable conduct finding. *1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1376-77 (Fed. Cir. 2012). Instead, "[t]o satisfy [the] intent requirement, 'the accused infringer must prove by clear and convincing evidence that the applicant . . . made a deliberate decision to withhold it." *Therasense*, 649 F.3d at 1290. Such "evidence must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances.'" *Id.* at 1290-91 (emphasis in original). Indeed, if more than one reasonable inference of intent is possible based on the available facts, "intent to deceive cannot be found." *Id.*

At summary judgment, "[a] failure of proof on any element precludes a finding of inequitable conduct, entitling the plaintiff to judgment as a matter of law." *Chamberlain Grp. v.*

*Techtronic Indus. Co.*, 2017 WL 3493799, at *3-4 (N.D. Ill. Aug. 14, 2017). And the patentee "need not offer any good faith explanation unless the accused infringer first carried his burden to prove a threshold level of intent to deceive by clear and convincing evidence." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1368 (Fed. Cir. 2008).

At issue are five prior art references that Shure contends were withheld during the prosecution of the '186 Patent: XAP 800, Vortex EF2241, Mitel, Lifesize, and Buchner. Shure cannot show deceitful intent by clear and convincing evidence for any of them, because Shure's Final Contentions did not offer any evidence in support of the "intent to deceive" element. DEX 198 at 22-24. And, as discussed above in *supra* section IV, the XAP 800, Vortex EF2241, and Buchner references are not material to the validity of the '186 Patent. Mitel and Lifesize are similarly immaterial because, as Shure admits, they are mere examples of the beamforming first prior art disclosed in the '186 Patent. PMSJ at 25; *see, e.g.*, PEX 1 ('186 Patent) at 1:45-59 & Fig. 7. Summary judgment should be granted against Shure's "shotgun-style approach to its accusations in the apparent hope that quantity will compensate for a lack of quality." *Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 339 F. Supp. 3d 803, 841 (N.D. Ill. 2018) (rejecting heavy reliance "on the maxim that a court may infer intent from circumstantial evidence").

With respect to K-97 and K-01, Shure concedes that they were disclosed during the prosecution of the '186 Patent. DSOF 182. But Shure contends that failure to disclose these references during the prosecution of a *prior* patent in the family—the '553 patent—renders the '186 Patent unenforceable. DEX 198 at 25. That is not the law. *See Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369, 1375 (Fed. Cir. 2005) ("[T]his court's inequitable conduct cases do not extend inequitable conduct in one patent to another patent that was not acquired through culpable conduct."); *Chamberlain Group, Inc. v. Lear Corp.*, 756 F. Supp. 2d 938, 972-73 (N.D.

Ill. 2010) ("The failure to disclose with respect to the '544 patent application did not permeate the prosecution of the '123 and '056 patents because Plaintiffs in fact disclosed the prior-art reference in the parent application."). Shure offers no evidence, let alone clear and convincing evidence, demonstrating how or why the non-disclosure of the Kellermann references in connection with the '553 Patent somehow infects the '186 Patent. DSOF 183-84. Indeed, Shure asserts intent to deceive based solely upon "information and belief." *Id*. Shure has thus failed to carry its burden.

Even if Shure had evidence of an "intent to deceive," and even if its "family-infection" argument were not precluded by law, Shure's argument fails because Shure cannot prove materiality. *1st Media*, 694 F.3d at 1376-77. As addressed above in section IV, neither K-01 nor K-97 was material to the patentability of the '186 Patent. Indeed, the Federal Circuit affirmed the PTAB's holding that K-01—which is more recent, expansive, and detailed than K-97[22]—does not invalidate the '553 patent. DSOF 185-86. If K-01 does not invalidate the '553 patent, neither K-97 nor K-01 can have been material to the prosecution of the '553 patent:

> This court holds that, as a general matter, the materiality required to establish inequitable conduct is but-for materiality. When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art. Hence, in assessing the materiality of a withheld reference, the court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference.

*Therasense*, 649 F.3d at 1291-92.

> 2. <u>Shure Has Not Shown Clear and Convincing Evidence Supporting Its Allegation that Booth Committed Inequitable Conduct by Mistakenly Providing the Wrong Copy of the '921 Application to the PTO</u>

As discussed above, Shure alleges that ClearOne engaged in inequitable conduct by not

---

[22] In addition, K-97 was disclosed to the USPTO in the '968 Provisional, which is a parent provisional to the '186 Patent. (DSOF 187.)

filing an "actual copy" of the '921 Application during the prosecution of the '135 Application. *See supra* § IV.E. ClearOne is entitled to partial summary judgment this claim for two reasons.

