UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHURE INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17-cv-03078 |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CLEARONE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

In August 2019, ClearOne secured a preliminary injunction against Shure in this ongoing fight over audio-conferencing patents. R. 551, Order.[1] The preliminary injunction targeted Shure's MXA910 system, which is a microphone array designed to be mounted into the ceilings of conference rooms. Long story short, one of the mounting configurations of the MXA910—in which the microphone board is fully hidden within the ceiling grid and thus looks like a normal ceiling tile—very likely infringes one of ClearOne's patents. So, until the litigation is resolved, Shure is not allowed to manufacture, market, or sell "the MXA910 to be used in its drop-ceiling mounting configuration, including marketing and selling the MXA910 in a way that encourages or allows integrators to install it in a drop-ceiling mounting configuration." Order at 64. According to ClearOne, though, Shure has since released a new product, the MXA910-A, which is ostensibly distinct from the MXA910, but is

---

[1]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number. Any citations to the sealed versions of the docket entries will be identified with the parenthetical "(sealed)." Otherwise, in the absence of any parentheticals, all citations are to the public versions of the docket entries.

in practice readily installable in the exact same "drop-ceiling" manner that the Court has enjoined. ClearOne also takes issue with another Shure product, the MXA910-60CM, for roughly the same reasons.

As a result of these alleged violations of the preliminary injunction, ClearOne now moves to hold Shure in contempt. R. 707, Mot. Contempt. Separately, ClearOne also requests leave to conduct additional fact discovery. *Id.* at 2. For the reasons explained below, ClearOne's contempt motion is granted in part, and entered and continued in part to determine the scope of the violation and the appropriate relief. ClearOne's request for leave to conduct discovery is thus also granted.

## I. Background

ClearOne is the owner of U.S. Patent No. 9,813,806 (the '806 Patent). The '806 Patent claims an invention that combines a beamforming microphone array (which is a separate patented technology that is meant to pick up and process certain sounds more effectively than traditional microphones) with a ceiling tile. The final integrated product can be mounted into a ceiling grid like any other ceiling tile. Also like a normal ceiling tile, none of the hardware dangles or protrudes down; the microphone tile is meant to blend in rather seamlessly with the rest of the ceiling.

### A. Preliminary Injunction

In September 2018, ClearOne moved for a preliminary injunction against Shure, alleging that Shure's MXA910 microphone array infringed on ClearOne's '806 Patent. R. 366. Among other arguments, ClearOne asserted that the MXA910 infringed on Claim 1, with most of the dispute turning on Limitation 5 of that claim.

Limitation 5 requires that "all or part of" the microphone ceiling tile "is in the drop space of the drop ceiling." Order at 6.

Initially, the parties sharply disputed what the term "drop space" meant. To understand "drop space," it is necessary (at the risk of repetition) to back up a bit and establish what "drop ceiling" means. Specifically, a "drop ceiling" refers to a ceiling configuration in which there is a true, structural ceiling at the very top of the room. From there, a ceiling grid system made up of T-bars hangs down from the structural ceiling, and then ceiling tiles are placed inside that ceiling grid. Here is a diagram:



Order at 22.[2] The thick horizontal black line is the structural ceiling of the room. The three vertical lines that look like upside-down T's represent the T-bars that suspend from the true ceiling. The yellow blocks represent the ceiling tiles (or microphones) that are "dropped" inside the ceiling grid to rest on the T-bars. So, a person sitting inside the room would look up and see only the bottom of the yellow ceiling tiles. The actual, structural building ceiling is hidden above the ceiling tiles, which are

---

[2]These images were originally provided by ClearOne in demonstrative slides offered in support of the preliminary injunction motion. *See* Order at 22.

suspended via the ceiling grid system. *Id.* at 20. The space in between all of that is the drop space. To be more precise, as the Court explained in its August 2019 Order, the term "drop space" refers to the space *inside* the ceiling grid—the upper boundary is the structural ceiling of the building, and the lower boundary is the imaginary horizontal plane created by the upside-down T-bars that hang down from the structural ceiling. *Id.* at 22. In the diagram depicted above, the top and bottom bounds of the drop space are represented by the red arrows.

So, what does it mean for "all or part of" something to be "in" the drop space, as required by Limitation 5? Here is another useful diagram:



Order at 25. This is the same T-bar ceiling grid configuration as in the diagram above. Here, the left-most and right-most yellow blocks represent ceiling tiles that sit entirely within the drop space—"all" of those ceiling tiles are situated in the drop space, and nothing dips below the drop space. By contrast, the yellow block in the center also sits within the drop space, but the bottom part of the block extends *below* the horizontal plane created by the T-bars as well. So only "part of" that block is in the drop space, while another part of the block extends into the actual room below. In this case, an MXA910 that is mounted in its drop-ceiling configuration sits entirely

within the drop space. Based on this definition of "drop space," the Court concluded that "any MXA910 mounted in the drop ceiling grid practices Limitation 5 of Claim 1." *Id.* at 33.

Ultimately, the Court granted ClearOne's preliminary injunction motion and ordered Shure to "cease manufacturing, marketing, and selling the MXA910 to be used in its drop-ceiling mounting configuration, including marketing and selling the MXA910 in a way that encourages or allows integrators to install it in a drop-ceiling mounting configuration." Order at 64. By "drop-ceiling mounting configuration," the injunction referred to the "drop space" limitation described above. Here is a photo of the enjoined drop-ceiling configuration:



R. 709, ClearOne Br. at 2. Shure is no longer allowed to make, market, or sell any beamforming microphone array designed to sit either fully or partially in the drop space of a drop-ceiling grid. But a microphone array that is suspended entirely *beneath* the drop space (and thus extends down from the ceiling) is still fair game. Order at 25 ("[A] BFMA that is not in the drop space at all—and is instead located totally beneath it ... would not practice Limitation 5 of Claim 1 of the '806 Patent.").

## B. The MXA910-A Model

In a purported effort to design around the '806 Patent, Shure released a new microphone product, the MXA910-A, that was supposed to hang 100% beneath the drop space of a drop ceiling. R. 732, Shure Resp. Br. at 3-4; R. 730, Klegon Decl. ¶¶ 7-8. Shure sought to accomplish this by adding two "flanges" to either side of the microphone board. *See* R. 710, ClearOne Br., Exh. B, User Manual at 26.[3] The flanges are circled in red below:



ClearOne Br at 3. As the picture demonstrates, rather than having the microphone board *itself* rest directly on the ceiling grid—which would result in the microphone board sitting entirely inside the drop space—the new design allows the microphone board to suspend from the ceiling grid via the two flanges on either side, which in turn allows the microphone array board to hang entirely *below* the drop space. There is no dispute that this particular configuration would not run afoul of Limitation 5.