*First*, for the reasons discussed in *supra* section IV.E, ClearOne complied with the USPTO's notice to file, and thus there can be no inequitable conduct.

*Second*, Shure has failed to introduce clear and convincing evidence showing a "specific intent to deceive." *Therasense*, 649 F.3d at 1290. To date, Shure contends only in conclusory fashion that Booth must have submitted a slightly different copy of the '921 Application for nefarious purposes. DEX 198 at 22. But there is no evidence of that. PMSJ at 21 n.22; DSOF 188. In fact, the evidence is to the contrary: at best for Shure, Booth made a simple mistake. DSOF 179.

*Third*, Shure has not introduced sufficient factual evidence for the factfinder to hold that any inequitable conduct that would render the '135 Application unenforceable should permeate the '186 Patent and render it unenforceable as well. *Pharmacia*, 417 F.3d at 1375 (infringer has burden to show why conduct on one patent would infect others in family).

3.  Shure Has Not Shown Clear and Convincing Evidence Supporting Its Inequitable Conduct Claim Relating to the Definition of "Fixed Beam"

Shure asserts that ClearOne's prosecuting attorney committed inequitable conduct by falsely claiming that he was not submitting "new matter" to the PTO during prosecution of the application that became the '186 Patent. DEX 198 at 21. Shure claims that the new matter included: (1) a new definition of "fixed beam"; and (2) new figures and new specification disclosure. Summary judgment should be granted on both arguments for two reasons.

*First*, Shure cannot show that Booth's statement regarding no new matter was anything other than permissible attorney legal or interpretive argument. Generally, "an applicant's legal or interpretive arguments in favor of patentability are not actionable." *Schwendimann v. Arkwright Advanced Coating*, 2011 WL 4007334, at *4 (D. Minn. Sept. 8, 2011) (citing, *e.g.*, *Rothman v.*

*Target Corp.* 556 F.3d 1310, 1328-29 (Fed. Cir. 2009)). Indeed, "legal or interpretive arguments favoring patentability are not misrepresentations if such arguments do not contain 'gross mischaracterizations or unreasonable interpretations' and are not 'demonstrably false.'" *Id.* at *5 (citing *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1349 (Fed. Cir. 2007)).

Shure claims that ClearOne's statement that "[a]pplicant is not adding new matter with this amendment" was misleading. But an attorney's representation that there is no "new matter" is unambiguously legal: it communicates a legal position that the amendments made to a patent application do not constitute "new matter" as understood in patent law. *See Schwendimann*, 2011 WL 4007334, at *4-7 (analyzing "new matter" inequitable conduct allegations as "legal or interpretive arguments"). Therefore, because the core of Shure's mischaracterization claim is its disagreement with ClearOne's legal position that amendments did not add "new matter," Shure must allege facts that show that the legal position was a "gross mischaracterization," "unreasonable interpretation," or "demonstrably false." *Schwedimann*, 2011 WL 4007334, at *5.

With respect to the definition of "fixed beam," Shure cannot meet this burden, because ClearOne has a reasonable explanation for why the definition of "fixed beam" has not changed, and thus does not constitute new matter. DSOF 189. Based on ClearOne's expert Larry S. Nixon's review, the relevant definition of "fixed beam" never materially or substantively changed. *Id.* For example, "fixed beam" was disclosed in related applications going back to and including the '968 Provisional, which referred to a beam being fixed during a given teleconference. *Id.* The insertion and/or deletion of comparisons to non-fixed beams does not change the definition of the required "fixed beams." *Id.* ClearOne's expert Dr. Schonfeld, a POSITA, agrees. *Id.* Indeed, Shure's expert Mr. Godici admitted that he had not considered whether literal word changes made any material difference in the definition of "fixed beam." DSOF 190. At bottom, the mere fact that Shure

- 76 -

disagrees with ClearOne's position does not mean that ClearOne's interpretation is unreasonable.

With respect to the new figures and new specification disclosure, Shure alleges that the simple fact that ClearOne introduced such new figures and disclosure constitutes "new matter." But that is not the law. A continuation of a patent application may contain "variations in scope," including "embodiments," so long as they are "supported by the disclosure in the original application." *Chiron Corp. v. Genentech, Inc.*, 266 F. Supp. 2d 1172, 1180 n.8 (E.D. Cal. 2022). Shure's failure to show why these additional figures and specification disclosure are not supported by the prior disclosure requires rejection of Shure's argument. DEX 198 at 21.

*Second*, Shure cannot show, by clear and convincing evidence, that there is a dispute as to material fact regarding ClearOne's "intent to deceive" when claiming that no "new matter" was added, because Shure has not identified any evidence on this point. DEX 198 at 20-21; *Schwendimann*, 2011 WL 4007334, at *7 (must show "intent" in addition to misrepresentation).