---

[3]Technically, the exhibits accompanying ClearOne's opening brief are attached to the Rayburn Declaration at R. 710 and R. 714 (sealed). But the reply brief exhibits are attached to a different Rayburn Declaration at R. 779. So, for ClearOne's exhibits, this Opinion will use the labels "ClearOne Br., Exh." or "ClearOne Reply Br., Exh." followed by the exhibit number. The same goes for Shure's exhibits. Because those exhibits are attached to multiple Patel Declarations, at R. 733, R. 802 (sealed), and R. 815, this Opinion will identify Shure's exhibits as either "Shure Resp. Br., Exh." or "Shure Sur-Reply Br., Exh." followed by the exhibit number.

### 1. Ceiling Grid Fitment Issues

The problem, according to ClearOne, is that Shure's flange addition is "functionally irrelevant" in way that, practically speaking, puts the MXA910-A right back into the drop space. ClearOne Br. at 13. To understand this argument, it is necessary to back up a bit and talk about ceiling grids again. Specifically, in standard 24 x 24-inch drop-ceiling setups (which is what we are dealing with in this case), the T-bars that hang down from the structural ceiling to create the ceiling grid come in two relevant sizes.[4] The first T-bar variety has a $^{15}/_{16}$-inch face length, while the second comes with a slightly shorter $^{9}/_{16}$-inch face length. R. 780, Fry Decl. ¶ 6. (The term "face" refers to the horizontal component on the bottom of a T-bar.) It turns out, though, that these few millimeters end up making all the difference when it comes to the installation of the MXA910-A.

Specifically, as the diagram above shows, the cross-section of the MXA910-A microphone board is in a sort of trapezoidal shape, that is, the bottom plane is longer than the top plane. With a $^{9}/_{16}$-inch ceiling grid, the installation is apparently straightforward. The integrator merely needs to lower the MXA910-A toward the ceiling grid, and the microphone board itself will descend through the opening between the T-bars and into the room below, at which point the two flanges will catch onto the T-bar faces on either side. The end result is that the MXA910-A is suspended

---

[4]There are actually more than just two varieties of T-bar face lengths, including a 1½-inch option, but for purposes of this motion, only two are relevant.

by its flanges with the microphone array itself hanging completely below the drop space. *See* ClearOne Reply Br., Exh. 9, Abraham Dep. Tr. at 12:18-25 (sealed).[5]

That simply does not work with the $\frac{15}{16}$-inch T-bars. With just a slightly longer T-bar face, the width between the T-bars is too small for the trapezoidal microphone array to make it past the ceiling-grid opening between the $\frac{15}{16}$-inch T-bars. *See* ClearOne Br., Exh. D, Abraham Dep. Tr. at 15:15-23 (sealed). As a result, if an installer simply lowers the MXA910-A onto the ceiling grid, then the product will come to rest on the microphone array itself, while the flanges will be left floating in midair inside the drop space, as half-depicted in this diagram:



ClearOne Br. at 5. Thus, the entire MXA910-A product, including the microphone array and the two flanges, will sit entirely *inside* the drop space of the ceiling grid. To borrow the terminology of the parties, we will refer to this supposedly incorrect

---

[5]Although this exhibit, as well as many others, were sealed (as noted throughout the Opinion), the facts disclosed do not meet the Seventh Circuit's requirements for sealing facts that are the basis for judicial decision-making. So this Opinion is being issued without redactions.

installation of the MXA910-A as the "flush" mount (because the microphone array sits flush against the ceiling grid) to distinguish it from the "flange" mount.

What makes the fitment issue worse, according to ClearOne, is the fact that $^{15}/_{16}$-inch ceiling grids are substantially more common than $^{9}/_{16}$-inch grids in commercial buildings.[6] *See* Fry Decl. ¶¶ 7, 10-13 ($^{15}/_{16}$-inch grid is the "most commonly installed" size of ceiling grid in commercial buildings generally, making up approximately 67% of enterprise/legal/financial spaces and at least 85% of education/healthcare/government spaces); R. 781, Senkowski Decl. ¶¶ 13-15 ($^{15}/_{16}$-inch grids are present in approximately 50% of enterprise/legal/financial/government spaces and at least 90% of education/healthcare spaces); R. 782, Gordon Decl. ¶¶ 11-14 ($^{15}/_{16}$-inch grids are present in approximately 75% of enterprise/legal/financial spaces and at least 80% of education/healthcare spaces); R. 783, Wall Decl. ¶¶ 10-13 ($^{15}/_{16}$-inch grids are present in approximately 95% of enterprise/legal/financial spaces and at least 99% of education/healthcare/government spaces). Indeed, ClearOne points out that even Shure's internal communications suggest that at least 50% and as many as 90% of commercial ceiling grids use $^{15}/_{16}$-inch ceiling grids. ClearOne Reply Br., Exhs. 4 (sealed), 7 (sealed). Thus, the MXA910-A fitment issue—which only occurs with $^{15}/_{16}$-inch grids—is not just limited to a select few installations; rather, it is potentially widespread enough to affect the vast majority of MXA910-A installations.

---

[6] Beamforming microphone arrays like the MXA910 models are only installed in commercial spaces, not residential. *See* Fry Decl. ¶ 9.

## 2. Shure's Response to Fitment Issues

Shure, however, denies that flush-mounting is a problem with the MXA910-A. For one, Shure disputes ClearOne's threshold premise that $^{15}/_{16}$-inch grids are more common than $^{9}/_{16}$-inch grids. *See* R. 736, Roy Supp. Report ¶ 82 (sealed). To be clear, Shure's expert, Dr. Kenneth Roy, does not dispute that $^{15}/_{16}$-inch grids are the "most commonly used system for *residential* and commercial applications." *Id.* (emphasis added) (sealed). But the relevant market here, Roy explains, is solely commercial. *Id.* (sealed). And within the commercial market, Roy notes that $^{15}/_{16}$-inch grids are "often the low cost solution," but that when you start to more carefully divide up the commercial market, it turns out that there is actually a "strong preference" for $^{9}/_{16}$-inch grids in the office-building segment in particular. *Id.* In terms of how that preference translates to actual installations, Roy explains that in "Class A" office buildings, $^{9}/_{16}$-inch grids make up 80 to 90% of the ceiling installations. *Id.*

And in any event, the prevalence of $^{15}/_{16}$-inch grids versus $^{9}/_{16}$-inch grids is irrelevant, argues Shure. Shure Sur-Reply Br. at 1. Specifically, the fitment issues with the $^{15}/_{16}$-inch T-bars can easily be avoided if the integrator simply goes through the additional labor of removing one of the T-bars, putting the MXA910-A in the correct flange-mount position, and then replacing the T-bar. Klegon Decl. ¶ 8. Those extra steps allow the microphone board to fit through the T-bar opening in $^{15}/_{16}$-inch T-bar setups, and then the MXA910-A can hang from its flanges as intended.