## B. Shure's Unenforceability Arguments Against the '806 Patent All Fail

Shure asserts inequitable conduct by members of ClearOne's prosecution team relating to the '806 Patent on two general bases: (1) a failure to disclose two prior art references (BMA and the CTG system); and (2) claims that there was no "new matter" added during prosecution. DEX 198 at 56-59. Shure's failure to identify clear and convincing evidence on these points requires entry of summary judgment of enforceability of the '806 Patent.

### 1. Shure Has Not Shown Clear and Convincing Evidence Supporting its Claim that ClearOne Committed Inequitable Conduct By Failing to Disclose the BMA System

To survive summary judgment, Shure must show that a reasonable factfinder could find by clear convincing evidence that ClearOne's omission of literature regarding ClearOne's BMA product during the prosecution of the '806 Patent rises to inequitable conduct. *Techtronic*, 2017

WL 3493799, at *3-4. Shure cannot meet its burden for at least three reasons.

*First*, the original '849 Application claimed priority to and "incorporated by reference for all purposes" the '751 Provisional. DSOF 191. The '751 Provisional included over 30 pages of literature about the BMA, including an "Installation Guide" and a "Quick-Start Guide." DSOF 192. ClearOne thus cannot be alleged to have "withheld" a prior art that was disclosed during patent prosecution. *1st Media*, 694 F.3d at 1376-77.

*Second*, "[c]ourts have held that it cannot be inequitable conduct for an applicant not to resubmit references that were cited in the parent application." *Chamberlain*, 756 F. Supp. 2d at 971. Here, the '751 Provisional was a parent provisional application to the '849 Application. DSOF 191. Thus, the fact that ClearOne did not resubmit the BMA literature during the prosecution of the '849 Application fails to establish inequitable conduct as a matter of law. *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 547 (Fed. Cir. 1998) (affirming summary judgment of no inequitable conduct where omitted prior art was submitted in earlier application).

*Third*, Shure has proffered no evidence that the ClearOne made a "deliberate decision" to withhold the BMA reference. DEX 198 at 57-58. And even if it did, there is at least a reasonable inference that ClearOne did not submit the BMA reference during prosecution of the '849 Application because it had already submitted it with the '751 Provisional. DSOF 191-192. *Therasense*, 649 F.3d at 1290-91.

    2.    <u>Shure Has Not Shown Clear and Convincing Evidence Supporting its Claim that ClearOne Committed Inequitable Conduct By Failing to Disclose the CTG System</u>

Shure also alleges in its Final Contentions that ClearOne committed inequitable conduct by failing to disclose the CTG System during the prosecution of the '806 Patent. DEX 198 at 58-59. Summary judgment must be granted in favor of ClearOne on this claim for two reasons.

*First*, as discussed above in Section IV, even if ClearOne had disclosed the CTG System, the '806 Patent would have still been granted. Indeed, the Court has already rejected once a Shure invalidity challenge over the CTG System. R. 551 at 36-38. Shure thus cannot show but-for materiality. *Therasense*, 649 F.3d at 1291-92 (inequitable conduct requires but-for materiality).

*Second*, Shure fails to offer any evidence in its Final Contentions in support of its claim that ClearOne made a "deliberate decision" to withhold the CTG System during prosecution with an "intent to deceive" the USPTO. DEX 198 at 58-59. *1st Media*, 694 F.3d at 1376-77.

3. Shure Has Not Shown Clear and Convincing Evidence Supporting its Inequitable Conduct Claim Regarding "New Matter"

As discussed above, "an applicant's legal or interpretive arguments in favor of patentability are not actionable." *Schwendimann*, 2011 WL 4007334, at *4. Shure claims that ClearOne's statement, during prosecution of the '849 Application, that "[a]pplicant is not adding new matter with this amendment" was misleading. DEX 198 at 56-57. Specifically, Shure claims that ClearOne changed definitions for "drop space," "grille," and "integrated into." *Id.* This argument has at least two fatal flaws.