During the design process, Shure realized that this extra work could "be perceived as less appealing to some" customers. Klegon Decl. ¶ 4 (sealed). But Shure

was supposedly unable to reach a conclusion on the question of "how many potential applications would have $^{15}/_{16}$ inch grids." *Id.* Which is not to say Shure did not try—there are emails suggesting that Shure asked various integrators to "keep tabs on how many grids are ½ versus 1 inch." ClearOne Reply Br., Exh. 6 (sealed). *See also* ClearOne Reply Br., Exh. 7 ("As per your request, we have discussed ceiling grid variations with several of our installers out here and apparently the $^{15}/_{16}$ version makes up the vast majority of [what] is installed in our territory. A couple of [project managers] mentioned 'like 90%' …") (sealed). Ultimately, Shure determined that the tradeoff was worth it: some customers might choose not to buy the MXA910-A given the additional labor requirement for $^{15}/_{16}$-inch grids, but overall, "offering a product that may require minimal additional installation time would not significantly impact sales." Klegon Decl. ¶ 5 (sealed). This particular design of the MXA910-A, where customers would need to do extra labor to flange mount it, would at least give Shure a "fighting chance" in the competitive marketplace. *Id.* ¶ 6 (citing R. 715, ClearOne Br., Exh. H) (sealed). According to Shure, "fighting chance" specifically referred to the idea that at least some, if not most, customers would not be deterred by the additional labor and would opt to buy the MXA910-A for their $^{15}/_{16}$-inch ceiling grids. *Id.* ¶ 6 (sealed).

Indeed, Shure explains, it has been entirely transparent with its customers about the extra labor that will be required. "Customers" in this context refers mainly to professional integrators, who are the ones responsible for installing the microphone arrays into the conference room ceilings of end users; Shure generally does not

interact directly with end users. Klegon Decl. ¶ 11. In any event, here, the MXA910-A user manual, which is available in both print and online, indicates that: "The flange sits on the ceiling grid, and the microphone hangs below it." *Id*. ¶ 7. The same user manual also includes the following instruction: "Depending on the width of the ceiling grid T-bars, you may need to remove or adjust one side's T-bar to install the [MXA910-A]." *Id*. ¶ 8. Similarly, on Shure's website, the Frequently Asked Questions section explains that "[c]eiling grids that use the $^{15}/_{16}$ inch T-Bar are a tight fit and the installer may need to remove the surrounding ceiling tiles to have more flexibility on the grid and be able to press the mic into the desired position." *Id*. ¶ 9. In addition, Shure's shipping announcement for the MXA910-A included the disclaimer that the MXA910-A "is not intended to be flush-mounted as shown above [in a photograph of a flush-mounted ceiling microphone array]." R. 815-5, Shure Sur-Reply Br., Exh. 5. In all of these written communications, Shure did not go so far as to "include a step-by-step process of how to remove the side T-bar of each manufacturer's grid system," but according to Shure, that is because "Shure relies on the integrators and installers to understand the specifics of how to install the product." Klegon Decl. ¶ 9.

In addition to the printed instructions, Shure also allegedly coordinated multiple meetings with its sales representatives (referred to internally as "rep firms") to preview and discuss the additional labor needed to install the MXA910-A in $^{15}/_{16}$-inch ceiling grids. R. 802-3, Shure Sur-Reply Br., Exh. 8 (sealed); R. 802-5, Shure Sur-Reply Br., Exh. 10 (sealed). In particular, Shure apparently instructed its rep firms to let their customers (the integrators) know about the MXA910-A fitment issues so

that nobody would be "blind-sided" during an installation job. Shure Sur-Reply Br., Exh. 10 (sealed). Shure claims that it also "held webinars" about the MXA910-A. R. 802-12, Shure Sur-Reply Br., Exh. 18 (email about "upcoming webinar") (sealed).

In short, Shure believes that professional installers tend to seek out and follow manufacturer instructions. Klegon Decl. ¶¶ 10, 12. And in the context of the MXA910-A, that is precisely what Shure argues that its integrators are doing: they are following Shure's instructions and going through the additional labor required to flange-mount the MXA910-A. *See* Shure Sur-Reply Br., Exhs. 7, 9, and 11 (emails reporting on positive statements from integrators) (sealed). And to the extent that any integrators are put off by that extra labor, they are simply not buying the MXA910-A in the first place. Klegon Decl. ¶ 6 (sealed). But what has never been an option, according to Shure, is incorrect flush mounting. *Id*. ¶ 10 ("[A]t no time did we believe that customers (installers) would install the product incorrectly or contrary to the installation instructions.").

### 3. Customer Experiences

ClearOne disputes all this. For one, ClearOne argues that the flange-mounting process is not as simple as Shure makes it out to be. *See* ClearOne Reply Br., Exh. 7 (email from integrator stating that "it took 2 guys 30 minutes" to install the MXA910-A in a $^{15}/_{16}$-inch grid) (sealed). ClearOne is also adamant that integrators who are put off by the additional labor are not simply forgoing the MXA910-A altogether, as Shure claims, but are instead opting for the less labor-intensive route of simply lowering the MXA910-A into the ceiling grid and flush-mounting it within the drop space. R. 778,

ClearOne Reply Br. at 11. In short, ClearOne maintains that there are still integrators out there who, whether on purpose or inadvertently, continue to install the MXA910-A in the enjoined drop-ceiling configuration—and that Shure allows these installations to happen. In support of this assertion, ClearOne points to its own attempt at an installation, as well as a few examples of Shure customers either having difficulty with the flange-mounting requirements or just flush-mounting the MXA910-A.