*First*, Shure cannot show that ClearOne's statement of no new matter is a "gross mischaracterization" or "unreasonable interpretation." As discussed in *supra* Section II, and as the Court has held, *see* R. 551 at 20, 47-48, 29, 33, there is sufficient disclosure of "drop space," "grille," and "integrated into" in the '806 Patent. The same was true during prosecution, during which the meanings of these terms did not materially change. Indeed:

- **"Grille."** The original '849 Application supports the disclosure of "grille" as defined in the '186 Patent. For example, the original specification contains the following sentence, which covers a "grille": "Further, the surface of the front side 268 may be modified to include various contours, corrugations, depressions, extensions, color schemes, and designs." DSOF 193. Moreover, the following sentence describes a metal ceiling tile: "The ceiling tiles such as the ceiling tile 264 may be made of a variety of materials or combinations of materials including, but not limited to, metals, alloys, ceramic, fiberboards, fiberglass, plastics, polyurethane, vinyl,

or any suitable acoustically neutral or transparent material known in the art, related art, or developed later." DSOF 194. Even Shure's expert Dr. Roy testified that modifications could be made to the front side of a metal ceiling tile that would result in a grille. DSOF 195. "Grille" was also disclosed in the '524 Provisional, where statements about a "microphone hole pattern" and "ceiling tile façade to be made with different textures" were included. DSOF 196.

- **"Drop Space."** Contrary to Shure's assertions, ClearOne has at all times disclosed "drop space." For example, the original specification disclosed: (1) that the surface of the front side of the ceiling tile may or may not "be coplanar with the front surface of the Array"; and (2) that there were ceiling tiles of "various sizes and shapes. DSOF 197. Since a POSITA would have been aware of several different types of ceiling tiles, that original specification supports "all or part of the beamforming microphone array" being in the "drop space." *Id*. In addition, the original specification also discloses that the BFMs, the NBMs, or both "may be embedded within contours or corrugations, depressions of the ceiling tile 264 or that of the panel 214 to disguise the band-limited array 116 as a standard ceiling tile or a standard panel respectively." DSOF 198.

- **"Integrated Into."** Shure's claim that ClearOne introduced new matter by adding the term "integrated into" relies on the assumption that "integrated with" and "integrated into" are not exactly the same. DSOF 199. As Shure's expert Mr. Godici agrees, because these two phrases are used interchangeably, the introduction of one term to replace another cannot be "new matter." *Id*. In any event, both terms were disclosed in the original specification. DSOF 200. Paragraph 53 of the original specification states: "the band-limited array 116 with BFMs 212 and the NBMs may be integrated to a ceiling tile for a drop ceiling mounting configuration," and paragraph 55 discloses that "the bandlimited array 116 may be introduced into the geometrical socket from any side of the ceiling tile 264 based on the geometrical socket design." *Id*. Paragraph 57 discloses that the beamforming microphone array and a ceiling tile can be combined "as a single unit." *Id.*

Shure cannot show that these explanations are "gross mischaracterization[s]" or unreasonable.[23]

*Second*, Shure has no offered no specific evidence to create a dispute as to material fact regarding ClearOne making a "deliberate decision" to deceive the USPTO by claiming that no "new matter" was added. DEX 198 at 56-57; *Schwendimann*, 2011 WL 4007334, at *7.

## VI.    CONCLUSION

ClearOne respectfully requests that the Court deny Shure's motion for summary judgment, and grant ClearOne's cross motion for summary judgment of validity and enforceability.

---

[23] Shure relatedly claims that ClearOne improperly introduced new embodiments. DEX 198 at 57. But a continuation of a patent application may contain "variations in scope," including "embodiments," so long as they are "supported by the disclosure in the original application." *Chiron*, 266 F. Supp. at 1180 n.8.

Dated: August 12, 2020                    By: */s/ Christina V. Rayburn*

        John C. Hueston, *pro hac vice*
        Douglas J. Dixon, *pro hac vice*
        Christina V. Rayburn, *pro hac vice*
        Sourabh Mishra, *pro hac vice*
        jhueston@hueston.com
        ddixon@hueston.com
        crayburn@hueston.com
        smishra@hueston.com
        Hueston Hennigan LLP
        523 West 6th Street, Suite #400
        Los Angeles, CA 90014
        Telephone: (213) 788-4340

        And

        Xinlin L. Morrow, *pro hac vice*
        xinlin@morrowfirm.com
        The Morrow Firm, P.C.
        1880 Century Park E, Ste 815
        Los Angeles, CA 90067
        Telephone: (213) 282-8166

        And

        Garret A. Leach, P.C.
        (IL Bar No. 6237520)
        garret.leach@kirkland.com
        KIRKLAND & ELLIS LLP
        300 North LaSalle
        Chicago, Illinois 60654
        Telephone: (312) 862-2000
        Facsimile: (312) 862-2200

        *Attorneys for ClearOne, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 12, 2020, the public version of the foregoing document was filed electronically through the Court's Electronic Case Filing System. Service of the public version of the document is being made upon all counsel of record in this case by the Notice of Electronic Filing issued through the Court's Electronic Case Filing System on this date. Service of the under seal version of this document is being made via e-mail to opposing counsel.

By: <u>/s/ Sourabh Mishra</u>

5499976