### a. ClearOne's Own Installation

First, in December 2019, ClearOne itself tried to install an MXA910-A in its offices, which have the standard 24 x 24-inch ceilings with $^{15}/_{16}$-inch grids. R. 711, Graham Decl. ¶¶ 4-5. ClearOne maintains that it was unable to install the MXA910-A in any way other than the enjoined flush configuration. *Id*. And then, once the MXA910-A was flush-installed, there were "no visible gaps to indicate that this installation is undesired or incorrect." ClearOne Br. at 5 (citing Graham Decl., Exhs. A, B, and C). What is more, ClearOne discovered that when the MXA910-A is installed in flush configuration, the flanges actually have the effect of stabilizing the microphone array in the flush arrangement. ClearOne Br. at 5. Later on, when ClearOne tried to follow the "correct" installation instructions in Shure's instruction manual, it required "significant effort" on ClearOne's part. Graham Decl. ¶¶ 6-9. Specifically, it took ClearOne's Facilities Assistant (who had 1.5 years of experience as a drop-ceiling installer) more than 10 minutes to flange-mount the MXA910-A in the $^{15}/_{16}$-inch ceiling grid. *Id*. ¶ 6. *See also* Graham Decl., Exhs. D-K (video exhibits).

### b. Reddit User

In addition, ClearOne managed to locate a Reddit thread discussing the effects of the preliminary injunction in this case. *See* ClearOne Br., Exh. K. In the thread, one user posted that Shure had just released a new version of the microphone—that is, the MXA910-A—that "does not fall under the remits of the injunction." *Id.* at 1. In response to that post, another user named "mistakenotmy" commented: "I just got a few of those [MXA910-As] in. I have only put one up so far but in the tile location I used, the mic won't actually come through the tile to rest on the lip as pictured. So it is actually flush mounted like the old ones." *Id.* Then, beneath that, another user responded: "That's pretty much the point. The official mounting method causes the mic to hang slightly below the ceiling grid. In reality, the installer can mount them in any way they choose and there's nothing ClearOne can do about it." *Id.*

With authorization from the Court, ClearOne eventually tracked down and deposed the user "mistakenotmy," who turned out to be an Instructional Technology Specialist at Moraine Park Technical College. *See* ClearOne Reply Br., Exh. 17, Dep. Tr. at 12:11-13 (sealed). Specifically, this tech specialist's job involved installing audiovisual equipment in classrooms at the school. *Id.* at 12:14-15. According to the specialist, he had dealt with the MXA910-A before; he described an instance where he installed an MXA910-A in a classroom ceiling, and he "was debating whether to pop [one of the ceiling grid T-bars] out" to mount the microphone the "correct" way, "or just to leave it sitting on the grid, flush." *Id.* at 23:8-16. The tech specialist revealed that he ultimately decided to leave the MXA910-A flush in the grid because

it was "just easier" and still "looked fine." *Id*. at 23:16-18. He also stated that he did not read the instructions that came with the MXA910-A because "it was pretty self-explanatory," and he knew how the "previous version" worked. *Id*. at 26:8-12.

### 4. The MXA910-US

One final piece of background related to the MXA910-A is useful to know. During a March 2020 status hearing, the Court asked Shure why the microphone board of the MXA910-A angled out into the trapezoidal shape, as opposed to just dropping straight down in a vertical line. R. 742 at 9:16-20. Without the outward angling, the MXA910-A would presumably drop through a $^{15}/_{16}$-inch ceiling grid with no extra work and rest on its flanges as intended, thus avoiding the flush-mount issue altogether, as depicted in green in the diagram below:



ClearOne Reply Br. at 4. During the hearing, though, Shure informed the Court that the board was angled outwards because it would require "substantial effort" to reduce the diameter of the board, which in turn would involve repositioning the microphones in the array. R. 742 at 9:21-10:8, 24:10-25:3.

It turns out that Shure's statement to the Court that day was wrong, as Shure itself acknowledges. R. 785, ClearOne Reply Br. at 5 (sealed); Shure Sur-Reply Br. at 12 (sealed). Shure did manage to reduce the diameter of the microphone board without repositioning the microphones. ClearOne Reply Br. at 5 (sealed). This new product was called the MXA910-US, and it was designed to fit (in a flange

configuration) in both $9/16$-inch and $15/16$-inch grids with no additional labor. R. 786, ClearOne Reply Br., Exh. 1 (sealed). Contrary to Shure's March 2020 representations to the Court, Shure had actually been planning the MXA910-US design as early as *December 2019*, before it even released the MXA910-A. ClearOne Reply Br., Exh. 4 at SHURE864002 ("We understand that [the MXA910-A is] an inconvenience to the installer we are working to resolve this … We expect a new universal fitment SKU solution in the April/May timeframe") (sealed).

## C. The MXA910-60CM

In addition to the MXA910-A, ClearOne also alleges that Shure has allowed integrators to flush-mount a different microphone product, the MXA910-60CM. ClearOne Br. at 9. To be clear, the MXA910-60CM is not a "new" product like the MXA910-A; it was already being marketed at the time that the MXA910 preliminary injunction was issued. ClearOne Br., Exh. L. But according to ClearOne, the MXA910-60CM is also capable of being flush-mounted in the enjoined configuration. Graham Decl. ¶ 10. As a result, in the August 2019 Order setting the preliminary injunction bond amount, the Court ordered Shure to "prominently include" the following statement in the instruction manuals and user guides for the MXA910-60CM (referred to in the Order as the "European version"): "A federal court has preliminarily found that this product cannot lawfully be used in a drop-ceiling mounted configuration. This includes using adapters of any kind to fit the product into a drop-ceiling mounted configuration." R. 592-1 at 2.

There is no dispute that Shure did include a variation of that statement in the relevant customer communications, but ClearOne now argues that Shure has nonetheless allowed its integrators to continue mounting the MXA910-60CM in a flush configuration. ClearOne Br. at 10. In support of this theory, ClearOne once again managed to locate a relevant Reddit thread where users were discussing ClearOne's patents (in an exceptionally unfavorable light). ClearOne Br., Exh. M. This time, in the comments section, a user with the handle "buschdogg" posted that they had "designed a mounting system that can be used on the MXA910-60CM (UK version) that mounts … flush (I hear that is illegal to install, though..)." *Id*. at 1. What's more, when the user showed the "solution to a Shure rep he said, 'That's actually better than our long term solution.'" *Id*. *See also* ClearOne Reply Br., Exh. 19, DeBusschere Dep. Tr. at 51:10-24 (sealed).

Again, ClearOne eventually tracked down and deposed "buschdogg," who turned out to be a former project engineer named Joshua DeBusschere. DeBusschere Dep. Tr. at 59:22-24 (sealed). DeBusschere worked for Avidex, a large integrator. *Id*. (sealed). During the deposition, DeBusschere confirmed what he had written in his Reddit post. Apparently, in September 2019, his supervisor told him to create a solution to flush-mount the MXA910-60CM, since the MXA910 would no longer be available. R. 787, ClearOne Reply Br., Exh. 21 (sealed). That same day, DeBusschere reached out to a Shure sales representative to ask about the possibility of creating an

adaptor for MXA910-60CM installations.[7] R. 787, ClearOne Reply Br., Exh. 22 (sealed). Instead of replying to the email, the sales representative called DeBusschere on the phone to talk about the MXA910-60CM solution. DeBusschere Dep. Tr. at 116:11-21 (sealed). During the call, the Shure representative did not tell DeBusschere not to make the adaptor; in fact, he "wasn't against us making it. He just didn't want to compromise his position or do anything illegal on his part by recommending them … I could tell he just didn't want to do anything that might get him or Shure in trouble." *Id.* at 119:2-8 (sealed). Later, as referenced in the Reddit post, when DeBusschere came up with the "solution" to mount the MXA910-60CM flush, he showed it to the Shure representative, who said something like, "Wow, that's actually better than our long-term solution." *Id.* at 51:16-24 (sealed). At that point, too, DeBusschere was *not* told that his flush-mounting solution was a violation of any court order or injunction. *Id.* at 52:1-11 (sealed).

### D. The MXA910

Finally, it is worth mentioning one final set of allegations that ClearOne has raised against Shure. Specifically, ClearOne alleges that right after the Court issued the preliminary injunction order but before the order went into effect, Shure encouraged integrators to stock up on as many MXA910s as possible. ClearOne Reply Br. at 13 (sealed). (In balancing the equitable interests, the order exempted from the injunction any MXA910s that had already been installed. *See* Order at 64.) Thus, on

---

[7]Specifically, DeBusschere emailed a representative from The Farm AV, which was one of the "rep firms" doing sales for Shure. *See* Shure Sur-Reply Br., Exh. 10 at SHURE864019 (sealed).

August 6, 2019 the day after the order was issued, Shure reached out to several integrators to let them know of an upcoming "shortage in production" of the MXA910s. R. 787, ClearOne Reply Br., Exh. 20 (sealed). According to an internal email from Avidex (an integrator), Shure had "notified their top partners to start stocking inventory." *Id.* (sealed) In that same email chain, another Avidex employee replied: "There will probably be a shortage of MXA910 ceiling pieces as the law suit will most likely hold Shure from selling them. … The idea is to get them into stock now." *Id.* (sealed). Indeed, Shure apparently managed to sell out its inventory over the next few days. R. 787, ClearOne Reply Br., Exh. 28 (sealed). On this point, ClearOne points to an August 8 internal email from McFadden (a sales firm), summarizing notes from a call with Shure that was "[p]robably not to be shared." *Id.* (sealed). Apparently, during the call, Shure told McFadden to "NOT tell people to return product. If they have stock, they are sitting on gold. All are sold out, they sold 800 of them in the last 2-3 days." *Id.* (capitalization in original) (sealed). The next day, on August 9, Shure filed a brief with the Court arguing that a recall of uninstalled MXA910s in the hands of integrators was unnecessary, because "[i]t is not the nature of this market for integrators to hold or warehouse products, and certainly not expensive ones like the MXA910." R. 575 at 12.

## II. Analysis

Based on all of this, ClearOne now argues that Shure has violated the court order enjoining Shure from "manufacturing, marketing, and selling the MXA910 to be used in its drop-ceiling mounting configuration, including marketing and selling

the MXA910 in a way that encourages or allows integrators to install it in a drop-ceiling mounting configuration." Order at 64. Shure, of course, maintains that the MXA910-A is a completely different product from the MXA910. According to Shure, as long as the new product is suspended from its flanges as designed, then there is no Limitation 5 problem; the MXA910-A microphone array hangs entirely *outside* of the drop space of the ceiling grid. (Recall that Limitation 5 of Claim 1 requires that "all or part of" the microphone array be installed in the drop space of a ceiling grid.) ClearOne, however, has a different view. Even though Shure has purported to design a new product in the MXA910-A by adding two flanges to a slightly smaller microphone array, ClearOne contends that none of those design changes mean anything because Shure's customers are incentivized by Shure's design choices to ignore the flanges and continue to install the MXA910-A in a flush configuration inside ceiling grids. In other words, Shure *allows* integrators to install the MXA910-A in a flush-mount fashion.

This motion essentially boils down to the factual question of whether or not Shure "allows" integrators to install its speaker products (including the MXA910-A and the MXA910-60CM) in a drop-ceiling mounting configuration in violation of the preliminary injunction order. For the reasons explained below, the record is clear and convincing that Shure—through its design choices—violated the injunction order by allowing integrators to install the MXA910-A in the enjoined flush configuration. The record is also clear as to the MXA910-60CM, but in an abundance of caution, the

Court will refrain from granting that aspect of the contempt motion to allow for additional discovery.

## A. Legal Standard for Contempt

In general, a contempt finding requires "clear and convincing evidence that the opposing party violated a court order." *Goluba v. Sch. Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995) (cleaned up).[8] There is no need to "find that the violation was willful," as long as the party "has not been reasonably diligent and energetic in attempting to accomplish what was ordered." *Id.* (cleaned up). At the same time, the Court bears in mind that contempt is a "severe remedy that should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801-02 (2019).

In the specific context of evaluating whether an injunction against patent infringement has been violated by a newly designed product, ClearOne must additionally satisfy the two-step test articulated by the Federal Circuit in *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869 (Fed. Cir. 2011) (*en banc*). First, ClearOne must show that "the newly accused product is not more than colorably different from the product found to infringe." *Id.* at 882. The colorable-difference analysis must focus on "those aspects of the accused product that were previously alleged to be, and were a basis for, the prior finding of infringement, and the modified features of the newly accused product." *Id.* If the differences are more than colorable, then contempt is "not the

---

[8]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

appropriate remedy," and ClearOne must instead bring a separate claim of infringement based on the new product. *Proveris Sci. Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1371 (Fed. Cir. 2014) (cleaned up). But if the differences are not more than colorable, then the Court proceeds to the second step, which asks whether the newly accused product "in fact infringes the relevant claims." *TiVo*, 646 F.3d. at 883. Here, too, "a lack of intent to violate an injunction alone cannot save an infringer from a finding of contempt." *Id.* at 880.

### B. The MXA910-A

There is no dispute that the MXA910-A contains design elements that were not present in the MXA910: Shure slightly reduced the size of the microphone array board and also added two flanges to the sides of the array to enable flange mounting instead of flush mounting. The question here, though, is whether those design additions make any difference from a functional perspective. Where two products are "functionally identical," a redesigned product is "not more than colorably different." *Proveris*, 739 F.3d at 1371.

ClearOne argues that the MXA910-A is indeed "functionally identical" to the MXA910 because in most MXA910-A installations, Shure's customers are ignoring the flanges and installing the MXA910-A in the exact same flush configuration that they previously used for the MXA910. ClearOne Br. at 12. In support, ClearOne offers several pieces of circumstantial evidence: (1) the fact that $^{15}/_{16}$-inch ceiling grids are more common than $^{9}/_{16}$-inch grids; (2) the relative difficulty of flange-mounting the MXA910-A compared to the relative ease of flush-mounting in those $^{15}/_{16}$-inch grids;

(3) an actual instance of a customer flush-mounting the MXA910-A; (4) the fact that Shure could have designed around the possibility of flush-mounting, which it eventually did via the MXA910-US; and (5) Shure's post-injunction behavior with the MXA910-60CM and MXA910.

Piecing all of this evidence together, the record strongly suggests that the MXA910-A is not colorably different from the MXA910. Yes, Shure added the flanges. But the circumstantial evidence clearly shows that Shure allowed integrators to ignore the flanges and continue to flush mount the microphones. For one, there seems to be no dispute that the MXA910-A is readily *capable* of being flush mounted in a $\frac{15}{16}$-inch ceiling grid. Similarly, Shure does not really offer any evidence to undermine ClearOne's point that it is *harder* to flange-mount the MXA910-A in a $\frac{15}{16}$-inch grid than it is to flush-mount the product. That is, both parties agree that in order to flange-mount the MXA910-A, the installer must go through the extra step of removing part of the ceiling grid in order to arrange the microphone array in the right position. Whether that additional labor is easy or difficult or takes ten minutes or 30 minutes, the point remains that, from a purely relative standpoint, it is much *more* difficult to flange-mount than to flush-mount the MXA910-A. Thus, from a design standpoint, Shure has provided an incentive for integrators to choose the no-effort option of simply lowering the MXA910-A flush against a ceiling grid instead of going through the extra labor of mounting the product by its flanges.

But of course, this flush-mounting issue only comes up with $\frac{15}{16}$-inch ceiling grids and not $\frac{9}{16}$-inch grids. There could be a universe in which every relevant ceiling

has a $9/16$-inch grid, which means that every time an MXA910-A is installed, it hangs from its flanges and thus avoids the drop-space limitation of ClearOne's patent. In that scenario, the MXA910-A would certainly be functionally and thus colorably different from the MXA910. But, as it turns out, the reverse is true. In the relevant market of spaces where MXA910-As are installed—commercial spaces—$15/16$-inch grids are substantially more common than $9/16$-inch grids. Even if Shure's expert, Dr. Roy, is correct about the prevalence of $9/16$-inch grids in "Class A" office buildings, Roy Supp. Report ¶ 82 (sealed), ClearOne has offered substantial evidence that for commercial spaces as a *whole*, $15/16$-inch grids are more common. *See* Fry Decl. ¶¶ 7, 10-13; Senkowski Decl. ¶¶ 13-15; Gordon Decl. ¶¶ 11-14; Wall Decl. ¶¶ 10-13.

Shure, for its part, argues that even if $15/16$-inch ceiling grids are more common compared to $9/16$-inch grids, that fact is irrelevant because there is no basis to assume that the mere presence of a $15/16$-inch grid automatically means the MXA910-A is being installed flush. Shure Sur-Reply at 4. It is true that ClearOne has not provided evidence directly showing that for *every* $15/16$-inch grid out there, a flush installation of an MXA910-A is occurring. But ClearOne *has* provided a substantial amount of circumstantial evidence showing that for every $15/16$-inch grid out there, it would be extremely *easy* for a flush installation of an MXA910-A to occur purely because of the way that the MXA910-A is designed. So, the prevalence of $15/16$-inch grids is relevant because the more $15/16$-inch grids there are, the more likely it is that an integrator installing a MXA910-A will be faced with the choice to flush-mount or flange-mount.

And between that choice, it is in turn more likely that an integrator would choose to flush-mount because it is much easier than flange-mounting.

Indeed, not only did ClearOne point to evidence from customers suggesting that the flange-mounting process is *not* a trivial process, *see* Graham Decl. ¶¶ 4-5; ClearOne Reply Br., Exh. 7 (sealed), but more importantly, ClearOne also managed to identify a concrete example of a customer actually admitting to flush-mounting the MXA910-A, *see* Dep. Tr. at 23:16-20 (sealed); ClearOne Br., Exh. K. To be clear, the Court is not holding Shure in contempt based solely on just this one instance of flush-mounting. Rather, this example is important because it provides extra confirmation of the fitment issue with the $^{15}/_{16}$-inch grids and also makes it much more likely that there are other instances of flush-mounting.

In response to all this, Shure points out that ClearOne's motion focuses solely on *incorrect* installations of the MXA910-A, when the relevant inquiry should be whether the *correct* installation of the MXA910-A is colorably different from the MXA910. Shure Resp. Br. at 12. And Shure argues that even if there are people out there installing the MXA910-A in the enjoined configuration, that does not amount to a violation on Shure's part because the preliminary injunction order does not extend any duty to "police its customers to verify that they follow Shure's installation instructions." *Id.* at 10.

Both of these arguments miss the mark. The issue is with Shure's *own* design choices. Specifically, Shure deliberately chose to design the MXA910-A so that, in order to install it in the majority of ceiling grids, the installer would need to go

26

through the extra labor of removing part of the grid. Shure asserts that it made the "fighting chance" calculation that there would only be two possible outcomes related to the MXA910-A: either integrators are willing to put in a slight amount of extra labor to install the MXA910-A, or integrators will just choose to not buy the product, in which case Shure will simply eat those lost sales. Klegon Decl. ¶¶ 6, 10 (sealed). But this seems disingenuous. Surely, Shure contemplated the third possibility (indeed, probability): that customers would ignore the instructions and simply flush-mount the MXA910-A in the enjoined configuration. Indeed, ClearOne points to evidence that Shure *did* ask integrators to look into the extent of the $^{15}/_{16}$-inch-grid problem and *did* receive word from integrators that flange-mounting was not easy, ClearOne Reply Br., Exh. 7 (sealed). In other words, the relevant inquiry is not so much correct versus incorrect installation, but rather, what would have been the plainly foreseeable result from Shure's perspective? This is not to say that Shure has some affirmative duty to make sure customers and end users are following its instructions and not misusing its products. But Shure *does* have an affirmative duty to not design a product that allows such easy flush-mounting that, in effect, it is no different than the enjoined MXA910. Shure has done just that, and simply adding instructions to the user manual does not insulate Shure from a contempt finding.

To illustrate the point, consider this: if Shure had made no design changes to the original MXA910 and simply added a note in its instruction manual that users should take care not to flush-mount the MXA910, then of course those two products would not be colorably different. Same here. The MXA910-A now has flanges, but

27

from a practical perspective, it is much easier to flush-mount the product than to flange-mount it. Installation instructions and webinars do not change that fact of design. Of course, the other extreme would also be true. If Shure were to design a product that is extremely *difficult* to flush mount—such as the MXA910-US—then of course there would be no basis to find Shure in contempt if an end user moved mountains to design a cumbersome and expensive work-around to continue flush-mounting the product. Here, though, the record evidence shows that the MXA910-A was not colorably different from the MXA910, and mere installation instructions cannot paper over that fact.

What's more, the record suggests that Shure's intentions with the MXA910-A were not fully in the spirit of a good-faith design-around. For one, if Shure were truly willing to give up some sales instead of taking the risk of allowing customers to improperly flush-mount the MXA910-A, then Shure would not have released the MXA910-A at all and instead marketed and waited for the MXA910-US (which would have avoided all of these problems) to come out. ClearOne Reply Br. at 5-6 (sealed). Given the evidence that Shure was already planning the MXA910-US design when it released the MXA910-A, the MXA910-A was from the beginning meant to be a stop-gap measure until Shure could finalize a truly non-infringing product.[9] At the very

---

[9]Shure's counsel maintains that they were not informed of the developments with the MXA910-US until after the March 2020 hearing in which Shure represented to the Court that a drop-down design (like the MXA910-US) would be extremely burdensome and difficult to execute. Shure Sur-Reply Br. at 12 n.10. Unfortunately, that means that Shure either gave dishonest information to counsel or was negligent in the extreme in providing that information, given the intense and widespread attention paid by Shure to the preliminary injunction and the design-around efforts. Also, to the extent that the costs of developing drop-down re-design would have exceeded the calculated bond amount, the solution there would

28

least, the MXA910-US story is additional circumstantial evidence that Shure knew there would be substantial risks of flush-mounting with the MXA910-A—hence why Shure ultimately developed a product that is fully capable of being flush-mounted in both $^9/_{16}$-inch and $^{15}/_{16}$-inch ceiling grids.

There are two more pieces of circumstantial evidence suggesting that Shure did not intend for the MXA910-A to be a good-faith work-around of the preliminary injunction. First, after the order came into effect, the record suggests that Shure allowed at least some integrators to develop adapters to flush-mount the MXA910-60CM, *see* DeBuscherre Dep. Tr. at 51:16-24 (sealed), despite an explicit court order requiring Shure to market the MXA910-60CM to avoid infringement, R. 592-1 at 2. (As explained in more detail below, the Court will allow additional discovery on this point to determine whether an independent court order violation occurred with the MXA910-60CM.)

Second, although ClearOne's initial contempt motion did not address this point, after more discovery, the record now suggests that Shure also took steps to evade the preliminary injunction by quick-selling its existing inventory of the original MXA910s. Remember that the Court crafted a public-interest exemption into the preliminary injunction order for "already installed" products:

> But Shure customers that have *already installed* the MXA910 in a drop-ceiling mounting configuration shall be permitted to continue using their MXA910s in that way, and Shure will be able to continue servicing those *already-installed* products the order would not apply to MXA910s that had already been

---

have been to ask the Court to increase the bond amount—*not* to withhold from the Court the knowledge that that solution, which the Court specifically asked about, was both physically possible and in the process of being developed.

> installed in a flush-configuration, and those products could continue to receive servicing from Shure.

Order at 64 (emphasis added). The idea behind this exemption was to minimize the hardship to Shure's current customers with *already-installed* products. As described earlier, on August 6, 2019—the day after the injunction was entered—Shure allegedly reached out to several integrators to let them know of an upcoming "shortage in production" of the MXA910s. R. 787, ClearOne Reply Br., Exh. 20 (sealed). According to an email of one of those integrators, Shure had "notified their top partners to start stocking inventory," because the lawsuit would probably soon ban further sales of the MXA910. *Id.* (sealed). The sales push apparently worked. According to a sales firm's internal email on August 8, 2019, which summarized notes from a call with Shure that was "[p]robably not to be shared," Shure told McFadden to "NOT tell people to return product. If they have stock, they are sitting on gold. All are sold out, they sold 800 of them in the last 2-3 days." R. 787, ClearOne Reply Br., Exh. 28 (capitalization in original) (sealed). Despite the push for customers to stock up on the MXA910, the next day, on August 9, Shure filed a brief with the Court arguing that a recall of uninstalled MXA910s in the hands of integrators was unnecessary, because "[i]t is not the nature of this market for integrators to hold or warehouse products, and certainly not expensive ones like the MXA910." R. 575 at 12. Yet it appears that Shure was encouraging exactly that.

Having said that, more facts and more briefing are needed on this potential violation of the preliminary injunction. It is possible that Shure did not do anything wrong: the preliminary injunction order did ask the parties to brief the bond amount

"*before the preliminary injunction goes into effect*," Order at 64 (emphasis added), which suggests that the preliminary injunction was not in effect at the time that the order was *issued*. In hindsight, maybe the Court should have foreseen this contingency (of Shure pushing hard to sell out its inventory before the posting of the bond) by explicitly banning it. But Shure at the least pushed the bounds of the public-interest exemption by deliberately increasing the population of "customers that have already installed the MXA910," Order at 64, to then take advantage of the exemption. Nor did Shure file a motion with the Court to clarify whether Shure could rapidly sell off its inventory before the posting of the bond. And Shure might have crossed a line when it represented to the Court that a recall was not necessary because integrators do not warehouse MXA910s—immediately after pushing for customers to stock up. Also, the record does not reveal whether every MXA910 sold in that time was also *installed* in a flush-mount configuration *prior* to the order coming into effect, or if some integrators, believing themselves to be exempt, felt free to flush-mount the MXA910s even after the bond was posted.

So, there is a possibility that Shure *also* violated the preliminary injunction order through its post-issuance actions, but that answer requires both additional legal and factual development. The Court does recognize that ClearOne's evidence on this point comes mainly from non-party emails provided by an integrator, and perhaps further factual development would tell a different story. For that reason, and because the relevant time period here is truly limited to a few days and a single model, the Court will grant ClearOne's request to take additional discovery on

Shure's post-order marketing of the MXA910. ClearOne Reply Br. at 15. ClearOne may issue discovery requests to Shure and additional non-party discovery as necessary to examine Shure's post-order marketing of the MXA910.

For all the reasons discussed, the record evidence is clear and convincing that Shure violated the August 2019 preliminary injunction order by designing the MXA910-A in a way that allowed integrators to easily flush-mount the product in the enjoined configuration, thus making the MXA910-A not colorably different from the MXA910. What's more, because the MXA910-A could be flush-mounted in the same way as the MXA910, the same infringement of the drop-space limitation (Limitation 5 of Claim 1) occurs when the MXA910-A is installed flush. Going forward, ClearOne is authorized to conduct discovery into the extent and scope of the violation. Specifically, ClearOne may request discovery from Shure, its integrators, and its end users on the questions of how many integrators flush-mounted the MXA910-A and the extent of Shure's knowledge of those installations.

### C. The MXA910-60CM

Turning to the MXA910-60CM, ClearOne has also put forth a *prima facie* case that Shure violated the August 2019 preliminary injunction bond order, in which the Court required Shure to add in some language to its user guides warning customers not to flush-mount the MXA910-60CM. R. 592-1 at 2. But because the parties overall devoted substantially less briefing to this argument, the Court will enter and continue this part of the motion to allow further discovery.

To be clear, because the MXA910-60CM is not a new product, the inquiry in this context is simply whether there is clear and convincing evidence that Shure has violated the court order, *Goluba*, 45 F.3d at 1037, and not whether the MXA910-60CM is colorably different from the MXA910 under *Tivo*. Here, ClearOne argues that, despite nominally including the required language in the user guides, Shure continues to allow and perhaps even encourage its customers to mount the MXA910-60CM flush. ClearOne Br. at 10; ClearOne Br., Exh. M at 1. Shure, for its part, asserts that it has already complied fully with the court order by adding the required language in its user guides. Shure Resp. Br. at 11. Beyond that, Shure argues that it has no duty to police the behavior of third-parties who choose to ignore the instructions. *Id.* at 10-11. Again, the Court disagrees. It is true that the order does not explicitly require Shure to "police" third-party behavior to make sure no violations are happening. But the order does "require that Shure market the [MXA910-60CM] to avoid infringing in concert with integrators and installers." R. 592-1 at 2. A Shure sales representative telling an integrator that the integrator's self-created flush-mounting system is "actually better than our long-term solution" does not count as Shure marketing the product to "avoid" infringement. *See* DeBuscherre Dep. Tr. at 51:16-24 (sealed). *See also id.* at 52:1-4 ("Q. And did he then say, Hey, you can't do that, that's against the terms of the injunction? A. No.") (sealed). It goes without saying that the Court in its Order did not mean: "Make sure to insert this written notice against flush-mounting in your user guide, but after that, feel free to look the other way when a customer tells you that they are still flush-mounting." Finally,

there is at least some suggestion that the continued flush-mounting issue is not limited to this one integrator. *Id.* at 283:7-284:11 ("I think that unless specifically told they absolutely couldn't do this, I think that our installers would likely— probably put it flush mount, because that's what they're used to doing.") (sealed).

Having said that, given how demanding the clear-and-convincing standard is, the Court will not hold Shure in contempt—at this point—based on what is really one example (albeit a strong one) from a third-party integrator reporting on what a Shure representative allegedly said. ClearOne is, however, allowed to take additional discovery from both integrators and end users (as well as from Shure itself) into how the MXA910-60CM is marketed and installed. *See* ClearOne Reply Br. at 15.

### III. Conclusion

ClearOne's motion to hold Shure in contempt is granted in part and entered and continued in part to determine the scope of the violation and potential relief. ClearOne's request for leave to conduct additional discovery is granted in part and denied in part. Specifically, Shure has violated the preliminary injunction order and is found in contempt because it designed the MXA910-A in such a way that allows it to be easily installed flush in most ceiling grids. Shure shall no longer manufacture, market, or sell the MXA910-A (to the extent that it still has any MXA910-As to sell).

Going forward, ClearOne is now entitled to take discovery, including from integrators and end users, into how widespread the violation is and what would be the appropriate relief arising from the violation. As for the MXA910-60CM, the record also strongly suggests (but not yet to the level of clear-and-convincing evidence) that

Shure violated the court order governing that model. So, out of an abundance of caution, the Court will enter and continue the contempt motion as to the MXA910-60CM to allow for more discovery.

To sum up, ClearOne is authorized to take discovery from Shure, its integrators, and its end users on: (1) how many MXA910-As have been installed in the enjoined flush configuration; (2) how many MXA910-60CMs have been installed in the enjoined flush configuration, and the extent of Shure's knowledge of those installations; and (3) what, if anything, Shure did with the MXA910 inventory, including trying to sell it, in the days immediately after the preliminary injunction order was issued but before it took effect, and whether any of those units were ultimately flush-mounted after the Order took effect. For now, the request to conduct discovery related to the MXA910-US is denied. The parties shall confer on a proposed discovery schedule and file a proposed schedule on or before September 14, 2020. After discovery is completed, the parties will have a chance to supplement the contempt briefing with any new evidence obtained during this next round of discovery. To track the discovery schedule only (no appearance is required, the case will not be called), a status hearing is set for September 25, 2020, at 8:30 a.m. (with the other tracking status of October 30, 2020, to remain on the books).

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 1, 2020